# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS, *et al.* | **CV 16-21-GF-BMM** |
| Plaintiffs, | |
| vs. | **OPINION AND ORDER** |
| U.S. BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of the Interior, *et al.* | |
| Defendants. | |

## I. Background

Plaintiffs Western Organization of Resource Councils, Montana Environmental Information Center, Powder River Basin Resource Council, Northern Plains Resource Council, Sierra Club, and Natural Resources Defense Council (collectively "Plaintiffs") have filed six claims under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h, and the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706. (Doc. 1 at 3; Doc. 24 at 7.) Plaintiffs filed these claims against the United States Bureau of Land Management (the "BLM"), Sally Jewell in her official capacity as Secretary of the United States Department of the Interior ("DOI"), Neil Kornze in his official

capacity as Director of the BLM, and Janice Schneider in her capacity as Assistant Secretary of Land and Minerals Management of DOI (collectively "Federal Defendants"). *Id.*

Plaintiffs challenge Federal Defendants' approval of Resource Management Plans ("RMPs") for two adjacent field offices in the Powder River Basin: the Miles City Field Office in Montana and the Buffalo Field Office in Wyoming. *Id.* Federal Defendants in Washington, D.C. approved these RMPs, and 10 others, through a single Record of Decision ("ROD"). *Id.*

Federal Defendants moved the Court to dismiss Plaintiffs' Buffalo RMP claims for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1406(a). (Doc. 22.) Federal Defendants request alternatively that the Court sever the Buffalo RMP claims and transfer those claims to the District of Wyoming pursuant to Rule 21 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1404(a). *Id.*

**A. The Federal Land Policy and Management Act and RMPs**

The Federal Land Policy and Management Act of 1976 directs the Secretary of the United States DOI, through the BLM, to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). The BLM accomplishes this directive by developing, maintaining, and revising RMPs. 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future

management actions." 43 C.F.R. §1601.0-2. RMPs establish "[l]and areas for limited, restricted or exclusive use" and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." 43 C.F.R. § 1601.0-5(n)(1)–(2).

The BLM should "coordinate the land use, inventory planning, and management activities" for lands covered by a RMP "with the land use planning and management programs of other federal departments and agencies of the States and local governments within which the lands are located." 43 U.S.C. § 1712(c)(9). The BLM obtains this federal, state, and local cooperation in the RMP process by inviting relevant state and local governments and federally recognized Indian tribes to participate as "cooperating agencies." 43 C.F.R. § 1610.3-1(b). The BLM provides cooperating agencies with "opportunity for review, advice, and suggestion on issues and topics that may affect or influence other agency or other government programs." 43 C.F.R. § 1610.3–1(c).

RMP approval represents a major federal action that significantly affects the quality of the human environment. 43 C.F.R. § 1601.0–6. RMP approval triggers an Environmental Impact Statement ("EIS") under NEPA. *Id*. The EIS and RMP shall be "published in a single document," whenever possible. *Id*. National level policy and procedure provides guidance for RMP development. 43 C.F.R. § 1601.0–4(a). Field Managers prepare RMPs, revisions and amendments to RMPs,

and the related EISs. 43 C.F.R. § 1601.0–4(c). State Directors approve the documents produced by the Field Managers. *Id.*

## B. The RMPs

Defendants Kornze and Schneider signed a single ROD that approved land use plans for the Rocky Mountain Region Greater Sage-Grouse Conservation Strategy on September 21, 2015. (Record of Decision, Doc. 23-1 at 29.) A ROD is a "concise public record" of an agency's decision-making process after completing its environmental analysis. 40 C.F.R. § 1505.2. A ROD must contain the following information:

> (a) State what the decision was.
> (b) Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision and state how those considerations entered into its decision.
> (c) State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation.

*Id.*

The ROD represents the final agency action which is subject to judicial review. *See* 5 U.S.C. § 704. The ROD approved RMP revisions for eight sub-regions and approved RMP amendments for four sub-regions. *Id.* at 3. An RMP

revision affects the "entire plan or major portions of the plan." 43 C.F.R. § 1610.5–6. RMP revisions must comply with all the requirements for approving an original RMP. *Id*. RMP amendments rewrite a more limited part of an existing RMP. 43 C.F.R. § 1610.5–5.

Efforts to conserve the Greater Sage-Grouse prompted the revisions and amendments approved under the ROD. The Approved RMPs for revisions to the eight sub-regions, including Buffalo and Miles City, in fact represent "full scale resource management plan revisions" and "are not limited to [Greater Sage-Grouse] habitat management." (Record of Decision, Doc. 23-1 at 15.)

The sub-regions addressed by the ROD cover millions of acres of federally managed lands in parts of Colorado, Montana, North Dakota, South Dakota, and Wyoming. (Record of Decision, Doc. 23-1 at 11-14.) "Each sub-region prepared its own separate EIS and conducted its own planning with input from local cooperators, stakeholders, and members of the public." *Id*. at 11.

The Buffalo RMP revision covers about 7.4 million acres of federal, state, and private land in north-central Wyoming, along with 4.8 million acres of BLM-administered federal mineral estate. (Buffalo Approved RMP, Doc. 23-2 at 13.) The Miles City RMP covers 2.75 million acres of BLM-administered surface lands and 10.6 million acres of BLM-administered mineral acres in seventeen eastern Montana counties. (Miles City Approved RMP, Doc. 23-5 at 8.)

## C. Plaintiffs' Claims

Plaintiffs assert six causes of action against Federal Defendants. First, Plaintiffs assert that Federal Defendants "failed to consider any reasonable alternatives that would allow for a lesser amount of coal leasing" in both EISs for the Miles City and Buffalo RMPs. (Doc. 1 at 34.) Plaintiffs allege that "the existence of reasonable but unexamined alternatives renders a NEPA analysis inadequate." *Id.*

Second, Plaintiffs assert that Federal Defendants violated NEPA by "failing to consider an alternative requiring reasonable and cost effective mitigation measures to reduce methane and other air emissions from oil and gas development," in both EISs for the Miles City and Buffalo RMPs. *Id.* at 36.

Third, Plaintiffs allege that Federal Defendants "failed entirely to address the foreseeable indirect impacts from downstream combustion of coal, oil, and gas resources leased and developed in the planning areas" in both EISs for the Miles City and Buffalo RMPs, in violation of NEPA. *Id.* at 37-38.

Fourth, Plaintiffs assert that the EISs for the Miles City and Buffalo RMPs "explicitly omit any discussion of the breadth and scale of the impacts" of greenhouse gas emissions under the various alternatives. *Id.* at 39. Plaintiffs further allege that Federal Defendants in both EISs, "failed to employ a social cost of carbon protocol, or any other tools, for assessing the impact of the climate

pollution caused by the production and combustion of the federal coal, or oil and gas resources made available for leasing pursuant to the RMPs" in violation of NEPA. *Id.* at 40.

Fifth, Plaintiffs allege that Federal Defendants "failed to take a hard look at the environmental impacts of the methane pollution that is projected under the plans," in the EISs for both the Miles City and Buffalo RMPs. *Id.* at 41. Plaintiffs assert that Federal Defendants failed "to properly quantify the magnitude of methane pollution from coal, oil, and gas emissions sources in the planning areas, and by using an outdated global warming potential for methane, therefore underestimating the impacts of methane emissions by a factor of four," in violation of NEPA. *Id.*

Sixth, Plaintiffs allege that Federal Defendants, in the EISs for both the Miles City and Buffalo RMPs "failed to consider the cumulative impacts on air resources of all extractive federal mineral development when taken together, by failing to consider that air impacts from oil and gas development are compounded by coal development, and vice versa." *Id.* at 42. Plaintiffs further assert that Federal Defendants "failed to analyze the cumulative impacts of the RMPs when taken together with other actions that could reasonably affect air quality within the planning area," for both EISs. *Id.* at 42-43. Plaintiffs also allege that Federal Defendants "failed to consider the cumulative impacts to groundwater and surface

water (both quality and quantity) from the RMPs together with other energy development in the project areas," for the EISs for both the Miles City and Buffalo RMPs, in violation of NEPA. *Id.* at 43.

Plaintiffs seek to enjoin Federal Defendants from "approving the leasing or development of coal, oil or gas resources in the planning areas pursuant to the Miles City and Buffalo RMPs until Federal Defendants have demonstrated compliance with NEPA and APA." *Id.* Plaintiffs argue that venue for their claims as presented is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the property that is the subject of the action is located in Montana. (Doc. 1 at 8.) Plaintiffs cite the 2.75 million surface acres of public land and 10.6 million acres of subsurface mineral estate administered by the BLM's Miles City Field Office. *Id.*

Plaintiffs further argue that venue is also proper under 28 U.S.C. § 1391(e)(1), because their complaint names officers of the United States in their official capacities, and a substantial part of the events and omissions giving rise to this case occurred in the BLM Miles City Field Office located in Montana. *Id.* Plaintiffs argue that venue is proper with respect to the BLM's Buffalo Field Office in Wyoming because the BLM approved two RMPs through the same ROD. *Id.*

## II. Discussion

Federal Defendants move to dismiss the Buffalo RMP claims for improper venue, or to sever and transfer the Buffalo RMP claims to the District of Wyoming. Federal Defendants' motion forces the Court to confront a novel legal question: whether the Plaintiffs' choice of forum should control venue for claims addressing RMPs of two adjacent and connected areas of land in two different states which the Federal Defendants have chosen to approve together, along with 10 others, in a single ROD.

### A. Venue

Venue is appropriate in a civil action where the defendant is an United States employee or officer in any judicial district in which: (1) a defendant resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property subject to the action is situated, or (3) the plaintiff resides, if the case involves no real property. 28 U.S.C. § 1391(e)(1). The district court shall dismiss or transfer the case where a plaintiff files a case "laying venue in the wrong division or district." 28 U.S.C. § 1406(a).

The plaintiff bears the burden of showing proper venue. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). The plaintiff must establish venue as to each claim. *Martensen v. Koch*, 942 F. Supp. 2d 983, 996 (N.D. Cal. 2013). Typically a court affords great deference to a plaintiff's choice of

forum as long as the forum represents a proper venue. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987); *Anderson v. Thompson*, 634 F. Supp. 1201, 1204 (D. Mont. 1986). Such deference diminishes, however, if "the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or subject matter." *Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968).

Multiple proper venues may exist. *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995). No requirement exists that the chosen venue represents the best choice. *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994). The Court need determine only whether a substantial part of the events giving rise to the claim occurred in the state of the venue. *Woodke*, 70 F.3d at 985. The Court possesses discretion "to dismiss or to transfer venue to a proper court" when appropriate. *Martensen,* 942 F. Supp. 2d at 996.

Challenges to federal agency actions under the APA have forced courts to evaluate proper venue under a variety of circumstances. Plaintiffs typically face a choice in challenges to agency action pursuant to the APA. They may file a challenge in the district where the land affected by the decision is located. *See, e.g., Southern Utah Wilderness Alliance v. Lewis*, 845 F. Supp. 2d 231, 234 (D.D.C. 2012). Plaintiffs also may file a challenge where the federal agency's decision making activities took place, almost always in the District of the District of

Columbia. *See, e.g. Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009). Venue in either forum is typically proper. Motions to transfer from one forum where venue is proper, to another forum where venue is proper, however, frequently occur.

Most cases cited by the parties involve a motion to transfer a case from the District of Columbia to the district where the land is located. The District of Columbia has transferred cases to the home forum in cases such as *Southern Utah Wilderness Alliance*, 845 F. Supp. 2d 231 (D.D.C. 2012), and *Trout Unlimited v. U.S. Dept. of Agriculture*, 944 F. Supp. 13 (D.D.C. 1996). Typically the courts in these cases focus on the idea that matters should be resolved in the "forum where the people whose rights and interests are most affected by the suit are located." *Southern Utah Wilderness Alliance*, 845 F. Supp. 2d at 237.

The District of Columbia also has retained cases in spite of a motion to transfer to the home forum. *See Nat'l Ass'n of Home Builders*, 675 F. Supp. 2d at 179; *Greater Yellowstone Coalition v. Bosworth*, 180 F. Supp. 2d 124, 126 (D.D.C. 2001); and *Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10, 13-14, 16-17 (D.D.C. 2000). Typically the courts in these cases focus on where the decision making primarily took place. *Nat'l Ass'n of Home Builders*, 675 F. Supp. 2d at 179 ("In cases brought under the APA, courts generally focus on where the decision making process occurred to determine where claims arose.").

None of the cases cited by the parties, or discovered by the Court's own research, addresses precisely the circumstances presented here. The Court has reviewed carefully these decisions in an effort to understand the reasoning that may assist in resolving the Federal Defendants' motion.

The key to the Court's determination of whether venue is proper in this case depends on whether the Court considers the claims together as pleaded. If so, venue would be proper because a substantial part of the events giving rise to the claim occurred in Montana. *Woodke*, 70 F.3d at 985. On the other hand, if the Court considers the claims as applying to the Miles City and Buffalo RMPs separately, venue for the Buffalo claims would not be proper. The Court must turn first then to a discussion of severance.

## B. Severance of Claims

Federal Defendants admit that this Court represents an appropriate venue for Plaintiffs' claims that apply to the Miles City RMP revision. (Doc. 23 at 7.) Federal Defendants argue, however, that the Court should dismiss or transfer Plaintiffs' claims related to the Buffalo RMP revision for improper venue because those claims did not arise in Montana. *Id.* at 7-8.

Plaintiffs contend that they present "non-segregable" claims that address both the Miles City and Buffalo RMPs, and that cannot be separated by location. (Doc. 24 at 17.) Plaintiffs characterize their claims as "inextricably and indivisibly

12

bound together." *Id.* at 12. Plaintiffs assert that the Miles City RMP revision and the Buffalo RMP revision both apply to a single "indivisible, geological, hydrological, and ecological entity" known as the Powder River Basin. *Id.* at 8. Plaintiffs also argue that the Federal Defendants' decision to approve the Miles City and Buffalo RMPs under one ROD requires the Court to consider together the RMPs. *Id.* at 13-14.

In order to dismiss or transfer the Buffalo RMP claims, as Federal Defendants request, the Court first must decide whether severance from the Miles City RMP claims proves warranted. Rule 21 allows the Court to "sever any claim against a party." Fed. R. Civ. P. 21. Courts possess broad discretion in this decision. *Id.*; *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1994).

Plaintiffs are not the first litigants to combine into a single complaint a challenge to multiple agency actions. Federal Defendants have brought two similar cases to the Court's attention. Federal Defendants first cited *WildEarth Guardians v. Jewell*, NO 1:15-cv-2026-WJM (D. Colo. June 17, 2016) ("*WildEarth Guardians II*"), during oral arguments on their motion. Federal Defendants also have attached as an exhibit in this case the order in *Western Organization of Resource Councils, v. Clark*, NO. CV 03-70-BLG-RWA (D. Mont. Jan. 13, 2004) ("*WORC*"). (Doc. 23-6). Both cases address claims related to two or more planning documents for activities in two or more states that plaintiffs attempted to challenge

in one case. The courts in each case severed and transferred the claims by location. The Court assesses the reasoning employed in each case.

In *WildEarth Guardians II*, plaintiff challenged the Secretary of Interior's approval of four mining plans that authorized mining of federally-owned coal mines in Colorado, New Mexico, and Wyoming under NEPA. *WildEarth Guardians II* at *1. The plaintiff brought all of the claims in a single complaint in the District of Colorado. The federal respondents sought to sever the claims by location of the mines and to transfer the New Mexico and Wyoming claims to those districts. *Id.*

The Secretary of the Interior separately had approved the four mining plan modifications between November 26, 2013 and April 18, 2015. *Id.* at *2. Approval of a mining plan usually represents the last required regulatory step before mining can take place. *Id.* The four separate approvals of the four mining plans represented "distinct agency actions." *Id.* at *8. A plaintiff may challenge only a final agency action. *Id.*, citing 5 U.S.C. § 704. Each separate approval of the four mining plans constituted a final agency action. *Id.*

The court relied on its prior decision in *WildEarth Guardians v. U.S. Office of Surface Mining Reclamation & Enforcement*, 2014 WL 503635, at *2 (D. Colo. Feb. 7, 2014) ("*WildEarth Guardians I*"), in determining that the claims did not "arise out of the same transaction or occurrence or present some common question

of law or fact such that severance would be improper." *Id.* at *8. The court in *WildEarth Guardians I* explained that the value "in having environmental claims litigated where their impacts resonate most deeply eclipses any alleged judicial economy in lumping together in one suit and one venue various locally charged claims." *WildEarth Guardians I* at *1.

Plaintiff in *WildEarth Guardians II* argued that its petition differed from the previous case because it did not "include any mine-specific claims," but rather alleged "NEPA violations common to all four of the challenged Mining Plans." *WildEarth Guardians II* at *9. Each of the four mining plan approvals constituted distinct agency actions. *Id.* The court reframed the discussion by noting that "the more accurate way to describe Plaintiffs' claims is that *each* of the four Mining Plan approvals violated NEPA in the same or similar ways, not that *all* of the approvals together violated the law." *Id.* at *9-10 (emphasis in original).

The court noted that the plaintiff had drafted the petition to present six claims, each pled as applicable to all four mines, "rather than more candidly presenting twenty-four separate claims." *Id.* The court determined that the drafting decision had not changed the underlying nature of the claims, or the form of judicial review under the APA: "Artful pleading cannot change the nature of the case." *Id.* The court determined that the plaintiff had presented "no reason the interests of justice would be served by having this Court review four separate

records rather than transferring the Wyoming and New Mexico claims for separate review." *Id.*

The court, after also considering the relevant factors for transfer, severed the claims related to each of the four mines in the lawsuit. The court transferred claims related to the mines in New Mexico and Wyoming to those respective districts, pursuant to Federal Rule of Civil Procedure 21 and 28 U.S.C. 1404(a). *Id.* at *16.

The plaintiffs in *WORC* filed a single complaint in the District of Montana to challenge the BLM's failure to prepare a single environmental impact statement for the Powder River Basin regarding the effects of coalbed methane development. (Doc 23-6 at 3.) The BLM conducted separate environmental analyses for Montana and Wyoming. *Id.* The BLM approved a separate ROD for the two separate states. *Id.*

The federal defendants, intervenor-defendant the State of Wyoming, and lessee intervenor-defendants moved the court to dismiss or transfer the Wyoming-based claims of the case to the District of Wyoming. *Id.* at 2. The movants argued that Montana did not qualify as proper venue for those claims. *Id.*

The court largely ignored whether venue would be proper in Montana. *Id.* at 4. The court determined instead that "the interest of justice dictates that those portions of the complaint directly challenging the adequacy and sufficiency of the Wyoming environmental studies and ROD should be heard in Wyoming." *Id.*

The court transferred the claims relating to the Wyoming EIS to the District of Wyoming. *Id.* at 5. The court relied on the proposition that "localized controversies should be decided at home." *Id.* The court acknowledged that the plaintiff's choice of forum generally is "given preference." *Id.* The court noted, however, that "the substantial part of the decision-making underlying the Wyoming ROD occurred in either Wyoming or Washington, D.C., not in Montana." *Id.*

The logic provided in *WildEarth Guardians II* and *WORC* proves only marginally helpful. In both cases, the federal agencies approved separate administrative records by separate final documents. Here the Federal Defendants elected to conduct a region-wide review of sage grouse habitat management on BLM lands. The Federal Defendants also opted to approve the eight RMP revisions and four RMP amendments in a single ROD signed in Washington, D.C. The review covered land and resources in parts of five western states. Further, as compared to *WildEarth Guardians II*, when viewed through the lens of the national sage grouse habitat management review and the single ROD, Plaintiffs' claims seem to "arise from the same transaction or occurrence" and "present a common question of law or fact, such that severance would be improper." *WildEarth Guardians II*, at *8.

The court's logic in *WORC* would indicate that the substantial part of the decision-making in this case occurred in Montana, Wyoming, or Washington, D.C. The BLM conducted environmental analyses in Montana and Wyoming. The BLM reviewed and approved these two environmental analyses in a single ROD issued in Washington, D.C. Under these circumstances, any of these three districts could be considered as an appropriate venue. Plaintiffs have elected to challenge the Buffalo and Miles City RMPs as approved by one ROD in Washington, D.C., in the District of Montana.

Federal Defendants assert that motions to transfer in cases such as this are frequently "determined by weighing a plaintiff's choice of forum against the competing interest in 'having localized controversies decided at home.'" *Ctr. for Biological Diversity & Pac. Env't v. Kempthorne*, No. C-07-0894, 2007 WL 2023515, at *5 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). The Court finds this balancing test helpful for the question of whether to keep plaintiff's claims together as pleaded or to separate them by location for determining venue.

1. Plaintiffs' Choice of Forum

Plaintiff's choice of forum is entitled to deference. *Lou*, 834 F.2d at 739; *Anderson*, 634 F. Supp. at 1204. Plaintiffs allege NEPA violations common to both the Miles City and Buffalo RMP revisions. Plaintiffs' claims reflect the court's

admonishment in *WildEarth Guardians II* that the plaintiffs should have argued that each of the mining plans violated NEPA "in the same or similar ways," not that the plans "together violated the law." *WildEarth Guardians II* at *9-10. The same can be said for Plaintiffs claims here compared to *WORC*. In *WORC*, plaintiffs claimed that the BLM violated NEPA and the APA by not creating one EIS for the Powder River Basin. Plaintiffs instead argue that the same procedural defaults apply to both the Miles City RMP and the Buffalo RMP.

Plaintiffs advance three key arguments to explain why they chose to file their claims the way they did. First is the unique circumstance that the BLM approved both RMPs in the same ROD. Second, judicial economy will be best served by one court hearing the claims as written. Third, keeping the claims together as pleaded will prevent the risk of inconsistent judgments as they argue occurred in *WORC* after the court severed the Montana and Wyoming claims. *See Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007); *BioDiversity Conservation Alliance v. Bureau of Land Management*, 608 F.3d 709 (10th Cir. 2010).

a. One ROD

Plaintiffs argue that the BLM's decision to approve the RMPs for Miles City and Buffalo in a single ROD in Washington, D.C. requires the Court to keep the claims together as pleaded. (Doc. 24 at 14.) Plaintiffs argue that the single ROD

approved in the present case distinguishes it from *WORC* where the federal

defendants had approved two separate RODS. *Id.* at 28. Further, the single ROD at

issue differs from the four separate and distinct mining plan approvals of

*WildEarth Guardians II*. Federal Defendants argue that the single ROD represents

"a distinction without a difference." (Doc. 23 at 22.) Federal Defendants further

argue that this formal approval in one ROD simply represented "a matter of

administrative convenience and efficiency." *Id.* at 20.

A ROD represents a final agency action, which is the only action that

Plaintiffs could challenge here. *See* 5 U.S.C. § 704. The ROD in this case approved

eight RMP revisions and four RMP amendments. These actions cover millions of

acres of land and natural resources in Colorado, North Dakota, and South Dakota,

as well as Montana and Wyoming. (Record of Decision, Doc. 23-1 at 11-14.) Each

sub-region conducted its own environmental analysis, each sub-region received

input from local cooperators, and each sub-region produced its own EIS. *Id.* at 11.

Federal Defendants argue that the "logical extension" of Plaintiffs venue

arguments is that venue in Montana could be appropriate for all RMPs approved

under the ROD, although those RMPs cover lands in parts of five states. (Doc. 23

at 21.) The Court notes, however, that BLM's decision to combine the eight RMP

revisions and four RMP amendments into a single ROD places potential plaintiffs

in a quandary.

A plaintiff with concerns regarding more than a single RMP revision or amendment would be required to bring the claim in the District of Columbia or else face the same dilemma as Plaintiffs. The Federal Defendants would be in a position to dictate a plaintiff's choice of forum and a plaintiff's litigation strategy. A plaintiff would be limited to a single action filed in the District of Columbia— the place where the BLM issued the ROD—or multiple actions filed in multiple venues where each of the challenged RMPs might be located.

The Court agrees that a plaintiff attempting to challenge two distinct RMPs unconnected other than being approved by the same ROD, would present a different question in terms of venue. The Court need not resolve that situation, however, as the Miles City RMP and Buffalo RMP address neighboring jurisdictions that overlap in terms of landscape-level realities. Whether Montana would be a proper venue presents a closer question.

b.  Judicial Economy

Plaintiffs present a compelling argument regarding judicial economy to support keeping the Buffalo and Miles City RMP claims together in one suit in a single venue. Plaintiffs argue that the "considerable overlap and similarity" between the RMPs means that severance will "do little more than burden the federal judiciary with duplicitous litigation," and "dramatically increase judicial costs and waste judicial resources." (Doc. 24 at 14, 8.)

21

Plaintiffs' claims likely will be decided on the administrative record through cross-motions for summary judgment. *See, e.g., S. Utah Wilderness Alliance v. Lewis*, 845 F. Supp. 2d 231, 236-37 (D.D.C. 2012) (noting APA challenge to RMPs likely decided solely on administrative record). Judicial resolution of Plaintiffs' claims would require the Court to consider the process used by each BLM field office to develop each EIS that supports each RMP under NEPA. The claims will be decided on federal law, which the U.S. District Courts of Montana and Wyoming possess equal capacity to do. This Court stands just as capable of assessing the claims that apply to the Buffalo RMP as the District of Wyoming would be, just as the District of Wyoming would be equally capable of resolving Plaintiffs' claims relating to the Miles City RMP.

c. <u>Risk of Inconsistent Judgments</u>

Plaintiffs also offer a compelling argument regarding the risk of inconsistent opinions. Plaintiffs argue that severing the case would "risk dueling, inconsistent opinions in two separate Circuits." (Doc. 24 at 8.) Plaintiffs point to *WORC*, where the court severed the Montana and Wyoming claims. The Ninth Circuit and Tenth Circuit reached different decisions regarding the agency's duty to consider a phased development alternative. *Id.* citing *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007); *BioDiversity Conservation Alliance v. Bureau of Land Management*, 608 F.3d 709 (10th Cir. 2010).

2. Interest in Having Localized Controversies Decided at Home

Broad policy decisions regarding the conservation of the Greater Sage-Grouse likely took place predominantly in Washington, D.C. The Buffalo Field Office developed the Buffalo RMP based on Wyoming lands and resources. The Miles City Field office developed the Miles City RMP based on Montana lands and resources. Local citizens and local cooperating agencies provided input for both RMPs. BLM officials signed the ROD in Washington, D.C. BLM officials approved all of RMP revisions in Washington, D.C.

The parties do not dispute that the District of Wyoming represents an appropriate venue for the Buffalo RMP claims. (Docs. 23 at 23; 24 at 14.) Federal Defendants argue that Wyoming possesses a strong interest in resolving the controversy over the Buffalo RMP claims. (Doc. 23 at 26.) Plaintiffs argue that the case presents questions of national interest. (Doc. 24 at 8.)

Courts have recognized a "local interest in having localized controversies decided at home." *Decker Coal Co.*, 805 F.2d at 843. Federal Defendants argue that the competing "interests of justice [that] are promoted when a localized controversy is resolved in the region it impacts" outweigh any deference to a plaintiff's choice of forum. *W. Watersheds Project v. Pool*, 942 F. Supp. 2d 93, 102 (D.D.C. 2013).

Plaintiffs counter that the "significant transboundary and cumulative environmental impacts to air, water, lands, and climate throughout the Powder River Basin" from coal, oil, and gas development in Wyoming will affect Montana. (Doc. 24 at 19.) Specifically, Plaintiffs assert that "climate pollution originating in Wyoming," will affect Montana. *Id.* at 19-20. Plaintiffs further contend that transportation of Wyoming's mineral development through Montana will pollute the headwaters of the Tongue and Powder Rivers. *Id.* Plaintiffs note the fact that both of these rivers flow north from Wyoming into Montana. *Id.*

Federal Defendants concede that areas outside of Wyoming maintain an interest in the resolution of claims related to the Buffalo RMP. Federal Defendants argue, however, that Wyoming residents maintain a broader interest in the issues as the resolution will directly impact Wyoming residents. (Doc. 23 at 26.)

3. Balancing Deference to Plaintiffs' Choice of Forum with Local Interest

The Court ultimately must exercise its discretion in deciding whether to sever the Buffalo RMP claims and the Miles City RMP claims. Fed. R. Civ. P. 21. The Court sees great benefit in local controversies being decided at home, and this factor might be dispositive in many scenarios. In this case, however, a balancing of the factors tilts slightly in favor of keeping the claims together as pleaded in this Court. The Court owes Plaintiffs choice of forum some level of deference. *Lou*, 834 F.2d at 739; *Anderson*, 634 F. Supp. at 1204.

Plaintiffs have pleaded their claims jointly for a number of reasons: (1) the RMPs are adjacent areas encompassing two halves of the resource-rich and ecologically important Powder River Basin; (2) the Miles City and Buffalo RMP are connected by the BLM's decision to approve them in a single ROD; (3) hearing arguments that apply to both RMPs in one court serves judicial economy; and (4) keeping the claims together before one court will prevent the risk of inconsistent judgments.

The Court's choice not to exercise its discretion to sever the Buffalo RMP from the Miles City RMP in Plaintiff's claims eliminates the need for the Court to address dismissal or transfer. A substantial part of the events giving rise to the claims occurred in Montana. Montana represents a proper venue for Plaintiff's claims.

## IV. Conclusion and Order

The BLM approved one ROD that encompassed the amendments and revisions to 12 RMPs that covered millions of acres of federally managed lands in five states. The ROD represented the final agency action that triggered the ability of the Plaintiffs to challenge the BLM's decision-making process for developing the Miles City and Buffalo RMP revisions. Although the Miles City and Buffalo field offices separately developed their RMPs for the separate lands in their planning areas, the RMPs remain connected on a landscape level. Plaintiffs'

claims, which address both the Miles City and Buffalo RMPs, can be heard by this Court. These claims, when considered together, demonstrate that a substantial part of the events arose in Montana. Accordingly, venue for Plaintiffs' claims is proper in this Court.

IT IS ORDERED:

1.      Federal Defendants' motion to dismiss Plaintiffs' Buffalo RMP claims (Doc. 22) is DENIED; and

2.      Federal Defendants' motion in the alternative to sever Plaintiffs' Buffalo RMP claims and transfer them to the District of Wyoming (Doc. 22) is DENIED.

DATED this 24th day of January, 2017.

Brian Morris
United States District Court Judge