Laura H. King (MT Bar No. 13574)
Shiloh S. Hernandez (MT Bar No. 9970)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4852
Ph: (406) 204-4861
king@westernlaw.org
hernandez@westernlaw.org

Kyle Tisdel, *pro hac vice* (CO Bar No. 42098)
Western Environmental Law Center
208 Paseo del Pueblo Sur #602
Taos, New Mexico 87571
Ph: (575) 613-8050
tisdel@westernlaw.org

*Counsel for Western Organization of Resource Councils,
Montana Environmental Information Center, Powder River
Basin Resource Council, and Northern Plains Resource Council*

Nathaniel Shoaff, *pro hac vice* (CA Bar No. 256641)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Ph: (415) 977-5610
nathaniel.shoaff@sierraclub.org

*Counsel for Sierra Club*

Sharon Buccino, *pro hac vice* (DC Bar No. 432073)
Alison L. Kelly, *pro hac vice* (DC Bar No. 1003510)
Natural Resources Defense Council
1152 15th Street, NW
Suite 300
Washington, D.C. 20005
Ph: (202) 289-6868
sbuccino@nrdc.org
akelly@nrdc.org

*Counsel for Plaintiff Natural Resources Defense Council*

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS, MONTANA ENVIRONMENTAL INFORMATION CENTER, POWDER RIVER BASIN RESOURCE COUNCIL, NORTHERN PLAINS RESOURCE COUNCIL, SIERRA CLUB, and NATURAL RESOURCES DEFENSE COUNCIL,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of the Interior; RYAN ZINKE, in his official capacity as Secretary of the U.S. Department of the Interior, MICHAEL NEDD, in his official capacity as Acting Director of the Bureau of Land Management; andKATE MACGREGOR, in her official capacity as Acting Assistant Secretary of Land and Minerals Management of the U.S. Department of the Interior,<br><br>Defendants. | Case No. CV-16-21-GF-BMM<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1.      Plaintiffs Western Organization of Resource Councils, Montana

Environmental Information Center, Powder River Basin Resource Council,

Northern Plains Resource Council, Sierra Club, and Natural Resources Defense

Council (collectively, "Citizen Groups" or "Plaintiffs") challenge the U.S. Bureau

of Land Management (BLM), and Ryan Zinke, Michael Nedd, and Kate

MacGregor,[1] in their official capacities (collectively, "Federal Defendants") for

their approval through a *single* Record of Decision (ROD) on September 21,

2015, of Resource Management Plans (RMPs) for two adjacent field offices in

the Powder River Basin: the Miles City Field Office in Montana and the Buffalo

Field Office in Wyoming. BLM's approval of these RMPs violated the National

Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h.

2.      Through its approval of the Miles City RMP, the BLM made

available more than 1.5 million acres of land for federal coal leasing containing

approximately 71 billion tons of coal and 6.6 million acres of land for federal oil

and gas leasing on which BLM projects more than 7,000 federal and nonfederal

wells will be drilled. Through its approval of the Buffalo RMP, BLM made

available more than 500,000 acres of land for coal leasing, on which the BLM

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of the Department of the Interior Ryan Zinke is automatically substituted for former Secretary Sally Jewell, Acting Director of the Bureau of Land Management Michael Nedd is automatically substituted for former Director Neil Kornze, and Kate MacGregor, Acting Assistant Secretary of Land and Minerals Management, is automatically substituted for former Assistant Secretary Janice Schneider.

expects to issue leases for approximately 10.2 billion tons of coal, and 3.3 million acres of land for federal oil and gas leasing on which BLM projects more than 11,000 wells will be drilled. The time horizon for both RMPs is 20 years.

3.     Federal Defendants violated NEPA by failing to prepare adequate environmental impact statements (EISs) addressing the environmental consequences of their decisions in the Miles City and Buffalo RMPs.

4.     The United States has committed to lead toward a clean energy future. In 2009, President Obama announced federal goals of reducing United States greenhouse gas emissions to 17 percent below 2005 levels by 2020. He reiterated this goal in 2010. In June of 2013, the President announced a "Climate Action Plan" that outlined a strategy to cut carbon pollution and transition to sustainable energy sources. The Plan again reiterated the goal to reduce U.S. carbon pollution in the range of 17 percent below 2005 levels by 2020. In a 2014 joint announcement with China, the U.S. pledged to reduce its carbon emissions 26-28 percent below 2005 levels by 2025. In January 2015, the President announced a new goal to cut methane emissions from the oil and gas sector by 40-45 percent below 2012 levels by 2025. On August 3, 2015, the President and the U.S. Environmental Protection Agency (EPA) announced the Clean Power

Plan, which sets standards to reduce carbon dioxide emissions from the electricity sector by 32 percent from 2005 levels by 2030.

5.      The President's actions contributed to the global adoption of the United Nations Framework Convention on Climate Change, Conference of Parties  "Adoption of the Paris Agreement" on December 12, 2015, in which 196 nations of the world, including the United States, agreed to take concrete measures to abate  climate change by reducing global greenhouse gas (GHG) emissions and, among  other things, to "pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels, recognizing that this would significantly reduce the risks and  impacts of climate change."

6.      In spite of America's broad commitment to lead a path towards a clean energy future, BLM made billions of tons of fossil fuels available for leasing and development on our public lands without  acknowledging and evaluating the environmental and human health  impacts—particularly the climate change implications—of its actions.

7.      BLM failed to consider any alternatives that reduce the amount of coal available for leasing or  require cost-effective measures to reduce methane emissions. BLM also failed to  consider the inevitable environmental and health effects of GHG emissions from the production and  combustion of vast amounts of fossil fuels that the RMPs have made available for  development.

**8.** Because of BLM's failure to adequately analyze and disclose the environmental impacts resulting from the Miles City and Buffalo RMPs, the Citizen Groups are compelled to bring this civil action.

## JURISDICTION AND VENUE

**9.** This action arises under NEPA, 42 U.S.C. §§ 4321-4370h, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

**10.** This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action raises a federal question. The Court has authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

**11.** This action reflects an actual, present, and justiciable controversy between Citizen Groups and BLM. Citizen Groups' interests will be adversely affected and irreparably injured if BLM continues to violate NEPA and affirmatively implements the decisions, as alleged herein. These injuries are concrete and particularized and fairly traceable to BLM's challenged decisions, providing the requisite standing in the outcome of this controversy necessary for this Court's jurisdiction.

**12.** The requested relief would redress the actual, concrete injuries to Citizen Groups caused by BLM's failure to comply with duties mandated by NEPA and its implementing regulations.

**13.** The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

**14.** The Citizen Groups have exhausted any and all available and required administrative remedies.

**15.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action—the 2.76 million surface acres of public land and 11 million acres of subsurface mineral estate administered by the BLM's Miles City Field Office—is located in Montana. Venue is also proper under 28 U.S.C. § 1391(e)(1) because officers of the United States are named as defendants in their official capacities, and a substantial part of the events and omissions giving rise to this case occurred in the BLM Miles City Field Office located in Montana. Plaintiffs Western Organization of Resource Councils, Montana Environmental Information Center, and Northern Plains Resource Council reside in Montana. Additionally, Plaintiff Natural Resources Defense Council maintains an office in Bozeman, Montana, and Plaintiff Sierra Club has a Montana Chapter located in Missoula, Montana. Venue is proper with respect to claims related to BLM's Buffalo Field Office in Wyoming because the two RMPs challenged herein were approved by BLM through a single ROD.

**16.** Venue is proper in the Great Falls Division of this Court because

the Miles City Field Office encompasses Daniels, Sheridan, and Valley Counties, which are within the jurisdiction of the Great Falls Division.

## PARTIES

**17.** Plaintiff Western Organization of Resource Councils (WORC) is a non-profit corporation with its principle office in Billings, Montana and additional offices in Washington, D.C. and Montrose, Colorado. WORC is a regional network of grassroots community organizations that includes 39 local chapters and 12,200 members. WORC's mission is to advance the vision of a democratic, sustainable, and just society through community action.

**18.** Plaintiff Montana Environmental Information Center (MEIC) is a nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution.

MEIC and its members have intensive, long-standing recreational, aesthetic, scientific, professional, and spiritual interests in the responsible production and use of energy, the reduction of GHG pollution as a means to ameliorate our climate crisis, and the land, air, water, and communities impacted by fossil fuel development. MEIC members live, work, and recreate in areas that will be adversely impacted by approval of the Miles City and Buffalo RMPs. MEIC brings this action on its own behalf and on behalf of its adversely affected members.

19. Plaintiff Powder River Basin Resource Council (PRBRC) is a nonprofit organization founded in 1973 and located in Sheridan, Wyoming. Powder River Basin Resource Council has approximately 1,000 landowner and citizen members in Wyoming dedicated to the stewardship of Wyoming's water, air, land, and wildlife resources. The organization's many agricultural members ranch and derive a livelihood from the land, many above federal split estate minerals managed by BLM. Others live in, use, and enjoy the communities and landscapes affected by BLM's actions. Powder River Basin Resource Council's mission includes the preservation and enrichment of Wyoming's agricultural heritage and rural lifestyle, the conservation of Wyoming's unique land, mineral, water, and clean air resources consistent with responsible use of those resources to sustain the livelihood of present and future generations, as well as the

education and empowerment of Wyoming's citizens to raise a coherent voice in the decisions that will impact their environment and lifestyle. Powder River Basin Resource Council members live, work, and recreate in areas that will be adversely impacted by approval of the Miles City and Buffalo RMPs. Powder River Basin Resource Council brings this action on its own behalf and on behalf of its adversely affected members.

20. Plaintiff Northern Plains Resource Council (Northern Plains) is a grassroots conservation and family agriculture non-profit organization based in Billings, Montana. Northern Plains organizes Montana citizens to protect water quality, family farms and ranches, and Montana's unique quality of life. Northern Plains is dedicated to providing the information and tools necessary to give citizens an effective voice in decisions that affect their lives. Northern Plains formed in 1972 over the issue of coal strip mining and its impacts on private surface owners who own the land over federal and state mineral reserves as well as the environmental and social impacts of mining and transporting coal. While Northern Plains was founded on coal issues, the group quickly expanded into helping preserve the land, air, and water of its members from similar threats caused by irresponsible oil and gas development. Many of the organization's roughly 3,000 members farm, ranch, and recreate adjacent to or above minerals covered by the Miles City Resource Management Plan, and

their livelihoods depend entirely on clean air and water, a healthy climate, native soils and vegetation, and lands that remain intact. Accordingly, Northern Plains members are adversely affected by approval of the Miles City RMP. Northern Plains brings this action on its own behalf and on behalf of its affected members.

21. The Sierra Club is America's largest grassroots environmental organization, with more than 2 million members and supporters nationwide. In addition to creating opportunities for people of all ages, levels and locations to have meaningful outdoor experiences, the Sierra Club works to safeguard the health of our communities, protect wildlife, and preserve our remaining wild places through grassroots activism, public education, lobbying, and litigation. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club members live, work, and recreate in areas that will be adversely impacted by approval of the Miles City and Buffalo RMPs. Sierra Club's concerns encompass the exploration, enjoyment, and protection of the land and air of Montana and Wyoming. Sierra Club brings this action on its own behalf and on behalf of its adversely affected

members.

22.     Plaintiff Natural Resources Defense Council (NRDC) is a non-profit environmental membership organization that uses law, science, and the support of more than two million members and activists throughout the United States to protect wildlife and wild places and to ensure a safe and healthy environment for all living things. NRDC has a long-established history of working to protect public lands and clean air in Wyoming and Montana and addressing climate change by promoting clean energy and reducing America's reliance on fossil fuels. NRDC's Northern Rockies office is located in Bozeman, Montana. Over 640 of NRDC's members reside in Wyoming, and over 1,600 members reside in Montana. NRDC members use and enjoy public lands in Wyoming and Montana, including the specific lands at issue, for a variety of purposes, including: recreation, solitude, scientific study, and conservation of natural resources. The use and enjoyment of these public lands by NRDC members is adversely affected by the Miles City and Buffalo RMPs. NRDC brings this action on its own behalf and on behalf of its members.

23.     The Citizen Groups and their members have concrete and particularized interests in the public lands and minerals managed by BLM through the Miles City and Buffalo RMPs.

24.     The Citizen Groups' and their members' interests are deeply rooted

in the communities of the American West where the Citizen Groups and their members live, work, and recreate. These interests are also bound to the land, wildlands, air, rivers, streams, habitat, wildlife, topography, and other components of healthy, intact landscapes in the Miles City and Buffalo planning areas—all of which are threatened by fossil fuel development and human-caused climate change. The Citizen Groups and their members use and enjoy these landscapes for hiking, hunting, camping, photography, aesthetic enjoyment, spiritual contemplation, ranching, and other vocational, scientific, and recreational activities. Some of Citizen Groups' members own surface lands overlying federal minerals that are subject to the Miles City and Buffalo RMPs. Citizen Groups and their members intend to continue to use and enjoy lands managed by BLM, and other public lands, wildlands, wildlife habitat, rivers, streams, and healthy environments located in Montana and Wyoming frequently, and on an ongoing basis in the future, including this spring, summer, fall, and winter.

25. The aesthetic, recreational, scientific, educational, religious, and procedural interests of Citizen Groups and their members have been adversely affected and irreparably injured by the process in which BLM approved the Miles City and Buffalo RMPs, and by the resulting RMPs and EISs. The adverse impacts that will result from BLM's processes and decisions threaten actual,

imminent, concrete, and particularized harm to the interests of the Citizen Groups and their members.

**26.** The relief sought would remedy the injuries suffered by the Citizen Groups and their members.

**27.** Federal Defendant U.S. Bureau of Land Management is a Federal agency within the United States Department of the Interior that is responsible for the management of more than 245 million acres of public lands in the United States and nearly 700 million acres of federal subsurface mineral estate.

**28.** Federal Defendant Ryan Zinke is sued in his official capacity as the Secretary of the U.S. Department of the Interior. As Secretary, Mr. Zinke is responsible for managing the public lands and resources, including the public mineral estate, of the United States, including lands and resources in Montana and Wyoming challenged herein, and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

**29.** Federal Defendant Michael Nedd is sued in his official capacity as Acting Director of the Bureau of Land Management. As Acting Director, Mr. Nedd oversees the agency's management of public lands and is responsible for managing public lands under BLM authority, including lands and resources in Montana and Wyoming challenged herein, in accordance with NEPA and other

federal law. Mr. Nedd's predecessor, Neil Kornze, signed the ROD at issue in this case.

30. Federal Defendant Kate MacGregor is sued in her official capacity as Acting Assistant Secretary of Land and Minerals Management of the U.S. Department of the Interior. Ms. MacGregor is responsible for managing public lands under BLM authority, including lands and resources in Montana and Wyoming challenged herein, in accordance with NEPA and other federal law. Ms. MacGregor's predecessor, Janice Schneider signed the ROD at issue in this case.

## STATUTORY BACKGROUND

## I. National Environmental Policy Act

31. "NEPA is our basic national charter for the protection of the environment." 40 C.F.R. § 1500.1(a). NEPA recognizes that "each person should enjoy a healthful environment," and ensures that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," among other policies. 42 U.S.C. § 4331(b).

32. NEPA regulations explain that:

> Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

40 C.F.R. § 1500.1(c).

**33.** "Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2.

**34.** To accomplish this purpose, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, an EIS, must, among other things, describe the "environmental impact of the proposed action," and evaluate alternatives to the proposal. *Id.* § 4332(2)(C)(ii), (iii).

**35.** NEPA also requires that every agency must "study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . ." *Id.* § 4332(E). The alternatives evaluation "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14. It should "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the

decisionmaker and the public." *Id.*

**36.** NEPA regulations direct that BLM should "encourage and facilitate public involvement." *Id.* § 1500.2(d).

## II. **Federal Land Policy Management Act**

**37.** The Federal Land Policy Management Act (FLPMA) instructs the Secretary of the Interior to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a).

**38.** "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id.* § 1702(c).

**39.** FLPMA also requires that:

> [p]ublic lands be managed in a manner that will protect the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

*Id.* § 1701(a)(8).

**40.** BLM must "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id.* §

1712.

**41.** BLM is also required to "take any action necessary to prevent unnecessary or undue degradation of the lands" and "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." *Id.* § 1732(b), (d)(2)(A).

## III. Mineral Leasing Act

**42.** Under the Mineral Leasing Act of 1920, as amended, the Secretary of the Interior is responsible for managing and overseeing mineral development on the public lands, not only to ensure safe and fair development of the mineral resource, but also to "safeguard[] . . . the public welfare." 30 U.S.C. § 187.

**43.** The Department of the Interior has discretion to determine where, when, and under what terms and conditions mineral development should occur. 43 C.F.R. § 3101.1-2. The grant of rights in a federal mineral lease is subject to a number of reservations of authority to the federal government, including reasonable measures concerning the timing, pace, and scale of development. *Id.*

## IV. Administrative Procedure Act

**45.** The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no

other adequate remedy in a court." *Id.*

46.     Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." *Id.* § 706(2)(B)-(F).

## STATEMENT OF FACTS

## I.     <u>Background of Planning Decisions</u>

47.     The Miles City planning area covers 25.8 million acres of federal, state, and private lands. Of the total area, there are 2.75 million federal surface acres and 10.6 million acres of federal minerals in Carter, Custer, Daniels, Dawson, Fallon, Garfield, McCone, Powder River, Prairie, Richland, Roosevelt, Rosebud, Sheridan, Treasure, Wibaux, and portions of Big Horn and Valley counties in eastern Montana.

48.     The adjacent Buffalo planning area covers 7.4 million acres of federal, state, and private lands. Of the total area, there are 780,000 federal surface acres and 4.8 million acres of federal minerals in Campbell, Johnson, and Sheridan counties in northeastern Wyoming.

49.     Together, the contiguous Miles City and Buffalo planning areas compose the northern and southern portions of a broader region known as the

Powder River Basin, an area of stark beauty with rolling grasslands, badlands, abundant wildlife, and remote wilderness. The Powder River Basin is also one of our nation's most prolific energy producing regions and is the largest coal producing region in the United States, accounting for nearly 40% of all domestic production. The Powder River Basin also produces significant amounts of natural gas and oil, about 1% and 1.3% of total U.S. natural gas and oil production, respectively.

**50.** The responsibility of BLM, through development of an RMP, is to balance the use of these public lands and minerals through its multiple use mandate, to prevent unnecessary and undue degradation, and to minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values.

**51.** The RMPs serve as blueprints guiding how the BLM will manage public land and minerals over a period of time. RMPs establish guidelines for future management actions and subsequent site-specific implementation decisions, the basis for which is the detailed "hard look" at the direct, indirect, and cumulative impacts of various alternatives in the corresponding EISs.

**52.** BLM initiated the RMP/EIS process in 2005 for the Miles City Field Office, and in 2008 for the Buffalo Field Office. Both processes included scoping meetings, public meetings, and comment periods on draft and final EISs. The

Citizen Groups participated extensively at all stages of development for each RMP.

**53.** On September 21, 2015, the BLM signed a *single* Record of Decision that included the Miles City and Buffalo Field Office RMPs, as well as other RMPs in the Rocky Mountain region.

**54.** Through the Miles City RMP, BLM makes available more than 1.5 million acres of land for coal leasing, containing approximately 71 billion tons of federal coal, of which BLM estimates that industry would produce over 900 million tons of coal during the planning period.

**55.** Through the Miles City RMP, the BLM makes available more than 4.9 million acres of land for oil and gas leasing, on which BLM projects more than 7,000 federal and nonfederal wells will be drilled.

**56.** Through the Buffalo RMP, the BLM makes available more than 500,000 acres of land for coal leasing, containing approximately 46 billion tons of federal coal, of which the BLM expects to issue leases for approximately 10.2 billion tons of coal.

**57.** Through the Buffalo RMP, the BLM makes available more than 3.3 million acres of land for oil and gas leasing, on which BLM projects more than 11,000 federal and nonfederal wells will be drilled.

**58.** Together, the Miles City and Buffalo RMPs make available for fossil

fuel extraction over 115 billion tons of federal coal and project that over 18,000 oil and gas wells would be drilled within approximately 10 million acres of our public lands in the Powder River Basin.

59. Energy development in the project areas includes coal, coalbed methane, horizontal oil, and uranium.

## II. Background on Climate Change

60. As of October 2015, the Earth had warmed by about 1.7 degrees Fahrenheit since 1880. Evidence shows that recent global warming is primarily a result of GHG emissions generated from human activities.

61. Changing the average global temperature by even a degree or two can lead to serious consequences around the globe, including reductions in crop yields, increases in rainfall and flooding, increases in hurricanes and typhoons, decreases in snowpack and stream flows, increases in wildfires, and rising sea levels. In the long term, if emissions continue to rise, climate change threatens the flooding of coastal cities, the mass extinction of plants and animals, the destabilization of governments, and refugee crises.

62. It is not too late for the United States government to take action to significantly lower the risk of much greater warming and climate disruption, as the Nation's international and domestic commitments demonstrate.

63. Carbon dioxide is one of a suite of greenhouse gases that

cause climate change. It is the primary GHG emitted by human activities.

64.     The EPA estimates that total annual carbon dioxide emissions from all sources in the United States exceed 5 billion metric tons.

65.     Potential climate impacts in the planning areas at issue include altered precipitation patterns and increased temperatures, drought, and wildfire.

## III.     Environmental Impacts of Coal Mining

66.     The Miles City and Buffalo planning areas compose the northern and southern portions, respectively, of the Powder River Basin, which is underlain by some of the largest deposits of sub-bituminous coal in the world. The Powder River Basin is the largest coal-producing region in the United States.

67.     The United States Geological Survey estimates that the Powder River Basin contains approximately 1 trillion tons of in-place coal resources, including 16 billion tons of coal considered recoverable under current economic conditions.

68.     The majority of the coal activity within the Wyoming portion of the Powder River Basin lies within the Buffalo planning area, which is responsible for over 80 percent of all coal mined on federal lands in the United States.

**69.** In the Buffalo RMP, BLM anticipates that an estimated 9-12 billion tons of federal coal will be mined during the 20-year planning period. All alternatives considered in the Buffalo RMP/EIS make approximately 46 billion tons of coal available for leasing.

**70.** In the Miles City RMP, BLM anticipates that over 900 million tons of federal coal will be mined during the 20-year planning period. All alternatives considered in the Miles City RMP/EIS make approximately 71 billion tons of coal available for leasing.

**71.** On January 15, 2016, the Secretary of the Department of the Interior issued an order requiring a programmatic environmental review of federal coal and placing a moratorium on new federal coal leases and lease modifications while the review was completed. *See* Secretarial Order No. 3338, Discretionary Programmatic Environmental Impact Statement to Modernize the Federal Coal Program (Jan. 15, 2016) ("Secretarial Order 3338"). However, on March 29, 2017, Secretary of the Interior Ryan Zinke issued Secretarial Order 3348 reversing the prior administration's Secretarial Order No. 3338. *See* Secretarial Order 3348, Concerning the Federal Coal Moratorium (Mar. 29, 2017) ("Secretarial Order 3348"). Thus, there is currently no moratorium on new coal leases or lease modifications.

**72.** Currently, there are lease and lease modification applications

pending for the Decker, Spring Creek, and Rosebud Mines in the Miles City

Field Office, and for the Antelope, Black Thunder, Buckskin, Cordero Rojo, and

Bell Ayr Mines in the Buffalo Field Office.

**73.**     Twelve mines currently operate in the Buffalo planning area. They

produced over 360 million tons of coal in 2015. Four mines operate in the Miles

City planning area, which together produce over 35 million tons of coal

annually.  Adverse effects from ongoing production at these mines include air

emissions,  water pollution, soil erosion, dust, noise, impacts to wildlife, and

reduced areas  available for livestock grazing.

**74.**     The resulting impacts from the pending applications for leases and

lease modifications, as well as the impacts resulting from the production and

combustion of  coal from ongoing development activities in the Powder River

Basin, have and will  continue to harm Citizen Groups and their members.

**75.**     Sub-bituminous coal like that underlying the Powder River Basin is

used almost exclusively to fuel power plants to generate electricity. Virtually all

coal mined from the Powder River Basin, including the coal in the Miles City

and  Buffalo planning areas, is burned to generate electricity.

**76.**     Coal-fired power plants are the largest single source of carbon

dioxide  in the country, responsible for 32 percent of all carbon dioxide emissions

nationwide.

**77.** Together, the leasing, mining, and burning of the federal coal BLM expects industry to produce under the Miles City and Buffalo RMPs during the planning period would emit over 17 billion tons of carbon dioxide pollution, which constitutes nearly four times the current annual carbon dioxide emissions of the United States. Combustion of the 117 billion tons of federal coal made available for leasing in the Miles City and Buffalo RMPs would emit over 180 billion tons of carbon dioxide, which is over 36 times the annual carbon dioxide emissions of the United States at current rates.

**78.** In addition to carbon dioxide, coal combustion releases numerous harmful and toxic pollutants, including nitrogen oxides (NOx), sulfur dioxide (SO$_2$), particulate matter (PM), mercury, arsenic, and lead. Coal combustion in the United States sickens hundreds of thousands of people and causes over ten-thousand deaths annually. The externalized costs of coal pollution in the United States have been estimated at $175 to $860 billion annually.

**79.** Coal mining has adverse effects on human health and the environment. Coal mining generates SO$_2$ and NOx. These pollutants have respiratory health impacts. They are also precursors to the formation of fine particulate matter, which also impacts respiratory health. In addition, in the presence of sunlight and volatile organic compounds, NOx undergoes a chemical reaction in the atmosphere to form ozone, which has been associated

with asthma.

80.    Coal mining adversely affects the quality and quantity of water resources. Coal seams in the Powder River Basin are often saturated and function as aquifers, providing some of the highest quality groundwater in the region, which is used for drinking and watering stock. Coal mining destroys these aquifers, dewaters streams that rely on baseflow from the coal aquifers, and discharges polluted mine water to surface waters located throughout the Powder River Basin.

81.    According to the EPA, coal mining is a major source of methane emissions. Methane is a potent greenhouse gas. BLM estimates that between 487,824 and 501,211 tons of methane per year would be released from all activities within the Buffalo planning area, approximately 90% of which would come from coal mining.

## III.    Environmental Impacts of Oil and Gas Production

82.    BLM anticipates that large quantities of oil and natural gas will be produced in the Miles City and Buffalo planning areas. In the Buffalo RMP, BLM projects that 136.5 million barrels of oil and 2,408.9 billion cubic feet of natural gas will be produced from new wells on federal, state, and privately-owned surface between 2009 and 2028. In the Buffalo planning area, as of 2008, there were 28,840 active oil and gas wells, including 11,034 federally administered

wells. BLM projects that during the planning period, 11,356 new wells will be drilled in the Buffalo planning area on federal, state, and privately-owned surface. In the Miles City RMP, BLM projects production levels of 5.9 million barrels of oil and 7.9 billion cubic feet of natural gas annually from the planning area, or approximately 118 million barrels of oil and 158 billion cubic feet of natural gas over the 20-year planning period. In the Miles City planning area, there are currently 6,024 active oil and gas wells, including 1,767 federally administered wells. BLM projects that during the 20-year planning period between 2011 and 2030, 7,524 new wells will be drilled in the Miles City planning area, of which 1,699 would be federally administered wells.

**83.** Oil and gas drilling, production, transmission, and processing result in emissions of methane, hazardous air pollutants, particulates, nitrogen oxides, and volatile organic chemicals.

**84.** Nitrogen oxide and volatile organic chemical emissions from oil and gas activities are major contributors to ground-level ozone formation.

**85.** Ground-level ozone is linked to health effects including premature mortality for adults and infants; cardiovascular morbidity, such as heart attacks; and respiratory morbidity, such as asthma attacks and acute and chronic bronchitis. These impacts result in increased hospital and ER visits, lost work and school days, and restricted activity days.

**86.**     Ozone negatively impacts agricultural productivity.

**87.**     Hazardous air pollutants associated with oil and gas production include benzene, toluene, ethylbenzene, and xylene. These hazardous air pollutants are linked to cancer, neurological, cardiovascular, liver, kidney, and respiratory effects as well as effects on the immune and reproductive systems.

**88.**     Impacts from high levels of air pollutants from concentrated oil and gas activity can be magnified due to weather conditions or topography.

**89.**     Air pollution, including $SO_2$, NOx, and particulates contribute to regional haze and visibility impairment in Class I air quality areas.

**90.**     Oil and gas production is one of the largest sources of methane emissions in the United States. Methane is the second most prevalent greenhouse gas, after carbon dioxide. Although an emissions leak rate is not disclosed in the Miles City and Buffalo RMP/EISs, the BLM often assumes an emissions leak rate as low as 1 percent of total production. The U.S. Environmental Protection Agency estimates a nation-wide leak rate of approximately 1.5 percent of production but this is likely an underestimate. Recent scientific studies have shown that actual nationwide emissions may be twice as high as EPA's estimates, and may even be higher. Emissions can also vary significantly by location, meaning that local or regional emissions can be much higher than the national average. For example, a 2014 study of the Denver-Julesberg Basin found emissions rates of around 6%, and a 2013

study of the Uintah Basin found emissions rates of around 12%.

91.     BLM estimates that between 2,452 and 2,831 tons of methane per year would be released from oil and gas wells and associated equipment within the Buffalo Planning area. While the BLM identifies the sources it considered in its oil and gas methane emission estimates, the agency does not explain how it arrived at estimates for each source, ignores some significant sources altogether, and projects that no emissions will be released from other sources. Also, because factors specific to a particular basin or production area can result in substantially different emissions rates, disclosure of emissions estimates—at a basin level—is fundamental to the assumptions made, analysis provided, and alternatives considered. It is crucial that the BLM disclose the methodology it used to calculate the estimated methane emissions from the Buffalo Planning area so that those calculations can be independently evaluated.

92.     The most recent report, and best available science, of the Intergovernmental Panel on Climate Change ("IPCC") estimates that as a climate pollutant, methane from fossil fuel sources is 87 times more potent than carbon dioxide over a 20-year period and 36 times more potent over a 100-year period. In both the Miles City and Buffalo RMP/EISs, the BLM assumes that methane is 21 times as potent as carbon dioxide, using a 100-year time horizon for calculating the total amount of carbon dioxide equivalent, or $CO_2e$, from project

activities. BLM not only underestimates the total number of tons of methane that will be emitted under the RMPs, but also underestimates the impacts that each ton of methane will have. BLM's reliance on the "global warming potential" of 21 is based on a now twice-outdated IPCC report from 1996. The IPCC first revised the 100-year estimate in 2007, to 25. This estimate was officially adopted by the EPA for GHG reporting requirements in 2013. That same year, however, the IPCC provided the now current, and best available, global warming potential values of 36 (100-year) and 87 (20-year).

93.     Here, in light of the Buffalo RMP's 20-year planning horizon, BLM should have used the updated global warming potential of 87 for the 20-year time horizon to estimate $CO_2e$, in addition to the updated global warming potential for the 100-year time horizon. Using the most current 20-year global warming potential of 87, and based on the FEIS's estimate of annual cumulative methane emissions for activities in the Buffalo Planning Area of 501,211 tons/year, the annual methane released from activities in the Buffalo planning area is equivalent to 43,605,357 tons/year of $CO_2e$, equivalent to the annual emissions of 12 coal-fired plants.

94.     BLM estimates that 3,267 tons of methane per year would be released from activities in the Miles City planning area. Again, the BLM uses the outdated assumption that methane is 21 times as potent as carbon dioxide

over a 100-year time horizon, fails to quantify methane's impact over a 20-year time horizon, and fails to disclose the basis for its calculation of methane emissions. Using the most current 20-year global warming potential of 87, Miles City emissions total 284,229 tons per year of $CO_2$e.

**95.** Oil and gas development can impact water quality and quantity. Impacts on water quantity and quality affect wildlife, including threatened and endangered aquatic species.

**96.** Transportation of wastewater generated during oil and gas production increases vehicular traffic, leading to safety risks.

**97.** New oil and gas wells, pipelines, compressor stations, and related facilities negatively impact viewsheds and fragment wildlife habitat.

**98.** Burning natural gas at the wellhead, or "flaring," causes light pollution.

**99.** The release of natural gas from wells to the atmosphere, or "venting" and "flaring" during oil and gas production reduce the ability of a lease to supply energy, thereby increasing the pressure to satisfy long-term demand with new drilling that impacts air, land, and water.

**100.** Cumulatively, the foregoing environmental impacts worsen over time.

**101.** Neither the Miles City RMP/EIS nor the Buffalo RMP/EIS consider alternatives involving reasonable and cost effective mitigation

measures to reduce methane emissions from venting, flaring, or gas leakage at oil and gas operations.

**102.** Oil and gas leasing is proceeding pursuant to the challenged RMPs for the Miles City and Buffalo planning areas.

**103.** The resulting impacts from oil and gas leasing, as well as drilling occurring pursuant to existing leases, have and will continue to harm Citizen Groups and their members.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Failure to Consider an Alternative
### Involving Less Coal Development
### (NEPA Violation)

**104.** Citizen Groups incorporate by reference all preceding paragraphs.

**105.** NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). An EIS must consider "alternatives to the proposed action." *Id.* § 4332(2)(C)(iii).

**106.** Federal Defendants must "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a). The alternatives analysis is the "heart" of the EIS. *Id.*

**107.** In the EISs for the Miles City and Buffalo RMPs, Federal Defendants considered alternatives that were identical with respect to the amount of coal made available for leasing, and failed to consider any reasonable alternatives that would allow for a lesser amount of coal leasing. The existence of reasonable but unexamined alternatives renders a NEPA analysis inadequate.

**108.** In the Miles City RMP, all alternatives made available approximately 71 billion tons of coal for leasing and anticipated approximately 900 million tons of coal production during the planning period. In the Buffalo RMP, all alternatives made available 46 billion tons of coal for leasing and anticipated 10.2 billion tons of coal leasing during the planning period.

**109.** In the EISs for the Miles City and Buffalo RMPs, Federal Defendants also failed to consider measures that would have controlled the timing, pace, and scale of such development. The existence of reasonable but unexamined alternatives renders a NEPA analysis inadequate.

**110.** BLM's failure to consider a reasonable range of alternatives with respect to coal leasing and development is arbitrary and capricious and unlawful in violation of NEPA, 42 U.S.C. § 4332(2)(C)(iii), (E), its implementing regulations, in 40 C.F.R. § 1502.14(a), and the APA, 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION**
**Failure to Consider an Alternative Involving**
**Methane Mitigation Measures**
**(NEPA Violation)**

**111.** Citizen Groups incorporate by reference all preceding paragraphs.

**112.** NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). An EIS must consider "alternatives to the proposed action." *Id.* § 4332(2)(C)(iii).

**113.** Federal Defendants were required to "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a). The alternatives analysis is the "heart" of the EIS. *Id.*

**114.** In the EISs for the Miles City and Buffalo RMPs, Federal Defendants violated NEPA by failing to consider an alternative requiring reasonable and cost effective mitigation measures to reduce methane and other air emissions from oil and gas development, as detailed by Citizen Groups in their comments submitted during the NEPA process. Such measures could include, but are not limited to: centralized liquid gathering systems and liquid transport pipelines; reduced emission completions/ recompletions (green completions); low-bleed/no-bleed pneumatic devices on all new wells; dehydrator emissions controls; replace high-bleed pneumatics with low-bleed/no-bleed or air- driven pneumatic devices on all existing wells; and electric compression—all of which have been adopted as mitigation

requirements by other BLM Field Offices, including, the Tres Rios Field Office in Colorado.

115. BLM's failure to consider an alternative requiring methane mitigation measures is arbitrary and capricious and unlawful in violation of NEPA, in 42 U.S.C. § 4332(2)(C)(iii), (E), its implementing regulations, 40 C.F.R. § 1502.14(a), and the APA, 5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**
**Failure to Take a Hard Look at the Indirect Impacts**
**of Combustion Emissions**
**(NEPA Violation)**

116. Citizen Groups incorporate by reference all preceding paragraphs.

117. NEPA requires a federal agency's EIS to consider "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii).

118. Agencies are required to take a hard look at the indirect impacts of a proposed action. 40 C.F.R. § 1502.16(b).

119. BLM is required to provide a hard look analysis of these impacts before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

120. "Indirect effects" are those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to

induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

121.    In the EISs for the Miles City and Buffalo RMPs, BLM acknowledged that fossil fuels would ultimately be combusted. However, the Federal Defendants failed to address the foreseeable indirect impacts from the downstream combustion of coal, oil, and gas resources leased and developed in the planning areas.

122.    Federal Defendants' failure to consider these impacts is arbitrary, capricious, an abuse of discretion, and contrary to NEPA, in 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, 40 C.F.R. § 1508.8(b), and the APA, 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION
### Failure to Take a Hard Look at the Severity and Impacts of Greenhouse Gas Pollution
### (NEPA Violation)

123.    Citizen Groups incorporate by reference all preceding paragraphs.

124.    NEPA requires a federal agency's EIS to consider "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii). In so doing, agencies must "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic

and technical considerations." *Id.* § 4332(2)(B). NEPA requires the EISs to take a hard look at the direct, indirect, and cumulative effects of the RMPs making available millions of acres for oil and gas, coal, and other energy development.

125. NEPA requires the EIS to present a hard look at the effects of proposed major federal actions and alternatives. These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. § 1508.8.

126. An EIS must do more than merely identify impacts. An EIS must also "evaluate the severity" of effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); 40 C.F.R. § 1502.16(a)-(b) (explaining "significance").

127. The EISs for the Buffalo and Miles City RMPs offer estimates of the amount of GHGs that will be emitted under the various alternatives, but the EISs omit any discussion of the breadth and scale of the impacts of these emissions. BLM instead asserted that discussion of the impacts of these emissions would require modeling that was beyond the scope of BLM's analysis and is impossible.

128. Where information relevant to foreseeable adverse impacts is

unavailable, agencies must nonetheless evaluate "such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.22(b)(4).

**129.** One generally accepted approach to evaluating the impact of GHG emissions is to estimate the costs of those emissions to society. The federal Interagency Working Group on the Social Cost of Carbon has developed estimates of the present value of the future costs of carbon dioxide emissions as a proxy for the magnitude and severity of those impacts. The EPA has relied on a similar peer-reviewed estimate for the social cost of methane emissions, which adjusts the social cost of carbon dioxide to account for the different dynamics of methane on climate change and its greater global warming potential. These tools are easy to use by agencies, easy to understand by the public, and supported by years of peer-reviewed scientific and economic research. The EPA and other federal agencies have used these social cost protocols to estimate the effects of rulemakings on climate. These protocols estimate the global financial cost of each additional ton of GHG pollution emitted to the atmosphere, taking into account factors such as diminished agricultural productivity, droughts, wildfires, increased intensity and duration of storms, ocean acidification, and sea-level rise.

**130.** In the EISs for the Miles City and Buffalo RMPs, Federal Defendants failed to employ a social cost of carbon protocol, or any other tools,

for assessing the impact of the climate pollution caused by the production and combustion of the federal coal, or oil and gas resources made available for leasing pursuant to the RMPs. Federal Defendants' failure to discuss the severity or impacts of these emissions, despite the availability of tools to do so, is arbitrary, capricious, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, in 40 C.F.R. § 1508.8, and the APA, 5 U.S.C. § 706(2)(A).

**FIFTH CAUSE OF ACTION**
**Failure to Take a Hard Look at Methane Emissions**
**(NEPA Violation)**

**131.** Citizen Groups incorporate by reference all preceding paragraphs.

**132.** NEPA requires a federal agency's EIS to consider "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii).

**133.** BLM is required to provide a hard look analysis of the impacts before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.* § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

**134.** In the EISs for the Buffalo and Miles City RMPs, the BLM failed to take a hard look at the environmental impacts of the methane pollution that is projected under the plans, including by failing to properly quantify the

magnitude of methane pollution from coal, oil, and gas emissions sources in the planning areas, and by using an outdated global warming potential for methane, therefore underestimating the impacts of methane emissions by a factor of four.

**135.** Federal Defendants' failure to take a hard look at methane waste is arbitrary, capricious, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations in 40 C.F.R. §§ 1501.2, 1502.5(a), and the APA, 5 U.S.C. § 706(2)(A).

**SIXTH CAUSE OF ACTION**
**Failure to Take a Hard Look at Cumulative Impacts**
**(NEPA Violation)**

**136.** Citizen Groups incorporate by reference all preceding paragraphs.

**137.** NEPA requires a federal agency's EIS to consider "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii).

**138.** BLM is required to provide a hard look analysis of the impacts before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.* § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

**139.** Agencies are required to take a hard look at the cumulative impacts of a proposed action. 40 C.F.R. §§ 1508.7, 1508.8, 1508.25.

**140.** "Cumulative impact is the impact on the environment which

results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non- Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

141. In the EISs for the Buffalo and Miles City RMPs, the BLM failed to consider the cumulative impacts on air resources of all extractive federal mineral development when taken together, by failing to consider that air impacts from oil and gas development are compounded by coal development and vice versa.

142. In the EISs for the Buffalo and Miles City RMPs, the BLM failed to analyze the cumulative impacts of the RMPs when taken together with other actions that could reasonably affect air quality within the planning area, including nearby existing coal-fired power plants and state and private oil and gas exploration, development, and processing activities.

143. In both the Miles City and Buffalo RMPs, the BLM failed to consider the cumulative impacts to groundwater and surface water (both quality and quantity) from the RMPs together with other energy development in the project areas, such as coal, coalbed methane, horizontal oil, and uranium.

144. Federal Defendants' failure to consider cumulative impacts is

arbitrary, capricious, an abuse of discretion, and contrary to NEPA, in 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, and the APA, 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Citizen Groups respectfully request that this Court:

A.      Declare that Federal Defendants' actions violate NEPA, the regulations and policies promulgated thereunder, and the APA;

B.      Vacate and set aside Federal Defendants' actions;

C.      Enjoin Federal Defendants from approving the leasing or development of coal, oil or gas resources in the planning areas pursuant to the Miles City and Buffalo RMPs until Federal Defendants have demonstrated compliance with NEPA and the APA;

D.      Retain continuing jurisdiction of this matter until BLM fully remedies the violations of law complained of herein;

E.      Award Citizen Groups their attorneys' fees, costs, and other expenses as provided by applicable law; and

F.      Issue such relief as Citizen Groups subsequently request or that this Court may deem just, proper, and equitable.

Respectfully submitted this 26th day of May, 2017.

/s/ Laura H. King
Laura H. King (MT Bar No. 13574)

Shiloh S. Hernandez (MT Bar No. 9970)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4852
king@westernlaw.org
hernandez@westernlaw.org

Kyle Tisdel, *pro hac vice* (CO Bar No. 42098)
Western Environmental Law Center
208 Paseo del Pueblo Sur #602
Taos, New Mexico 87571
Ph: (575) 613-8050
tisdel@westernlaw.org

*Counsel for Western Organization of
Resource Councils, Montana
Environmental Information Center,
Powder River Basin Resource
Council, and Northern Plains
Resource Council*

Nathaniel Shoaff, *pro hac vice* (CA Bar No. 256641)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Ph: (415) 977-5610
nathaniel.shoaff@sierraclub.org

*Counsel for Sierra Club*

Sharon Buccino, *pro hac vice* (DC Bar No. 432073)
Alison L. Kelly, *pro hac vice* (DC Bar No. 1003510)
Natural Resources Defense Council
1152 15th Street, NW
Washington, D.C. 20005
Ph: (202) 289-6868
sbuccino@nrdc.org
akelly@nrdc.org

*Counsel for Plaintiff Natural*
*Resources Defense Council*