JEFFREY H. WOOD,
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

SHAUN M. PETTIGREW, Trial Attorney
JOHN S. MOST, Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3895 (Pettigrew)
Phone: (202) 616-3353 (Most)
Fax: (202) 305-0506

*Counsel for Federal Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | | |
|---|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:16-cv-00021-BMM |
| v. | ) ) ) | |
| U.S. BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of the Interior, *et al.*, | ) ) ) ) ) ) | **FEDERAL DEFENDANTS' BRIEF IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| Federal Defendants, | ) ) | |
| and | ) ) | |
| CLOUD PEAK ENERGY, INC., *et. al.*, | ) ) ) ) | |
| Intervenor Defendants. | ) ) | |

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................................1

LEGAL BACKGROUND ...............................................................................1

    I.      National Environmental Policy Act .......................................................1

    II.     Federal Land Policy and Management Act ...........................................2

    III.    Mineral Leasing Act of 1920 .................................................................3

         A.     Coal Development.............................................................................3

         B.     Oil and Gas Production.....................................................................4

    IV.    Administrative Procedure Act ................................................................5

ARGUMENT .................................................................................................6

    I.      Plaintiffs have not established standing. ...............................................6

         A.     Elements of standing.........................................................................6

         B.     Plaintiffs' declarations fail to demonstrate standing. ................7

             1.     The legal status of the lands is unchanged. .....................7

             2.     Recent implementation decisions do not support standing..........................................................................8

             3.     Declarants' use and enjoyment of the affected lands is inadequate to support standing. .................................10

    II.     The EISs considered a reasonable range of alternatives....................14

         A.     The EISs were not required to consider alternatives identifying fewer areas as acceptable for further consideration for coal leasing. ................................................16

         B.     The EISs were not required to consider an alternative requiring specific measures to reduce methane emissions from oil and gas development.................................................19

i

III.    The EISs took a hard look at the potential environmental effects
        of the proposed action. ......................................................................21

        A.    The EISs took a hard look at GHG emissions. ........................22

              1.    The EISs were not required to quantify the potential
                    effect of the downstream combustion of coal, oil,
                    and gas resources potentially developed under the
                    RMPs. ..............................................................................23

              2.    The EISs adequately addressed the cumulative
                    impacts of GHG emissions. ............................................25

              3.    The EISs' conversion of methane emissions to
                    carbon dioxide equivalents was not arbitrary or
                    capricious. ........................................................................30

        B.    The EISs took a hard look at the effects to air quality..............31

IV.    Plaintiffs improperly seek to supplement the administrative
       record. ...................................................................................................33

CONCLUSION .........................................................................................................34

# TABLE OF AUTHORITIES

## Cases

*Alaska Envt'l Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ...............................................................14

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
  67 F.3d 723 (9th Cir. 1995) ................................................................14

*Ashley Creek Phosphate Co. v. Norton*,
  420 F.3d 934 (9th Cir. 2005) ...............................................................13

*Border Power Plant Working Grp. v. Dep't of Energy*,
  260 F. Supp. 2d 997 (S.D. Cal. 2003) ..................................................32

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ........................................................ 14, 20

*Cent. Sierra Envt'l Res. Ctr. v. U.S. Forest Serv.*,
  916 F. Supp. 2d 1078 (E.D. Cal. 2013) ...............................................16

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997) ..............................................................31

*Cottonwood Envtl. Law Ctr. v. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) ................................................................6

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) ........................................................ 28, 29

*Earth Island Inst. v. U.S. Forest Serv.*,
  697 F.3d 1010 (9th Cir. 2012) ................................................................5

*Foster v. Carson*,
  347 F.3d 742 (9th Cir. 2003) ..................................................................9

*Friends of Yosemite Valley v. Norton*,
  348 F.3d 789 (9th Cir. 2003) ................................................................15

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ................................................................................6

*High Country Conservation Advocates v. U.S. Forest Serv.*,
  52 F. Supp. 3d 1174 (D. Colo. 2014) ............................................. 28, 29

*High Sierra Hikers Ass'n v. U.S. Dep't of Interior*,
  848 F. Supp. 2d 1036 (N.D. Cal. 2012) ............................................................18

*Hunt v. Wash. State Apple Advertising Comm'n*,
  432 U.S. 333 (1977) ............................................................................................7

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.*,
  88 F.3d 754 (9th Cir. 1996) ..............................................................................26

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ..........................................................................................27

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ............................................................................................6

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ..............................................................................5

*Lands Council v. McNair*,
  629 F.3d 1070 (9th Cir. 2010) ..........................................................................17

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005) ..........................................................................33

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ......................................................................................13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................. 6, 7, 10

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
  177 F.3d 800 (9th Cir. 1999) ............................................................................15

*N. Alaska Envt'l Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ..............................................................................5

*Nat. Res. Def. Council v. U.S. Dep't of Transp.*,
  770 F.3d 1260 (9th Cir. 2014) ..........................................................................32

*Native Ecosystem Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) ..........................................................................27

*Native Vill. of Point Hope v. Jewell*,
  740 F.3d 489 (9th Cir. 2014) ............................................................... 21, 22, 24

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................................10

*Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*,
  56 F.3d 1060 (9th Cir. 1995) ................................................................14

*Organized Village of Kake v. U.S. Dep't of Agric.*,
  795 F.3d 956 (9th Cir. 2015) ..................................................................8

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*,
  377 F.3d 1147 (10th Cir. 2004) ...........................................................4, 5

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) .................................................................................2

*San Diego Cty. Gun Rights Comm. v. Reno*,
  98 F.3d 1121 (9th Cir. 1996) ...................................................................6

*Selkirk Conservation All. v. Forsgren*,
  336 F.3d 944 (9th Cir. 2003) .......................................................... 27, 33

*Sierra Club v. U.S. Dep't of Transp.*,
  310 F. Supp. 2d 1168 (D. Nev. 2004) ...................................................32

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ...................................................................................6

*Summers v.Earth Island Inst.*,
  555 U.S. 488 (2009) ...................................................... 11, 13, 14

*Taxpayers of Mich. Against Casinos v. Norton*,
  433 F.3d 852 (D.C. Cir. 2006) ..............................................................25

*W. Watersheds Proj. v. Abbey*,
  719 F.3d 1035 (9th Cir. 2013) ...............................................................18

*W. Watersheds Project v. Kenna*,
  610 F. App'x 604 (9th Cir. 2015) .................................................. 15, 18

*Westlands Water Dist. v. U.S. Dep't of Interior*,
  376 F.3d 853 (9th Cir. 2004) ...................................................................2

*WildEarth Guardians v. Bureau of Land Mgmt.*,
  8 F. Supp. 3d 17 (D.D.C. 2014) ............................................................22

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ....................................................... 22, 26

*WildEarth Guardians v. U.S. Forest Serv.*,
  120 F. Supp. 3d 1237 (D. Wyo. 2015) ..................................................24

**Statutes**

5 U.S.C. §§ 701-706 ........................................................................................9

5 U.S.C. § 702 ...............................................................................................9

5 U.S.C. § 706(2)(A) .....................................................................................5

30 U.S.C. § 181 .............................................................................................3

30 U.S.C. § 201 .............................................................................................3

30 U.S.C. § 201(a)(3)(A)(i) ...........................................................................3

30 U.S.C. § 201(a)(3)(B) ...............................................................................3

30 U.S.C. § 203(a)(1) .....................................................................................4

30 U.S.C. § 207(c) .........................................................................................4

30 U.S.C. § 226 .............................................................................................3

30 U.S.C. § 226(a) .........................................................................................5

42 U.S.C. § 4321 ...........................................................................................1

42 U.S.C. § 4331 ...........................................................................................1

42 U.S.C. § 7409 .........................................................................................32

43 U.S.C. § 1712(a) .......................................................................................2

43 U.S.C. § 1732(a) .......................................................................................2

**Rules**

Fed. R. Evid. 201(b)(2) ...............................................................................33

**Regulations**

30 C.F.R. § 746.13 .........................................................................................4

40 C.F.R. pt. 98 ...........................................................................................30

40 C.F.R. pt. 1502 .........................................................................................2

40 C.F.R. § 1501.1 .........................................................................................1

40 C.F.R. § 1502.14(a) .................................................................................14

40 C.F.R. § 1502.23 .....................................................................................28

40 C.F.R. § 1508.8(b) ..................................................................................24

43 C.F.R. pt. 3100 ..................................................................................5

43 C.F.R. § 1601.0-5(n) ...................................................................2, 10

43 C.F.R. § 1601.0-6 .............................................................................3

43 C.F.R. § 3162.3-1(c) .........................................................................5

43 C.F.R. § 3420 subpt. 3425 ................................................................4

43 C.F.R. § 3420.1-4(a) .........................................................................3

43 C.F.R. § 3420.1-4(d) .........................................................................3

43 C.F.R. § 3420.1-4(e)(1)-(4) ..............................................................4

43 C.F.R. § 3420.1-4(e)(3) ...................................................................17

43 C.F.R. § 3425.2 .................................................................................4

43 C.F.R. § 3425.3 .................................................................................4

43 C.F.R. § 3425.3(b) ............................................................................4

43 C.F.R. § 3430 subpt. 3432 ................................................................4

43 C.F.R. § 3432.3(c) ............................................................................4

43 C.F.R. § 3460 subpt. 3461 ................................................................4

43 C.F.R. §§ 1601.0-2 ............................................................................2

58 Fed. Reg. 51,735 (October 4, 1993) ...............................................28

78 Fed. Reg. 71,904 (Nov. 29, 2013) ..................................................30

81 Fed. Reg. 17,720 (Mar. 30, 2016) ..................................................23

82 Fed. Reg. 16,093 (Mar. 31, 2017) ..................................................23

## Other Authorities

Bureau of Land Management, NEPA Register,
    https://eplanning.blm.gov/epl-front-
    office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&
    currentPageId=94042 (last checked August 7, 2017) ...........................................9

# TABLE OF ACRONYMS

| APA | Administrative Procedure Act |
|-----|------------------------------|
| BLM | Bureau of Land Management |
| EIS | Environment Impact Statement |
| FCPA | Fortification Creek Planning Area |
| FLPMA | Federal Land Policy and Management Act |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| RMP | Resource Management Plan |
| SOF | Statement of Facts |
| TBNG | Thunder Basin National Grassland |

## INTRODUCTION

Plaintiffs assert six claims under the National Environmental Policy Act (NEPA), challenging two separate environmental impact statements (EISs) prepared in support of two resource management plans (RMPs) governing the Buffalo planning area in Wyoming and the Miles City planning area in Montana. *See* Fed. Defs.' Stmt. of Facts (SOF) ¶¶ 1, 7-8, 44, 53-54. Plaintiffs argue that those EISs failed to consider an adequate range of alternatives and failed to take a hard look at the potential environmental consequences of those alternatives. Those claims fail because Plaintiffs have not met their burden of establishing standing under Article III of the Constitution. But even if Plaintiffs had established standing, their claims fail because the EISs considered a reasonable range of alternatives and took a hard look at the potential environmental consequences of those alternatives.

## LEGAL BACKGROUND

### I.   National Environmental Policy Act

The purpose of NEPA is to ensure that federal agencies consider the environmental consequences of major federal actions significantly affecting the environment. 42 U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1. NEPA serves the dual purpose of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available

1

to members of the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA itself "does not mandate particular results, but simply prescribes the necessary process." *Id.* at 350 (citations omitted).  As a result, a "court must avoid passing judgment on the substance of an agency's decision.  Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing *Robertson*, 490 U.S. at 350).  An agency can comply with NEPA by preparing an EIS, which is a detailed statement subject to extensive regulations regarding format, content, and methodology. *See* 40 C.F.R. pt. 1502.  An EIS "must consider and assess the environmental consequences of the proposed action and reasonable alternatives to the action." *Westlands*, 376 F.3d at 865 (citing 40 C.F.R. § 1502.14).

## II.   Federal Land Policy and Management Act

The Federal Land Policy and Management Act of 1976 (FLPMA) instructs the Secretary of the United States Department of the Interior, through the Bureau of Land Management (BLM), to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a).  BLM does this, in part, by developing, maintaining, and revising RMPs.  43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0-5(n).  RMPs "are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans

2

for resources and uses." 43 C.F.R. §§ 1601.0-2.  Approval of an RMP "is

considered a major Federal action significantly affecting the quality of the human

environment," triggering an EIS under NEPA.  43 C.F.R. § 1601.0-6.

## III.   Mineral Leasing Act of 1920

The Mineral Leasing Act of 1920 governs the leasing of federal coal, oil,

and gas.  30 U.S.C. §§ 181 (generally), 201 (coal), 226 (oil and gas).  The process

for leasing and developing coal differs from the process for oil and gas.  But the

role of RMPs to identify lands potentially available for leasing is the same.  And

once such lands have been identified, neither coal leasing nor oil and gas leasing

can occur without further environmental analysis under NEPA.

### A.    Coal Development

The development of federal coal deposits begins with identifying lands

containing coal deposits "in a comprehensive land use plan or land use analysis."

43 C.F.R. § 3420.1-4(a); *see also* 30 U.S.C. § 201(a)(3)(A)(i).  That plan or

analysis—typically in the form of an RMP—must "contain an estimate of the

amount of coal recoverable by either surface or underground mining operations or

both."  43 C.F.R. § 3420.1-4(d); *see also* 30 U.S.C. § 201(a)(3)(B).  It must further

identify "areas acceptable for further consideration for leasing" by, among other

things, screening them for (1) "development potential," (2) whether the areas are

"unsuitable for all or certain stipulated methods of mining," (3) whether coal

production would interfere with other important "resource values and land uses," and (4) whether the surface owners, if any, have a "preference for or against mining by other than underground mining techniques."  43 C.F.R. § 3420.1-4(e)(1)-(4); *see also* 43 C.F.R. subpt. 3461 (process for unsuitability review).

BLM then identifies leases for sale, which is done through a process known as "leasing on application."  *See* 43 C.F.R. subpt. 3425.  Leases are issued only after the preparation of "an environmental assessment or [EIS] of the proposed lease area."  43 C.F.R. §§ 3425.2, 3425.3.  In addition, BLM can modify an existing coal lease in certain circumstances.  30 U.S.C. § 203(a)(1); *see also* 43 C.F.R. subpt. 3432.  A modification can be approved only after the preparation of "an environmental assessment or [EIS] covering the proposed lease area."  43 C.F.R. § 3432.3(c).

Finally, once a lease or modification has been issued, surface-disturbing activities can proceed only upon approval of a mining plan by the Secretary.  30 U.S.C. § 207(c); 43 C.F.R. § 3425.3(b).  That approval is based on a recommendation from the Office of Surface Mining Reclamation and Enforcement after analysis under NEPA.  30 C.F.R. § 746.13.

## B.    Oil and Gas Production

Production of federal oil and gas resources begins "[a]t the earliest and broadest level of decision-making" when BLM develops an RMP.  *Pennaco*

*Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004).  BLM

then offers leases for sale consistent with the RMP.  *Id.* at 1151; *see* 30 U.S.C.

§ 226(a); 43 C.F.R. pt. 3100.  BLM must then approve an Application for Permit to

Drill (APD) before a lessee may "commenc[e] any 'drilling operations' or 'surface

disturbance preliminary thereto.'"  *Pennaco Energy*, 377 F.3d at 1151-52 (quoting

43 C.F.R. § 3162.3-1(c)).  "NEPA applies at all stages of the process."  *See N.*

*Alaska Envt'l Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006).

## IV.    Administrative Procedure Act

Alleged violations of NEPA are reviewed under the Administrative

Procedure Act (APA).  *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010,

1013 (9th Cir. 2012) (quotation and citation omitted).  A court will set aside an

agency action under the APA only if it was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This

is a "narrow" standard of review in which a court is not to "substitute [its]

judgment for that of the agency."  *Lands Council v. McNair*, 537 F.3d 981, 987

(9th Cir. 2008) (en banc) (citation and quotation omitted).  Instead, a court

> will reverse a decision as arbitrary and capricious only if the agency
> relied on factors Congress did not intend it to consider, entirely failed
> to consider an important aspect of the problem, or offered an
> explanation that runs counter to the evidence before the agency or is
> so implausible that it could not be ascribed to a difference in view or
> the product of agency expertise.

*Id.* (citations and quotations omitted).

# ARGUMENT

## I. Plaintiffs have not established standing.

### A. Elements of standing.

Federal courts are courts of "limited jurisdiction" and are presumed to lack jurisdiction unless a plaintiff establishes its existence. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *accord Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). The burden of demonstrating standing and other elements of jurisdiction rests squarely on the plaintiff, who must meet the burden "affirmatively" and "clearly." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotations and citations omitted); *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (noting plaintiff's burden).

A plaintiff seeking to establish standing must demonstrate: (1) injury-in-fact: that is, an injury which is "concrete and particularized" and either "actual or imminent," and not "conjectural or hypothetical;" (2) a "causal connection" between the alleged injury and the "conduct complained of;" and (3) a likelihood, as opposed to mere speculation, that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted) ("*Defenders*"); *Cottonwood Envtl. Law Ctr. v. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015), *cert. denied*, 137 S. Ct. 293 (2016) (same). When, as here, a plaintiff "is not himself the object of the government action or inaction he

challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders*, 504 U.S. at 562 (citation omitted). Here, Plaintiffs do not make the required showing and their claims should be dismissed.

**B.    Plaintiffs' declarations fail to demonstrate standing.**

The Plaintiff organizations attempt to establish standing under *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977), by relying on declarations of five of their members. ECF Nos. 72-3 to 72-7. Ms. Shannon Anderson, a Wyoming resident, attests to using and enjoying lands in Wyoming in the Buffalo planning area. ECF No. 72-5 (Decl. of Shannon Anderson) ¶¶ 4, 6, 8. Four other witnesses (three from Montana and one from Wyoming) attest to working on, using, or enjoying lands in Montana in the Miles City planning area. ECF Nos. 72-3 (Decl. of Wade Sikorski) ¶¶ 6, 8, 9, 16, 17; 72-4 (Decl. of Terry Punt) ¶¶ 1, 4; 72-6 (Decl. of Lori Byron) ¶ 4; 72-7 (Decl. of Donald Cushman) ¶ 4. These declarations are geographically and temporally vague and do not clearly and affirmatively meet the *Defenders* standing test.

**1.    The legal status of the lands is unchanged.**

The declarations devote considerable attention to the adverse effects of energy development, but this emphasis cannot mask the deficiencies in Plaintiffs' showing. Most notably, under the prior RMPs, the lands of concern to declarants were "open" to oil and gas leasing and coal leasing and it is undisputed that they

7

remain "open" to leasing today.  Declarants cannot point to any newly opened lands because there are none.  Bills Decl. ¶ 6, attached as Exhibit 1; Miller Decl. ¶¶ 6-7, attached as Exhibit 2.

Thus, energy development was a possibility under the prior regimen and remains a possibility today, subject of course to completion of required NEPA analysis.  Because the RMPs did not change the legal status of the land (except to impose more protective conservation measures in certain instances, *see* Bills Decl. ¶ 6; Miller Decl. ¶ 6), Plaintiffs cannot fairly trace their alleged harm to the RMPs. And even if they could, the redressability requirement is still not satisfied because an order vacating the new RMPs would have the effect of restoring the prior RMPs—under which the lands were also open to leasing—to full force and effect. *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (invalidating an agency rule "reinstate[s] the rule previously in force") (quotation and citation omitted).

## 2. Recent implementation decisions do not support standing.

Perhaps recognizing that the new RMPs do not change the status quo, Plaintiffs attempt to bolster their showing of harm by pointing to two recent events—an oil and gas lease sale held in February 2017 for the Buffalo planning area and another sale held in June 2017 for the Miles City planning area—as well as a proposal to conduct a lease sale in the Miles City planning area in December

2017, for which NEPA analysis and public comment are currently under way.[1]  All of these events occurred *after* the complaint in this case was filed and thus cannot provide a basis for standing, because the law is clear in this Circuit that jurisdiction must exist at the time of filing the complaint.  *See Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) (referring to standing as the "requisite personal interest that must exist at the commencement of the litigation").

It also bears mention that BLM conducted formal, public NEPA processes for the two completed lease sales and issued separate decisions, each constituting final agency action.  Such action may be challenged under the APA by a proper plaintiff, aggrieved within the meaning of NEPA or another relevant statute.  *See* 5 U.S.C. § 702.  However, rather than challenge those projects directly, Plaintiffs seek to use them as a lever to topple two broad-based management regimens, years in the making and affecting a vast array of uses, resources, and economic interests.

The Court should reject this tactic because any harm the declarants might suffer as a result of these projects is traceable to the leasing decisions and not to the RMPs, which make no implementation decisions respecting energy leasing or development, and which did nothing to change pre-existing allocations of land open to potential coal development.  Bills Decl. ¶ 6 (Ex. 1); Miller Decl. ¶¶ 6-7

---

[1] *See* https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=94042 (last checked August 7, 2017).

(Ex. 2). BLM regulations underscore this point, providing that RMP approval "is not a final implementation decision on actions which require further specific plans, process steps, or decisions under specific provisions of law and regulations." *See* 43 C.F.R. § 1601.0-5(n).

Plaintiffs' misconception in this regard flows from their overstated view of an RMP's force and effect. As the Supreme Court has explained, "a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 71 (2004). Thus, if any declarant is to suffer harm to a recreational or aesthetic interests, it would be as a result of a leasing decision, not the RMPs, which make no implementation decisions.

### 3. Declarants' use and enjoyment of the affected lands is inadequate to support standing.

Plaintiffs' claim of standing fails for the additional reason that the declarants only vaguely describe their use of the affected lands and identify no concrete plans to return in the future. In *Defenders*, the Supreme Court rejected a declarant's "some day" intentions to return to an affected area, stating such "intentions— without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.*, 504 U.S. at 564. More recently, the Supreme Court in *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), reaffirmed this

10

principle in rejecting a claim of standing, explaining that a declarant must identify a project that will "impede a specific and concrete plan . . . to enjoy the national forests." 555 U.S. at 495.

Plaintiffs' declarations do not meet this standard.  Ms. Anderson, an environmental attorney and staff member of Plaintiff Powder River Basin Resource Council, testifies that she visited two locations within the Buffalo planning area—the Fortification Creek Planning Area (FCPA) and the Thunder Basin National Grassland (TBNG)—in June and July 2017, respectively.  ECF No. 72-5 ¶¶ 6, 10.  However, these visits post-date the Complaint and thus fail to support standing because an environmental plaintiff must establish use of the allegedly affected lands prior to the challenged decision.  This is also Ms. Anderson's only temporally-specific averment.  For example, she states in the first sentence of paragraph 6 that "since 2008," the FCPA has "fast become one of [her] favorite places to recreate," but this unusual phrasing falls short of specifying *when* the alleged recreation first occurred.  The second sentence describes hiking and scenic drives in the FCPA, but gives no indication as to when this occurred.  No other passage places Ms. Anderson's prior use of the allegedly affected lands in time.

Regarding the necessary intent to return, Ms. Anderson fails to meet the requirement of a "specific and concrete plan," *Summers*, 555 U.S. at 495,

11

providing only the naked assertion that she "plan[s]" to return to the FCPA "in the months and years to come." ECF No. 72-5 ¶ 6.  These "plans" are not described in any way.  She makes a similar assertion about the TBNG, stating only that she has "plans to return in the months and years to come."  *Id.* ¶ 10.  No other declarant attests to using these Wyoming lands.  Consequently, the claims of error in the Buffalo RMP should all be dismissed as a matter of law.

As for the Miles City RMP, Dr. Byron, a Montana resident, describes bike rides taken in areas of southeastern Montana, without stating whether these areas fall within the planning area, then vaguely attests that she intends to take bike rides within the planning area "in the months and years to come."  ECF No. 72-6 ¶ 4.  Mr. Cushman, a Wyoming resident, states that he first visited the planning area about forty years ago.  He vaguely notes, in the present tense, without temporal context, that he "hunts" and "recreates" on the Yellowstone River and in the Tongue River area, but does not specify concrete plans to visit any particular area and indicates only that he intends to "continue to recreate in the . . . planning area in the future."  ECF No. 72-7 ¶ 4.  His declaration, like Dr. Byron's, is vague both geographically and temporally, which stands in stark contrast to the precision used in recounting environmental impacts.

Mr. Sikorski, a Montana rancher, indicates that, when looking to the northwest from certain buttes on his ranch, potential future development within the

12

Miles City planning area "may be visible," ECF No. 72-3 ¶ 6, but he specifies no concrete plans to visit any particular areas and identifies no specific project that poses an imminent threat to his recreational and aesthetic interests, let alone one traceable to the RMP.  Mr. Punt, also a Montana rancher, makes no assertion of intent to visit any particular lands that may be affected and likewise identifies no specific project posing an imminent threat to his interests.  ECF No. 72-4.  Finally, even if the Court were to conclude that the ranchers' alleged economic injuries are sufficient to support Article III standing, it should nonetheless dismiss the case because the ranchers' economic interests fall outside NEPA's "zone of interests." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387-88, n.4 (2014); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005).

In sum, Plaintiffs do not show a single imminent threat of injury-in-fact that is concrete and particularized and fairly traceable to the challenged action.  They also fail to show that it is "likely" that a favorable judicial decision would "prevent or redress" the claimed injuries, *Summers*, 555 U.S. at 493, because an order vacating the decision for further NEPA analysis would restore the prior RMPs, under which the lands at issue are also open to leasing.  They also fail to identify any project authorized by either RMP that threatens to "impede a specific and

13

concrete plan" to enjoy these lands. *Id*. at 495. For all these reasons, this case should be dismissed as a matter of law.

## II.    The EISs considered a reasonable range of alternatives.

NEPA's implementing regulations require agencies to "evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The range of alternatives an agency must consider is "dictated by the nature and scope of the proposed action." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (quotations and citations omitted). "An agency need not . . . discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Kempthorne*, 457 F.3d at 978 (quotation and citation omitted). "Judicial review of the range of alternatives considered by an agency is governed by a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (quotations and citation omitted). A court's inquiry "is whether an EIS's selection and discussion of alternatives fosters informed decision-making and public participation." *Id.* Courts give agencies "considerable discretion in defining the scope of an EIS." *Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1067 (9th Cir. 1995) (quotation and citation omitted).

14

RMPs are programmatic plans that provide high-level planning direction that is later implemented through site-specific projects and management decisions. *W. Watersheds Project v. Kenna*, 610 F. App'x 604, 606 (9th Cir. 2015). "An EIS for a programmatic plan . . . must provide sufficient detail to foster informed decision-making, but site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003) (quotations and citations omitted). As a result, alternatives considered in EISs prepared for RMP revisions consider various high-level "alternative management scenarios." *Id*. (quotation and citation omitted).

These are exactly the types of alternatives considered by both EISs here. The EISs considered a broad spectrum of management approaches, ranging from management with an emphasis on conserving resources to that with an emphasis on developing resources. *See* SOF ¶¶ 10-17, 56-64. Extensive tables explained the management goals, management actions common to all alternatives, and management actions that differed by alternative for the multitude of resources and resource uses in the planning areas. *See* SOF ¶¶ 17, 64. The different approaches to managing these resources and resource uses reflected in those tables is a far cry from the near-identical alternatives the court found wanting in *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999), the principal case

15

relied on by Plaintiffs.  Mem. Supp. Pls.' Mot. Summ. J. 9, ECF No. 72-1 (Pls.'

Br.).  BLM's consideration of alternatives in the EISs was not arbitrary or

capricious.

    **A.**    **The EISs were not required to consider alternatives identifying fewer areas as acceptable for further consideration for coal leasing.**

Plaintiffs ignore the broad spectrum of management alternatives considered

by the EISs and argue that they should also have considered alternatives

identifying less area as acceptable for further consideration for coal leasing.  Pls.'

Br. 8-13.  This was not required.

All alternatives in both EISs carried forward the results of earlier coal

screening that identified areas in the Buffalo and Miles City planning areas as

"acceptable for further consideration for leasing."  SOF ¶¶ 23, 66.  As explained in

the Final Buffalo EIS, "no substantial new information" was provided during the

RMP development process that affected the previous identification of areas as

acceptable for further consideration for leasing.  SOF ¶ 23.  As a result, there was

no basis for revisiting the previous determinations or analyzing alternative

scenarios.  *Cf. Cent. Sierra Envt'l Res. Ctr. v. U.S. Forest Serv.*, 916 F. Supp. 2d

1078, 1090 (E.D. Cal. 2013) (noting alternative closing roads that "would not have

been inconsistent with the Purpose and Need" need not be considered for agency to

make a "reasoned choice").

16

Plaintiffs suggest in their brief that "the impacts of climate change" constitute new information that should have been considered in the coal-screening process. Pls.' Br. 10. This argument fails for two reasons. First, Plaintiffs provide no citations to the record in which they commented during the administrative process that the previous coal screening was outdated due to climate change. Instead, the cited comments refer to requests that BLM not "open[] up more coal resources to development" and that it "slow the pace of coal . . . development." Pls.' Br. 12-13. Those comments go to the implementation stage of issuing coal leases and approving mining plans. This is different from Plaintiffs' argument now that climate change impacts required the EISs to consider "eliminat[ing] additional coal deposits from further consideration for leasing" during the coal-screening process at the RMP stage to "protect other resource values and land uses that are locally, regionally, or nationally important or unique." 43 C.F.R. § 3420.1-4(e)(3). Plaintiffs therefore waived this argument. *See Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) ("A party forfeits arguments that are not raised during the administrative process) (citation omitted)).

Second, Plaintiffs identified no specific resource values or land uses that would be protected by determining, *at the programmatic level*, that additional coal deposits should be removed from further consideration for leasing. The RMPs' identification of areas as acceptable for further consideration for coal leasing has

no immediate effect.  Instead, among other things, BLM must first determine whether to issue a lease (or lease modification) within any of those areas.  And both EISs committed BLM to reconsideration of the coal-screening criteria at that time.  SOF ¶¶ 24, 67.  This will permit BLM to concretely assess whether any new information affects the results of the earlier determinations that an area was acceptable for further consideration for coal leasing.

In addition, the NEPA analysis triggered by a proposed leasing decision would include additional consideration of alternatives and an analysis of the potential direct, indirect, and cumulative effects under those alternatives.  SOF ¶¶ 24, 27, 67.  BLM's decision to defer such analysis until the site-specific stage is entitled to deference and is not arbitrary or capricious.  *See W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1047 (9th Cir. 2013) (concluding at "programmatic level of NEPA review, it was reasonable for BLM to decline to analyze in detail an alternative that would change grazing management levels throughout the entire [planning area]."); *Kenna*, 610 F. App'x at 606-07 ("The BLM chose not to determine levels of use at this planning stage.  Deferring to that decision, the district court properly concluded that the BLM considered an adequate range of alternatives."); *High Sierra Hikers Ass'n v. U.S. Dep't of Interior*, 848 F. Supp. 2d 1036, 1052 (N.D. Cal. 2012) ("[I]f the [agency] is not using the [management plan] to make any *new* decisions that alter current or future [resource] use, it is

18

premature to insist that the [plan] should consider detailed alternatives to these

unmade decisions—they will be evaluated in the upcoming [site-specific plans].").

**B.    The EISs were not required to consider an alternative requiring specific measures to reduce methane emissions from oil and gas development.**

Plaintiffs also maintain that BLM was required to consider a specific

alternative that would have mandated particular methane-reduction measures on oil

and gas operations in the planning areas.  Pls.' Br. 13-16.  This argument fails

because it does not acknowledge the management actions common to all

alternatives considered in the EISs or the programmatic nature of the RMPs.

All of the alternatives considered in the Final Buffalo EIS contemplated

BLM continuing "to require lessees to conduct operations in a manner that

minimizes adverse impacts to other resources and other land uses and users."  This

included "reduc[ing] the impacts of . . . greenhouse gases associated with BLM

actions" by implementing "mitigation measures within BLM's authority."  SOF

¶ 28.

Similarly, the Final Miles City EIS stated goals to: (1) "Reduce [GHG]

emissions when feasible;" (2) "Evaluate the observed and anticipated long-term

dynamic of climate change and minimize the impact of GHGs from projects to the

degree practicable and reasonably foreseeable;" and (3) "Provide for flexible,

adaptable management that allows for timely responses to changing climatic

19

conditions." SOF ¶ 69. In light of these goals, all alternatives in the Final Miles City EIS contemplated that "[e]mission reduction mitigation measures and conservation actions would be considered during project-level planning," and "[a]ctions that reduced or mitigated GHG emissions such as enhanced energy efficiency, use of lower-GHG-emitting technologies, capture or beneficial use of methane emissions, and/or sequestration of carbon dioxide through enhanced oil recovery or other means would be prioritized." SOF ¶ 70. Moreover, the Final Miles City EIS noted that "post-lease actions or authorizations (e.g., APDs or road or pipeline ROWs) would potentially be encumbered by mitigation measures, as necessary, on a case-by-case basis as required through the project-specific NEPA analysis or other environmental review." SOF ¶ 72.

In short, both EISs included the general goal of reducing the impact of GHG emissions in the planning area. All alternatives then considered implementing mitigation measures at the project-level planning stage. This is how RMP planning is supposed to work. Plaintiffs' insistence that BLM consider alternatives imposing specific methane-mitigation measures at the RMP development phase is in tension with the general management direction provided in RMPs and is not necessary "to permit a reasoned choice." *Block*, 690 F.2d at 767 (quotations and citation omitted).

20

**III.   The EISs took a hard look at the potential environmental effects of the proposed action.**

Plaintiffs next argue that BLM failed to take a hard look at GHG emissions and air quality.  Plaintiffs' arguments fail because both EISs provided detailed qualitative and quantitative analyses of these issues that fostered informed decision-making.

"The required level of analysis in an EIS is different for programmatic and site-specific plans." *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 497 (9th Cir. 2014).  "An EIS for a programmatic plan . . . must provide sufficient detail to foster informed decision-making, but site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development." *Id.* (quotations and citation omitted).  In other words, an agency need not "provide the most extensive environmental analysis at the earliest possible moment, for an agency has some flexibility in deciding the level of analysis to be performed at a particular stage." *Id.* at 498.  A court must "defer to the agency's judgment about the appropriate level of analysis so long as the EIS provides as much environmental analysis as is reasonably possible under the circumstances, thereby provid[ing] sufficient detail to foster informed decision-making at the stage in question." *Id.* at 498 (quotation and citation omitted).

21

**A.      The EISs took a hard look at GHG emissions.**

Both EISs provided detailed qualitative analyses of the potential effects of climate change, acknowledged the role of GHG emissions in climate change, quantified those emissions for the planning area, compared those emissions to inventories covering broader geographic areas, and explained why additional modeling or analysis was impractical.  SOF ¶¶ 31-38, 74-82.  This provided "sufficient detail to foster informed decision-making" at the RMP stage.  *Native Vill. of Point Hope*, 740 F.3d at 497.  NEPA requires nothing more.  *Cf. WildEarth Guardians v. Jewell*, 738 F.3d 298, 308-11 (D.C. Cir. 2013) (finding similar level of analysis at the leasing stage satisfied NEPA).

Plaintiffs nevertheless argue that the analyses in the EISs were insufficient because they did not (1) quantify the indirect impacts of downstream combustion of coal, oil, and gas resources potentially developed under the RMPs, (2) adequately assess the cumulative impacts of the RMPs' management of fossil fuels on climate change; or (3) properly estimate the impacts of methane emissions.  None of these arguments is well founded.  *Cf.  id.* at 309 (rejecting similar arguments at leasing stage as "of the flyspecking variety"); *WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 34-36 (D.D.C. 2014) (rejecting similar arguments at leasing stage).

    **1.**    **The EISs were not required to quantify the potential effect of the downstream combustion of coal, oil, and gas resources potentially developed under the RMPs.**

Quantification of the indirect impacts of the downstream combustion of coal, oil, and gas resources potentially developed from the Buffalo and Miles City planning areas is remote and speculative at the RMP stage of the mineral-development process.  With respect to the production of minerals, it is unknown at the RMP stage whether additional mineral leases will be issued, when any such leases will be issued, what the exact geographic area covered by those leases will be, whether minerals will be extracted from those leases, and what the precise quantity of minerals ultimately developed from those leases will be.[2]  With respect to downstream uses of the produced minerals, it is unknown which specific uses will be made of those minerals, where those uses will occur, what the type and

---

[2]Although both EISs contained production estimates for minerals potentially developed under the RMPs, such estimates at the RMP stage are necessarily uncertain.  For example, both EISs estimated the potential coal development that could be expected to occur during the 20-year planning period of the RMPs.  *See* SOF ¶¶ 25-26, 68.  Shortly after the RMPs were issued, however, federal coal leasing was paused to permit a programmatic re-evaluation of the leasing program.  *See* 81 Fed. Reg. 17,720 (Mar. 30, 2016).  That pause has since been lifted, Exec. Order No. 13783, 82 Fed. Reg. 16,093, 16,096 (Mar. 31, 2017), but the decision to lift it is itself being challenged, *see Citizens for Clean Energy v. Dep't of Interior*, 17-cv-30-BMM (D. Mont.) and *Cal. v. Dep't of Interior*, 17-cv-42-BMM (D. Mont.).  All of this reflects the uncertainties inherent in making predictions at the RMP stage.  In addition, other changes can occur between the adoption of RMPs and an actual leasing decision that may affect mineral development, such as shifts in the energy markets or technological changes.

amount of GHG emissions emitted by those uses will be, and what effects those emissions may have on climate change.[3]  *Cf. WildEarth Guardians v. U.S. Forest Serv.*, 120 F. Supp. 3d 1237, 1272-73 (D. Wyo. 2015) (noting uncertainty even at leasing stage as to "where the coal may be sold" and "the location and the method or timing of the combustion").  As a result, it was reasonable for the EISs not to attempt to quantify downstream indirect effects of the minerals potentially produced pursuant to the RMPs.

Instead, BLM reasonably deferred the analysis of downstream impacts until later in the development process when such impacts could be considered with more certainty and in light of the most up-to-date information.  In other words, BLM performed the analysis of GHG emissions that it deemed "reasonably possible under the circumstances" at the RMP stage.  *Native Vill. of Point Hope*, 740 F.3d at 498; *see also* 40 C.F.R. § 1508.8(b) (indirect effects must be "reasonably foreseeable").  This approach is entitled to deference and is not arbitrary or capricious.  *Cf. WildEarth Guardians*, 120 F. Supp. 3d at 1273 (finding NEPA

---

[3] Plaintiffs state that "BLM has previously determined that it can estimate the amount of greenhouse gases indirectly emitted by use of Powder River Basin coal on the basis of the amount of coal delivered to market and a 'conversion factor' expressing the known amount of $CO_2$ emitted from burning a ton of coal."  Pls.' Br. 19.  But Plaintiffs' citations to the record are to *lease-level* or *mine-specific* EISs, which allow for less-speculative estimates than RMPs.

satisfied because "the agencies did not ignore the effects of coal combustion, GHGs and climate change in reaching the decisions it made.").

> **2.    The EISs adequately addressed the cumulative impacts of GHG emissions.**

Plaintiffs also insist that the EISs should have discussed "the cumulative impact of BLM's management of fossil fuel extraction across the eight resource management plans simultaneously revised in the Rocky Mountain Region, or across the 700 million acres of mineral estate that BLM manages."  Pls.' Br. 23. NEPA does not require such an analysis.

As a practical matter, the analysis of the effects of GHG emissions does not lend itself to a traditional NEPA cumulative effects analysis.  Under that analysis, an agency identifies an area where the effects of the proposed project will be felt, estimates the project-level impacts, estimates impacts from other past, present, and reasonably foreseeable projects within the relevant geographic area, and then assesses the cumulative impact of all of those projects combined.  *See TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006).  GHG emissions and their effect on the climate, however, are necessarily cumulative, and necessarily global in nature.  They do not affect a particular project area, airshed, basin, state, or nation.  Thus, under the traditional cumulative effects analysis for any GHG-emitting project, an agency would be required to identify any past, present, or reasonably foreseeable GHG-emitting projects

25

*worldwide*.  This would be impossible, and it is not required by NEPA.  *See Inland*

*Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 764 (9th Cir. 1996)

("NEPA does not require the government to do the impractical.").

Instead, both EISs contained GHG emissions inventories at the statewide

level, SOF ¶¶ 37, 79-80, and the Final Miles City EIS also provided annual GHG

emissions inventories for the United States and the world.  SOF ¶¶ 79-80.  The

EISs then compared the GHG emissions under each of the alternatives to those of

the state, country, or globe.  In this manner, BLM provided useful context for

understanding the magnitude of each alternative's project emission levels, which in

turn served as a proxy for assessing the potential climate impacts of each

alternative.  The EISs also provided a qualitative analysis of climate change and

the role played by GHG emissions, and discussed the potential for additional

climate change impacts.  SOF ¶¶ 31-33, 38, 74, 77-78, 82.  This level of analysis

was reasonable and more than adequate, because any analysis of GHG emissions is

necessarily cumulative and thus subsumed within an EIS's general analysis and

discussion of climate change.  *See WildEarth Guardians*, 738 F.3d at 310 (holding

that an EIS's evaluation of "GHG emissions as a percentage of state—and nation-

wide emissions" satisfied NEPA).

Insofar as Plaintiffs complain that BLM should also have considered GHG

emissions from "eight resource management plans simultaneously revised in the

26

Rocky Mountain Region," *see* Pls.' Br. 23, the Miles City EIS already contains that

information, because BLM necessarily considered *all* GHG-emitting activities that

contributed to the state, national, and global GHG-emissions inventories it

prepared; all such emissions are subsumed within those inventories.  And while the

Buffalo EIS included only a State-level GHG inventory, Plaintiffs' desire for a

broader scope of analysis does not mean BLM violated NEPA; to the contrary,

BLM's choice of methodology—including the scope of its GHG emissions

analysis—is entitled to deference.  *Cf.  Selkirk Conservation All. v. Forsgren*, 336

F.3d 944, 962 (9th Cir. 2003) ("[S]electing the geographic boundaries of an EIS . .

. 'is a task assigned to the special competency of the appropriate agencies.'"

(quoting *Kleppe v. Sierra Club*, 427 U.S. 390 (1976)).

Plaintiffs also argue that the EISs should have utilized a "carbon budget" or

the "social cost of carbon protocol" to assess "the magnitude and severity of BLM-

managed fossil fuel emissions."  Pls.' Br. 25-26.  This argument reflects a mere

disagreement with BLM's reasoned approach to assessing GHG emissions.  Such a

disagreement "does not constitute a NEPA violation" because an agency's

scientific judgments are afforded "the highest level of deference."  *Native Ecosys.*

*Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012).

Furthermore, NEPA does not require an agency to quantify the costs of the

alternatives it considers through a cost-benefit methodology like the social cost of

carbon tool.  40 C.F.R. § 1502.23 ("[T]he weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis . . . .").  The social cost of carbon tool was developed for the express purpose of "allow[ing] agencies to incorporate the social benefits of reducing carbon dioxide ($CO_2$) emissions into cost-benefit analyses of regulatory actions that impact cumulative global emissions" and to assist agencies in complying with Executive Order 12866.  MC_0071793.  Executive Order 12866 required federal agencies to assess the cost and benefits of rulemakings as part of their regulatory impact analyses.  58 Fed. Reg. 51,735 (October 4, 1993).  The action challenged here is not a rulemaking and does not require a regulatory-impact analysis.  Accordingly, BLM reasonably did not prepare such a cost-benefit analysis.  *See WildEarth Guardians v. Jewell*, No. 1:16-cv-00605-RJ-SCY, *23-24 (D.N.M. Feb. 16, 2017), attached as Exhibit 3.

Plaintiffs suggest that the EISs did prepare such an analysis by citing *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1192 (D. Colo. 2014), for the proposition that BLM "effectively zeroed out the costs in its quantitative analysis."  Pls.' Br. 26.  That is inaccurate.  Consistent with NEPA's implementing regulations, the EISs prepared no cost-benefit analysis, but

28

they did thoroughly discuss the potential impacts of climate change.[4]  Moreover,

that case is further distinguishable because the court faulted the agency's reasoning

when it had included a social cost of carbon analysis in the draft EIS but removed

the analysis from the final EIS without an adequate explanation, simply stating that

any such analysis was impossible.  *Id*. at 1190-91.  This was deficient, the court

concluded, because the agency had "offer[ed] a factually inaccurate justification

for why it omitted" use of the tool in the Final EIS.  *Id*. at 1191.  Similar facts are

not present here.

Finally, Plaintiffs argue that the social cost of carbon protocol should have

been employed because it acts "as a proxy for understanding climate impacts and

to compare alternatives."  Pls.' Br. 26.  But the same can be said for GHG-

emission estimates.  *See WildEarth Guardians*, No. 1:16-cv-00605-RJ-SCY, *23

(noting use of GHG emissions as proxy for assessing climate impacts under

NEPA).  As discussed above, the EISs used estimated GHG emissions as a proxy

for assessing the potential climate impacts of activities contemplated by the various

alternatives.  That decision is entitled to deference and is not arbitrary or

capricious.

---

[4] *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172, 1200 (9th Cir. 2008), is similarly inapposite because it involved a nationwide rulemaking on corporate average fuel economy standards in which the agency conducted a cost-benefit analysis.  *Id.* at 1191-92.

### 3.    The EISs' conversion of methane emissions to carbon dioxide equivalents was not arbitrary or capricious.

Both EISs estimated the quantity of methane emissions.  SOF ¶¶ 35-36, 79. They then standardized those emissions with other GHGs to express the total GHG emissions as carbon dioxide equivalents ($CO_2e$).  This required identifying a "global warming potential" (GWP) factor by which to multiply the methane emissions to determine the $CO_2e$.  The EISs used a factor of twenty-one for methane.  SOF ¶ 36, 75.  Plaintiffs argue that use of this factor violated NEPA because it was outdated and should have been based on a shorter time horizon. Pls.' Br. 28.  This argument fails because the EISs' use of a factor of twenty-one fostered informed decision-making and was not arbitrary or capricious.

The Final Miles City EIS explained that the GWP factor of twenty-one for methane emissions was based on EPA regulations effective as of November 1, 2013, which used a 100-year time horizon.  SOF ¶ 75.  The Final Miles City EIS acknowledged that EPA had proposed to change that factor to twenty-five,[5] and that other organizations had set different factors that varied "depending on the time frame being analyzed."  SOF ¶ 76.  "For example, estimates of [methane's GWP] over a 20-year period range from 72 to 105."  *Id.*

---

[5] EPA revised its rule to change the GWP factor for methane to 25 effective in 2014.  *See* 78 Fed. Reg. 71,904, 71,909 (Nov. 29, 2013).  That factor, based on a 100-year time horizon, remains current under the relevant regulation.  40 C.F.R. pt. 98, subpt. A, Table A-1 (2017).

The EIS reasonably explained, however, that using the EPA factor of twenty-one "allow[ed] for consistent comparisons with state and national GHG emission inventories." *Id.* Moreover, providing the estimated methane emission quantities would "allow the public to use other [GWPs] to calculate $CO_2$e, if desired," simply by multiplying the methane emissions by a different GWP. *Id.* This approach was reasonable, promoted informed decision-making, and is entitled to deference. *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1152 (9th Cir. 1997) (NEPA "does not require [courts to] settle disputes between scientists, it dictates that [courts] defer to agency opinion if it is not otherwise shown to be arbitrary or capricious." (citations omitted)).

### B.     The EISs took a hard look at the effects to air quality.

Both EISs contained extensive analyses of air quality in their respective planning areas and surrounding areas. They provided an overview of air quality in the region and then analyzed the potential effect on air quality for each alternative. SOF ¶¶ 39-42, 83-85. Based on those analyses, both EISs concluded that the National Ambient Air Quality Standards (NAAQS) and relevant state air quality standards would not be exceeded in the planning area under any of the

31

alternatives.[6]  SOF ¶¶ 43, 85.  These extensive analyses permitted informed decision-making.

Citing no legal authority, Plaintiffs argue that these analyses violated NEPA by not considering health and other effects at pollutant levels below the NAAQS threshold.  This was not required.  Instead, "[i]f ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health."  *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003); *see also Sierra Club v. U.S. Dep't of Transp.*, 310 F. Supp. 2d 1168, 1202 (D. Nev. 2004) (finding agency "does not act arbitrarily and capriciously by relying on the prevailing NAAQS standard EPA has set.").[7]

Plaintiffs further argue that the EISs failed to adequately assess the cumulative impacts of the alternatives on regional air quality.  Both EISs analyzed

---

[6] Under the Clean Air Act, EPA establishes NAAQS for certain type of pollutants and then "designates areas throughout the United States as 'attainment,' 'nonattainment,' or 'maintenance' for each type of pollutant depending on whether these national standards have been met."  *Nat. Res. Def. Council v. U.S. Dep't of Transp.*, 770 F.3d 1260, 1264 (9th Cir. 2014) (citing 42 U.S.C. § 7409).

[7] Plaintiffs also imply that the EISs' reliance on the NAAQS for ozone in effect at the time they were finalized is improper.  Pls.' Br. 33.  It was not.  *See Nat. Res. Def. Council*, 770 F.3d at 1271 (noting reliance on standards at time of analysis appropriate under NEPA).

air quality in the planning areas and surrounding areas.  Plaintiffs appear to argue that a different geographic area should have been assessed.  But an agency retains broad discretion to identify the geographic scope of a cumulative-impacts analysis. *Forsgren*, 336 F.3d at 962.  The EISs' analysis of air quality was not arbitrary or capricious.

## IV.    Plaintiffs improperly seek to supplement the administrative record.

Plaintiffs attach four exhibits to their brief and argue in a footnote that the "Court may take judicial notice of [them] under Federal Rules of Evidence 201(b)(2), (c)."  Pls.' Br. 16 n.8; *see also* Pls.' Br. 20 n.11, 25 n.12, 31 n.13. Plaintiffs also cite other extra-record documents in their "Statement of Undisputed Facts" and ask the Court to take judicial notice over those documents.  ECF No. 72-2 at 7 nn.1-5.  In effect, Plaintiffs seek to supplement the administrative record. This is improper.

The Order dated February 16, 2017, required Plaintiffs to "file any motions . . . seeking to supplement the record" by June 23, 2017.  ECF No. 36 ¶ F.  Plaintiffs filed no such motion but now seek to circumvent the Court's Order by attaching exhibits to their brief.  This should not be countenanced.

Moreover, even if Plaintiffs had filed a motion to supplement the record, they would have been required to explain how the exhibits satisfy one of the narrow exceptions that permit a court to consider extra-record materials.  *Lands*

33

*Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) ("[T]hese exceptions are narrowly construed and applied." (citations omitted)).  Plaintiffs have not even attempted to make such a showing.  Accordingly, those exhibits and any arguments relying on them should be stricken from the record.

**CONCLUSION**

For the foregoing reasons, Federal Defendants request that the Court deny Plaintiffs' motion for summary judgment, grant Federal Defendants' cross-motion for summary judgment, enter judgment in favor of Federal Defendants, and strike Plaintiffs' extra-record exhibits from the record.

Respectfully submitted on this 11th day of August, 2017.

JEFFREY H.  WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
JOHN S. MOST
Trial Attorneys
Natural Resources Section
P.O.  Box 7611
Washington, D.C.  20044–7611
Phone:  (202) 305-3895(Pettigrew)
Phone: (202) 616-3353 (Most)
Fax:  (202) 305–0506
shaun.pettigrew@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF WORD COUNT

I certify that this brief complies with LR 7.1.  It is 7,909 words, as counted using the word count feature of Microsoft Word, excluding the caption, table of contents, table of authorities, table of acronyms, exhibit index, certificate of word count, and certificate of service.

/s/ *Shaun M. Pettigrew*
SHAUN M. PETTIGREW
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court via the CM/ECF system, which will provide service to counsel for the parties.

*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
*Counsel for Federal Defendants*

37