# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS, *et al.* | **CV 16-21-GF-BMM** |
| Plaintiffs, | |
| vs. | |
| U.S. BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of the Interior, *et al.* | **OPINION AND AMENDED ORDER** |
| Defendants. | |

## I.    INTRODUCTION

The Court held a hearing on the parties' four cross-motions for summary judgment (Docs. 72; 78; 84; 87) on November 2, 2017. (Doc. 108.)

Plaintiffs Western Organization of Resource Councils, Montana Environmental Information Center, Powder River Basin Resource Council, Northern Plains Resource Council, Sierra Club, and Natural Resources Defense Council (collectively "Plaintiffs") filed this action on March 15, 2016. (Doc. 1.) Plaintiffs filed their instant motion for summary judgment on July 14, 2017. (Doc. 72.)

Defendants United States Bureau of Land Management ("BLM"), Sally

1

Jewell in her official capacity as Secretary of the United States Department of the Interior ("DOI"), Neil Kornze in his official capacity as Director of the BLM, and Janice Schneider in her capacity as Assistant Secretary of Land and Minerals Management of DOI (collectively "Federal Defendants") filed a cross-motion for summary judgment on August 11, 2017. (Doc. 78.) Intervenor-Defendants Peabody Caballo Mining, LLC and BTU Western Resources, Inc. filed a cross-motion for partial summary judgment on August 18, 2017. (Doc. 84.) Intervenor-Defendant Cloud Peak Energy filed a cross-motion for summary judgment on August 18, 2017. (Doc. 87.)

Plaintiffs have raised six claims under the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h, and the Administrative Procedures Act, 5 U.S.C. §§ 701-706. (Doc. 1 at 3.) Plaintiffs challenge Federal Defendants' approval of Resource Management Plans ("RMPs") for two adjacent field offices in the Powder River Basin. *Id*. Federal Defendants approved the Buffalo RMP and the Miles City RMP, and six others not at issue here, by the same Record of Decision ("ROD"), dated September 21, 2015. (Doc. 23-1 at 29.)

Plaintiffs allege that Federal Defendants acted arbitrarily and capriciously in approving the RMPs when BLM failed to consider the following matters: 1) alternatives that would reduce the amount of coal available for leasing in each field office; 2) measures that would reduce methane emissions from resource

2

development; 3) direct, indirect, and cumulative impacts of the fossil fuel development under the plans. (Doc. 72-1 at 11.)

Federal Defendants ask the Court to grant summary judgment in their favor. (Doc. 78.) The Defendant-Intervenors also have offered arguments as to why Plaintiffs' claims should fail. (Docs. 84; 87.)

## II.   BACKGROUND

BLM drafted the Buffalo RMP and Miles City RMP to address conditions that had changed within the planning areas since the most recent RMPs had been approved in 1985 for Buffalo and Miles City, and again in 1996 for Miles City. (Doc. 80 at 3, 6, 19, 22.)  These changing conditions included conservation of the Greater Sage-Grouse. The Approved RMPs for revisions to the eight sub-regions, including Buffalo and Miles City, represent, in fact "full scale resource management plan revisions" and "are not limited to [Greater Sage-Grouse] habitat management." (Record of Decision, Doc. 23-1 at 15.)

The ROD addresses sub-regions that cover millions of acres of federally owned and managed lands in parts of Colorado, Montana, North Dakota, South Dakota, and Wyoming. (Doc. 23-1 at 11-14.) "Each sub-region prepared its own separate EIS and conducted its own planning with input from local cooperators, stakeholders, and members of the public." *Id*. at 11.

The Buffalo RMP revision covers about 7.4 million acres of federal, state,

and private land in north-central Wyoming, along with 4.8 million acres of BLM-administered federal mineral estate. (Doc. 23-2 at 13.) The Miles City RMP covers 2.75 million acres of BLM-administered surface lands and 10.6 million acres of BLM-administered mineral acres in seventeen eastern Montana counties. (Doc. 23-5 at 8.)

## A.    RMP Development under FLPMA

The Federal Land Policy and Management Act of 1976 ("FLPMA") directs the Secretary of the United States DOI, through BLM, to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). BLM accomplishes this directive by developing, maintaining, and revising RMPs. 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future management actions." 43 C.F.R. § 1601.0–2. RMPs establish "[l]and areas for limited, restricted or exclusive use" and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." 43 C.F.R. § 1601.0-5(n)(1)–(2).

BLM should "coordinate the land use, inventory planning, and management activities" for lands covered by a RMP. 43 U.S.C. § 1712(c)(9). BLM should coordinate these activities "with the land use planning and management programs of other federal departments and agencies of the States and local governments within which the lands are located." *Id.* BLM obtains this federal, state, and local

cooperation in the RMP process by inviting relevant state and local governments and federally recognized Indian tribes to participate as "cooperating agencies." 43 C.F.R. § 1610.3–1(b). BLM provides cooperating agencies with "opportunity for review, advice, and suggestion on issues and topics that may affect or influence other agency or other government programs." 43 C.F.R. § 1610.3–1(c).

RMP approval represents a major federal action that significantly affects the quality of the human environment. 43 C.F.R. § 1601.0–6. RMP approval triggers the preparation of an Environmental Impact Statement ("EIS") under NEPA. *Id.* The EIS and RMP shall be "published in a single document" whenever possible. *Id.*

**B.      Resource Development Under the MLA**

An RMP "guide[s] and control[s] future management." 43 C.F.R. § 1601.0–2. An RMP may identify lands available for leasing, define resource use, and levels of production. 43 C.F.R. § 1601.0–5(n)(1)–(2). Before federal coal, oil, or gas resources may be developed, however, the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181, et seq., prescribes additional procedures. Coal remains subject to a different leasing process than that required for oil and gas development.

After BLM identifies areas suitable for coal leasing in an RMP or other programmatic document, the agency then identifies leases for sale. *See* 43 C.F.R. subpt. 3425. Coal leases and coal lease modifications trigger the preparation of an

EIS of the proposed lease area. 43 C.F.R. §§ 3425.2, 3425.3, 3432.3(c). A lessee seeking to develop leased resources must submit a plan for operation and reclamation for approval by the Secretary of Interior. 30 U.S.C. § 207(c). The Secretary of Interior bases approval on a recommendation from the Office of Surface Mining Reclamation and Enforcement. The Office of Surface Mining Reclamation and Enforcement must comply with NEPA in evaluating the plan. 30 C.F.R. § 746.13.

BLM offers oil and gas leases for sale consistent with the RMP. 43 C.F.R. § 1610.5–3(a). A lessee seeking to develop oil or gas must submit an Application for Permit to Drill (APD) at least thirty days before commencement of operations. 43 C.F.R. § 3162.3–1(c). "NEPA applies at all stages of the process." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006).

### III.   LEGAL STANDARD

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court will grant summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## A.    NEPA

The National Environmental Policy Act ("NEPA") requires federal agencies to "take a hard look" at the "environmental consequences" of their decision-making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal citations omitted). The statute "does not mandate particular results." *Id*. NEPA instead "prescribes the necessary process" that agencies must follow to identify and evaluate "adverse environmental effects of the proposed action." *Id*. Such effects may be direct, "indirect," or "cumulative." 40 C.F.R. § 1502.16.

The NEPA process requires preparation of an EIS for "major Federal actions" that "significantly" affect the "quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. An EIS must provide a "full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. This discussion should "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.*

## B.    APA

The Court reviews NEPA compliance through the Administrative Procedures Act ("APA"). *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.,* 549 F.3d 1211, 1215 (9th Cir. 2008). The APA instructs a reviewing court to "hold unlawful and set aside" agency action deemed

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

APA review requires the Court to consider whether an agency based a particular decision on "consideration of the relevant factors." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted). Such inquiry must be "thorough," "probing," and "in-depth." *Id*. at 415. The Court must defer to the judgment of the agency, and reverse a decision as arbitrary and capricious only where "a clear error of judgment" has occurred. *League of Wilderness Defs.*, 549 F.3d at 1215. This "clear error of judgment" may entail the following scenarios: 1) the agency's reliance on factors "Congress did not intend [for] it to consider;" 2) the agency's failure to "consider an important aspect of the problem;" 3) the agency's explanation "runs counter to the evidence" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## IV. STANDING

To establish standing, Plaintiffs must demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ecological Rights Found. v Pac. Lumber Co.*, 230 F.3d 1141, 1147

(9th Cir. 2000) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). Individual members possess standing if they can demonstrate three elements: 1) injury-in-fact that is concrete and particularized, and actual or imminent; 2) causation, such that the injury is fairly traceable to the challenged action; and 3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Courts relax the normal standards for redressability and immediacy where a plaintiff seeks to enforce a procedural requirement. *Lujan*, 504 U.S. at 572 n.7. Injury-in-fact can be established by an environmental plaintiff who demonstrates "an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by defendant's conduct." *Ecological Rights Found.*, 230 F.3d at 1147. The Ninth Circuit has determined that "[e]nvironmental plaintiffs adequately allege injury in fact" where they attest to their use of the affected area and "are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *WildEarth Guardians v. U.S.D.A.*, 795 F.3d 1148, 1154 (9th Cir. 2015).

Plaintiffs have provided the Court with five declarations sworn by members of their respective groups who use areas open to development under the Buffalo RMP and the Miles City RMP. (Docs. 72-3; 72-4; 72-5; 72-6; 72-7; 94-1.)  These declarants attest that they live, farm, ranch, and recreate on and near BLM land in

the Miles City and Buffalo Field Office areas.

## A.     Legal Status of the Land

Federal Defendants argue broadly that Plaintiffs fairly cannot trace their alleged injuries to the RMPs. Federal Defendants allege that the RMPs do not change the legal status of the land. (Doc. 79 at 16-17.) In other words, the same land open to energy development under previous RMPs remains open today. *Id*. Federal Defendants further argue that the prior status of the land also impedes the redressability requirement. *Id.* at 17. Federal defendants point out that an order by the Court to vacate the new RMPs simply would restore the prior RMPs. *Id*. These previous RMPs also allow for resource development. *Id*.

The Ninth Circuit has recognized that NEPA "define[d] [an] injury" and conferred "the right to have agencies consider all reasonable alternatives before making a decision affecting the environment." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1514 (9th Cir. 1992). Federal Defendants' argument incorrectly attempts to characterize Plaintiffs' claimed injury as an injury suffered by virtue of the status of the land alone. This argument suggests by extension that no modern agency decision to maintain the status quo can give rise to a fairly traceable, redressable injury.

Plaintiffs challenge the sufficiency of the process underlying Federal Defendants' decision to maintain the land's eligibility for resource development.

The outcome of that process represents a decision not to foreclose additional land to development. Plaintiffs' alleged injury stems from Federal Defendants' decision to keep these lands open to potential development. This outcome represents the type of injury "contemplated by Congress" in drafting NEPA. *Idaho Conservation League*, 956 F.2d at 1516.

The same reasoning applies to Federal Defendants' argument regarding the lack of redressability. Plaintiffs ask first that this Court vacate and set aside Federal Defendants' actions. Plaintiffs further ask the Court to enjoin leasing of coal, oil, and gas until Federal Defendants have complied with NEPA. Such an injunction would redress the alleged harm. An injunction would require NEPA compliance before any future resource development takes place on the lands encompassed by the Buffalo RMP and the Miles City RMP.

**B.     Traceability to RMPs versus Implementation Decisions**

Federal Defendants also argue broadly that Plaintiffs' concern over implementation-level lease sales demonstrate that Plaintiffs' alleged injuries cannot fairly be traced to the programmatic RMPs. (Doc. 79 at 17-18.) Federal Defendants contend that these implementation-level decisions constitute final agency action subject to APA challenge for want of compliance with NEPA or another statute. *Id*. at 18. A challenge to an implementation-level decision, according to Federal Defendants, would afford "direct" redress for Plaintiffs'

grievances rather than upset broad, programmatic-level management decisions that have been "years in the making" and affect a "vast array" of interests. *Id*. Federal Defendants suggest that RMPs represent instead a general "statement of priorities" that do not prescribe further specific actions. *Id*. at 19.

The Ninth Circuit has rejected the argument that future statutory safeguards against an alleged injury preclude a challenge to a programmatic decision that makes such injury possible. *Idaho Conservation League*, 956 F.2d at 1516. The Ninth Circuit in *Idaho Conservation League* determined that environmental plaintiffs possessed standing to challenge the sufficiency of an EIS underlying the United States Forest Service's decision to recommend against wilderness designation. *Id*. The Court acknowledged that the "concrete effect[s]" of the EIS and recommendation "might be seriously mitigated" at the implementation level by NEPA's requirements. *Id*. The EIS and recommendation "made possible development," however, which constituted "injuries that we must deem *immediate, not speculative*." *Id*. A contrary finding would assume Congress's procedural safeguards "useless" and the wilderness designation itself "superfluous." *Id*.

This Court sees no reason that future NEPA obligations should bar Plaintiffs' claim. The RMPs represent "important decision[s]" similar to the agency recommendation considered in *Idaho Conservation League*. *Id*. Federal Defendants' approval of the RMPs "ma[k]e possible" Plaintiffs' alleged injuries.

*Id.* Such injuries can be traced to the current agency action "in the sense contemplated by Congress." *Id.*

## C.     Sufficiency of Declarants' Use and Enjoyment

Federal Defendants argue that the declarations submitted by Plaintiffs regarding their members use and enjoyment of the affected lands lacks specificity in both declarants' descriptions of their use of the land and plans to return. (Doc. 79 at 19.) Federal Defendants rely on *Lujan*, where the United States Supreme Court held that a group of plaintiffs lacked standing to challenge the Secretary of the Interior's determination that a section of the Endangered Species Act did not apply to federally-funded actions taken outside the United States. 504 U.S. at 578. The Supreme Court discussed the affidavits of two people who "had visited" certain international project areas and "intend[ed]" to return. *Id.* at 563. The Supreme Court deemed these affidavits insufficient to support standing because the affiants lacked a concrete or specific plan to return. *Id.* at 564. These "some day" intentions to return could not support an "actual or imminent" injury. *Id.*

The Ninth Circuit has distinguished *Lujan* in articulating a "flexible approach" to injury-in-fact in environmental cases. *Ecological Rights Found.*, 230 F.3d at 1150. This "flexible approach" to injury-in-fact in environmental cases requires a showing of a connection to the relevant area "sufficient to make credible the contention" that the declarant "really has or will suffer in his or her degree of

aesthetic or recreational satisfaction" should the area suffer environmental harm. *Id.* at 1149. The Ninth Circuit evaluated the sufficiency of declarations submitted by members of environmental groups to establish standing to bring an action against a logging company for violations of the Clean Water Act. *Id.* at 1143.

The Ninth Circuit first reviewed the declarations in *Lujan*. The affiants in *Lujan* lived "huge distances" from the foreign development projects located "halfway around the world" that they challenged. *Id*. at 1148, n.7. The *Lujan* affiants lacked a definite plan to return and "any tangible, continuing connection to any particular location affected by the challenged decision." *Id*. at 1148. The Ninth Circuit concluded that this attenuation rendered their injuries "extremely speculative." *Id*.

By contrast, the declarants in *Ecological Rights Foundation* were members of the plaintiff environmental groups who actually used a particular creek for recreation. *Id*. at 1144. The declarants alleged "longstanding recreational and aesthetic interests." *Id.* at 1150. The declarants attested to having "used [the area] for recreational activities several times in the past." *Id.* And declarants "expressed an interest in participating in recreational activities [in the area] in the future." *Id*. The Court discussed in detail two declarations. *Id*. at 1144.

The first declarant attested to intermittent visits to the creek since 1989. *Id*. The declarant had gone swimming in the creek at least a dozen times. *Id*. The

declarant attested that he was less likely to swim in the creek in the future because of the logging company's actions. *Id*. The declarant also indicated that he had fished the creek in the past, but was less likely to fish there because he is concerned about pollutants in the water. *Id*. Finally, the declarant's knowledge about potential pollution in the creek decreased his aesthetic enjoyment of the creek. *Id*. at 1144-45.

The second declarant took part in various recreational activities on, and downstream of, the creek, including snorkeling and swimming. *Id*. at 1145. The declarant also enjoyed observing wildlife in the area. *Id*. The declarant intended to continue to use the creek for these purposes. Discharges of pollutants into the waterway compromised his enjoyment. *Id*.

Plaintiffs' member declarations articulate a sufficient injury-in-fact to support Plaintiffs' challenge to the Miles City RMP under the "flexible approach" put forth in *Ecological Rights Foundation*. Four of five declarants live, ranch, work, and recreate in the Miles City RMP area. (Docs. 72-3; 72-4; 72-6; 94-1; 72-7.) These declarants belong to the Plaintiff organizations. These declarants have stated longstanding recreational and aesthetic interests in the area.

For example, declarant Wade Sikorski's home overlooks land subject to the Miles City RMP. (Doc. 72-3 at 2.) Sikorski cites two specific areas of potential resource development under the Miles City RMP where such development would

impact his aesthetic satisfaction "every morning." *Id*. Other declarants expressed

concerns regarding public health and safety, air and water contamination, and

various other impacts to the Miles City RMP area's recreational and aesthetic

values. Those declarants who did not attest to living on, or in sight of, land subject

to development under the Miles City RMP "expressed an interest" in future

recreation with an intent to return regularly. (Docs. 72-6; 94-1; 72-7.) These

declarants satisfy the "flexible approach" to standing adopted in *Ecological Rights*

*Found*ation. 230 F.3d at 1150.

Plaintiffs submitted one declaration to support standing for Plaintiffs'

challenge to the Buffalo RMP. Declarant Sharon Anderson described use of the

Fortification Creek Planning Area and the Thunder Basin National Grassland

within and nearby the Buffalo RMP area. (Doc. 72-5 at 2-3.) Anderson described

regular recreational use of these areas between 2008 and 2017. And importantly,

Anderson attested that she plans to return. *Id*.

Anderson articulated her concern about harm to wildlife as a result of oil and

gas development in the Fortification Creek area that would impact her aesthetic

appreciation of the area. (Doc. 72-5 at 3.) Anderson further articulated her

concerns about air quality impacts as a result of coal development that would

impact her ability to recreate in the Thunder Basin area. *Id*. at 4. Anderson stressed

her concern about the impacts that resource development may have on her ability

to access areas in which she intends to continue to recreate in the future. *Id*. at 5-6.

Anderson's declaration meets the Ninth Circuit's "flexible approach" for injury-in-fact and establishes Plaintiffs' standing to challenge the Buffalo RMP. *Ecological Rights Found.*, 230 F.3d at 1150.

## V.    DISCUSSION

### A.    BLM's Consideration of Alternatives

Plaintiffs allege that BLM violated NEPA by failing to consider a reasonable range of alternatives in approving the Miles City and Buffalo RMPs. (Doc. 72-1 at 16.) Specifically, Plaintiffs allege that the Buffalo EIS and the Miles City EIS failed to consider any alternative that would decrease the amount of extractable coal available for leasing. *Id*. at 17. Plaintiffs further allege that BLM unlawfully failed to consider alternatives that would require measures to reduce methane pollution from oil and gas development in drafting both RMPs. *Id*. at 22.

Consideration of alternatives falls at the "heart" of the NEPA-mandated environmental impact statement. 40 C.F.R. § 1502.14. This consideration must "sharply defin[e] the issues" and "provid[e] a clear basis for choice among [the] options." *Id*. "An agency must look at every reasonable alternative" within the "nature and scope of the proposed action." *Friends of Yosemite Valley*, *v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (quoting *Alaska Wilderness*

*Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir.1995)). The agency must evaluate a broader range of alternatives where a proposed action constitutes "an integral part of a coordinated plan to deal with a broad problem." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1098 (9th Cir. 2006) (internal citations omitted).

The Court limits its review of the sufficiency of alternatives considered to whether the agency considered alternatives "necessary to permit a reasoned choice." *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982). Whether the agency's "selection and discussion" of the alternatives "fosters informed decision-making and informed public participation" provides the "touchstone" for the Court's analysis of the sufficiency of alternatives considered by the agency. *Id.*

An agency first violates this provision of NEPA where it considers "essentially identical" alternatives. *Friends of Yosemite Valley*, 520 F.3d at 1039. An agency also may violate NEPA when it fails to examine all reasonable alternatives. *'Ilio'ulaokalani Coal.*, 464 F.3d at 1095. The Court admittedly should afford the agency "considerable discretion in defining the scope of an EIS." *Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1067 (9th Cir. 1995). Statutory objectives "serve as a guide" to determine the reasonableness of objectives outlined in an EIS. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004); *New Mexico ex rel. Richardson v. Bureau of Land*

*Mangagement*, 565 F.3d 683 (10th Cir. 2009).

The BLM operates under a statutory mandate to "take into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(c). These long-term needs of future generations include, but need not be limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific, and historical values." *Id*. With specific regard to coal development, the multiple use mandate allows BLM to "eliminate" coal deposits from eligibility for leasing. 43 C.F.R. § 3420.1–4(e)(3). These coal deposits may be removed "to protect other resource values and land uses that are locally, regionally, or nationally important or unique." *Id*.

### i.    Claim 1: Identical Coal Alternatives

The Miles City EIS considered five coal alternatives. (Doc. 80 at 23.) Each alternative maintained the same acreage available for leasing. *Id*. at 24-25. Each alternative anticipated identical amounts of recoverable coal available for leasing, and expected coal production. *Id*. These figures "carried forward" the results of previous coal screening that had been adopted by BLM through approval of the 1985 Miles City RMP and the 1996 Miles City RMP. *Id*. The 1985 Miles City RMP and the 1996 Miles City RMP failed to consider the impacts of climate change. (Doc. 72-2 at 14.)

The Buffalo EIS considered four alternatives. (Doc. 80 at 7.) Each

alternative identified the same potential coal leasing acreage. *Id*. at 10. Each

alternative identified the same tonnage estimates. *Id*. These figures "carried

forward" the results of a 2001 coal screening update to the 1985 Buffalo RMP. *Id*.

at 9-10. Neither the 2001 coal screening, nor the 1985 RMP, considered climate

change in identifying coal available for leasing. (Doc. 72-2 at 14.)

Federal Defendants rely on three main contentions to support the sufficiency

of the alternatives considered. Federal Defendants first argue that the scope of an

EIS deserves "considerable discretion." (Doc. 79 at 23.) Federal Defendants reason

that this discretion affords the BLM the ability to defer consideration of additional

alternatives and impacts to the leasing stage. *Id*. at 27. Federal Defendants next

argue that the EIS did not consider identical alternatives. Federal Defendants

contend that each alternative reflected a different management approach that

imposed varying emphases on conservation or development. (Docs. 79 at 24; 80 at

23-24.) Federal Defendants finally contend that no provision of NEPA required

them to consider alternatives that identified less area for coal leasing. In this

regard, Federal Defendants suggest that they received "no substantial new

information" during the development of the RMP and EIS that brought into

question the previous assessments of acreage and tonnage potentially suitable for

coal development. (Doc. 79 at 25.)

The Ninth Circuit in *'Ilio'ulaokalani Coalition* held that the Army violated

NEPA by failing to consider all reasonable alternatives. 464 F.3d at 1102. The Army sought to transform various brigades into "Brigade Combat Teams." *Id*. at 1086-87. The Army identified Hawaii as one of the sites for transformation in a Programmatic Environmental Impact Statement ("PEIS"). *Id*. at 1086. The Army completed a Site-Specific Environmental Impact Statement ("SEIS") that analyzed the impacts on the environment of the proposed transformation. *Id*. at 1087.

The Army violated NEPA by failing to consider alternatives in either the PEIS or SEIS that addressed the transformation of the brigade in a location outside of Hawaii. *Id*. at 1098. The Army's own experts during the PEIS process had identified transformation of the brigade in a location outside of Hawaii as a reasonable, unexamined alternative. *Id*. Specifically, Major Army Command attorneys characterized the decision to select Hawaii as "a decision that is not based on any analysis." *Id*. at 1099. The Court further noted that the public had questioned the selection of Hawaii in the scoping process for the SEIS. *Id*. at 1102.

The Tenth Circuit in *Richardson* addressed, among other issues, the reasonableness of the BLM's decision to consider no alternative for an RMP that closed more than 27 percent of the area covered by the RMP for development. The Tenth Circuit premised the agency's alternatives analysis on two guideposts of reasonableness. An agency's alternative will be considered reasonable only where the alternative falls within the agency's statutory mandate. *Richardson*, 565 F.3d at

709. Reasonableness must be judged with reference to an agency's objectives for a particular project. *Id.*

The Tenth Circuit agreed with plaintiffs that BLM's failure to analyze alternatives that considered no development of the areas covered by the RMP, despite numerous public comments to that effect, violated the rule of reason. *Id.* at 711. The closing of the entire RMP from resource development represented a reasonable management possibility that should have been analyzed. The Tenth Circuit reached this conclusion, in large part, based on the fact that the planning process for the RMP must have included the question of whether any of the lands in the plan area would be "suitable" for resource development. *Id.*

The Ninth Circuit in *Block* provides another analysis of what constitutes "a reasoned choice" regarding alternatives. The district court in *Block* ordered the Forest Service to consider additional alternatives as part of its analysis of what land should be opened to further resource development or non-wilderness designation. The Ninth Circuit agreed with respect to alternatives that considered an increase in resource development on forest lands currently open to development and a potential increase in lands assigned to wilderness. *Block*, 690 F.2d at 767-768. These two alternatives proved essential to the Forest Service making "a reasoned choice." *Id.*

The Ninth Circuit reversed, however, with respect to a proposed alternative

that would have required the Forest Service to increase the number of temporary land management classifications. These proposed conditional use categories lacked connection to the Forest Service's policy concerns related to resource development. The consideration of an increased number of temporary uses would not aid the Forest Service in determining how much land ultimately should be open to resource development or non-wilderness designation. *Id.* at 767.

BLM's "considerable discretion" to establish the scope of an EIS fails to absolve BLM of its duty to "look at every reasonable alternative." *Friends of Yosemite Valley*, 520 F.3d at 1038. These reasonable alternatives should be "dictated by the nature and scope of the proposed action." *Id*. BLM operated under its multiple use mandate to revise the RMPs in light of conditions that have changed since the last RMP revision. (Doc. 80 at 3, 6, 19, 22.) BLM acknowledged in the proposed Miles City RMP and final EIS ("PRMP and FEIS") that the public scoping period identified climate change as a concern. MC:7-2537. BLM recognized the importance of "identifying management actions" to reduce climate change impacts. *Id*.

The Buffalo PRMP and FEIS similarly recognized that citizens had raised climate change issues in the scoping phase. The Buffalo PRMP and EIS acknowledged the need to address this concern in "land management practices." BUF:6-1419. Both the Buffalo PRMP and FEIS and the Miles City PRMP and

FEIS also acknowledged Secretarial Order 3289. The Secretary of Interior through this order "establish[ed] a Department-wide, scientific-based approach" to both "increase understanding of climate change" and to "coordinate an effective response to impacts on managed resources." MC:7-2718; BUF:6-1732.

BLM recognized climate change concerns at a departmental level and within the PRMP and FEIS for both Buffalo and Miles City. BLM's previous coal-screening decisions had not addressed these concerns. Climate change concerns presented a reasonable basis for BLM to conduct a new coal-screening and to consider adopting an RMP that foreclosed coal extraction in additional areas. Without such consideration, BLM could not make a reasoned choice as to whether foreclosing development on additional acreage would serve its multiple use mandate and would address concerns that may arise from the changing conditions that spurred the RMP revision, including climate change. *Block*, 690 F.2d at 767. The agency's reliance on the results of previous coal screening foreclosed consideration of a reasonable alternative.

BLM's failure to consider any alternative that would decrease the amount of extractable coal available for leasing rendered inadequate the Buffalo EIS and Miles City EIS in violation of NEPA. *Id.*; *see also Richardson*, 565 F.3d at 711. Similar to the Army's failure to consider options outside Hawaii, BLM violated NEPA when it failed to consider options that modified or foreclosed the amount of

acreage available for coal development. *'Ilio'ulaokalani Coal.*, 464 F.3d at 1102. BLM's "considerable discretion" in determining the scope of the EIS fails to justify this omission. *Id.*

### ii.    Claim 2: Methane Emissions Mitigation

Plaintiffs next allege that BLM violated NEPA by failing to consider alternatives that would require producers to implement mitigation measures for methane emissions from oil and gas development. The Miles City PRMP and FEIS identified the goal of "reduc[ing] greenhouse gas emissions when feasible." MC:7-2576. The Buffalo PRMP similarly identified a goal of "reducing the impacts of . . . greenhouse gases associated with BLM actions." BUF:8-4276. Federal Defendants characterize these goals as general and programmatic. (Doc. 79 at 29.)

Federal Defendants reason that it properly deferred to the leasing stage consideration of specific mitigation measures. Federal Defendants once again point to the broader, programmatic nature of the RMP and EIS. (Doc. 79 at 29.) Federal Defendants further contend that imposition of specific methane-mitigation measures was not necessary "to permit a reasoned choice." *Id.* Plaintiffs point to the Tenth Circuit's decision in *Richardson* to support its claim that BLM should have considered alternatives that imposed additional methane mitigation measures.

As discussed previously, *Richardson* deemed unreasonable BLM's failure to consider removal of additional lands from resource development during the

RMP process. *Richardson*, 565 F.3d at 711. This omission differs from BLM's decision regarding methane mitigation measures required for future lessees. BLM considered in the Buffalo FEIS a requirement that future lessees "conduct operations in a manner that minimizes adverse impacts to other resources and other land uses and users." BUF:6-1547. This consideration included implementation of "mitigation measures within BLM's authority." BUF:6-1536. The Miles City FEIS similarly considered the implementation of "emission reduction mitigation measures and conservation actions" during "project-level planning." MC:6-2576.

The district court's decision in *Natural Resources Defense Council, Inc. v. Evans*, 168 F. Supp. 2d 1149 (N.D. Cal. 2001), *order aff'd in part, vacated in part on other grounds*, 316 F.3d 904 (9th Cir. 2003), provides a more appropriate comparison. The district court evaluated the adequacy of alternatives considered by the National Marine Fisheries Service ("NMFS") in developing two EAs. *Id*. at 1160. The first EA concerned fishing limits for groundfish. *Id*. NMFS considered two alternatives based on groundfish mortality rates that the agency acknowledged to be inaccurate. *Id*. The reliance on inaccurate data failed to satisfy the "hard look" mandate. *Id*. NMFS further failed to justify its use of the inaccurate data. *Id*. The second EA considered the environmental impacts of an amendment to the law governing the management of federal fishing waters off the coast of the United States. *Id*. NFMS considered only two alternatives: the status quo and the agency's

own proposed alternative. *Id*.

The district court noted that NMFS ignored "at least four alternatives" proposed by environmental groups. *Id.* NMFS also "did not explain its failure" to address these possible alternatives. *Id*. The district court agreed that NEPA did not require the agency to "address every conceivable alternative." *Id*. NFMS violated NEPA, however, by failing to "at least '[s]tudy, develop and describe appropriate alternatives." *Id*. (quoting 42 U.S.C. § 4332(2)(E)). NEPA required the agency to base its consideration of alternatives on sound science. *Evans*, 168 F. Supp. 2d at 1160. NEPA required the agency to expand its consideration of alternatives beyond maintenance of the status quo and the agency's own preferred alternative. *Id*.

Plaintiffs argue that NEPA required BLM to consider an alternative RMP that considered imposing mandatory methane mitigation measures for future lessees. (Doc. 72-1 at 23.) The imposition of such a requirement would exceed what the district court required in *Evans*. Unlike *Evans*, 168 F.Supp.2d at 1160, nothing indicates that BLM's proposed methane mitigation analysis relies on inaccurate data.

BLM considered in the Buffalo EIS a requirement that mineral lessees operate in a manner that reduces adverse impacts. In particular, BLM considered implementation of "mitigation measures within BLM's authority." BUF:6-1536; *see Richardson*, 565 F.3d at 709. A consideration of mitigation measures beyond

BLM's authority would not assist BLM in a making a "reasoned choice" regarding its proposed action. *Block*, 760 F.2d at 767. Likewise the Miles City FEIS adequately considered implementation measures within BLM's authority to reduce methane emissions. MC:6-2576.

More importantly, *Evans* addressed EAs for two discrete project level actions by the agency. *Evans*, 168 F.Supp.2d. at 1160. BLM's proposed action relates to what lands should be available for resource development in Buffalo RMP and the Miles City RMP. The environmental analyses for the Buffalo RMP and the Miles City RMP provide a programmatic look at the resource development options for large planning areas. BLM retains the ability to impose specific methane mitigation measures at the project level. BLM likely will address these methane mitigation measures more extensively as part of its consideration of greenhouse gases and climate change from indirect and downstream uses related to resource development in the Buffalo RMP and the Miles City RMP. The imposition of the methane mitigation measures urged by Plaintiffs would demand more of the agency than what would be needed to "permit a reasoned choice." *Block*, 690 F.2d at 767.

B.    **BLM's Consideration of Greenhouse Gases and Climate Change**

Plaintiffs next allege that BLM violated NEPA by failing to consider cumulative and indirect impacts of the extraction of fossil fuels pursuant to the

RMPs and in the context of BLM's management of other areas. (Doc. 72-1 at 25.) Plaintiffs further claim that BLM violated NEPA when it understated the foreseeable methane emissions from resource development under the RMPs. Plaintiffs allege that BLM likely understated foreseeable methane emissions when it relied upon outdated science. *Id.*

NEPA's "hard look" mandate requires BLM to identify and evaluate "adverse environmental effects of the proposed action." *Robertson*, 490 U.S. at 350. Congress has provided that the agency must consider "direct effects" of an agency action, "indirect effects" of that agency action, and the likely "cumulative impact" of the same agency action. 40 C.F.R. § 1502.16, 1508.7, 1508.8. "Indirect effects" are "caused by the action," but occur "later in time or farther removed in distance." 40 C. F. R. § 1508.8. Congress requires consideration of these "indirect effects" so long as these effects seem "still reasonably foreseeable."

"Cumulative impact" of an agency action results from "the incremental impact" of a major federal action when "added to other past, present, and reasonably foreseeable future actions, regardless of what agency or person undertakes such actions." 40 C.F.R. § 1508.7. These reasonably foreseeable future actions may result from "individually minor but collectively significant actions" that occur "over a period of time." *Id.* The Court's evaluation of the sufficiency of an agency's consideration of environmental consequences asks "whether the EIS's

form, content and preparation foster both informed decision-making and informed public participation." *Block*, 690 F.2d at 761.

### i.    Claim 3: Indirect and Downstream Effects

Plaintiffs argue that NEPA requires BLM to consider the indirect effects of downstream combustion of resources extracted from the planning areas. (Doc. 72-1 at 25.) Plaintiffs assert that these emissions qualify as foreseeable effects. Plaintiffs point out that the resources developed under the RMPs will be used for foreseeable purposes that generate emissions capable of estimation. *Id*. at 26.

The Buffalo FEIS estimated that BLM would lease 10.2 billion tons of coal over the 20 year period spanned by the RMP. BUF:6-2232. BLM additionally estimated the greenhouse gas emissions for activities in the Buffalo Planning Area in tons per year. BUF:6-2096; 6-2098; 6-2101; 6-2103. BLM estimated that the development of leasable coal within the Buffalo Planning Area would produce annual emissions equivalent to 10,106,906 tons of carbon dioxide ("$CO_2e$"). *Id*. The annual emissions multiplied by the 20-year span of the Buffalo RMP would amount to approximately 202 million tons of $CO_2e$.

The Miles City FEIS estimated that 926 million tons of coal would be mined over the 20-year period. MC:7-3799–3800. BLM estimated the greenhouse gas emissions, in tons per year, for BLM activity in the Miles City Planning Area under each of the five alternatives considered. MC:7-3083–3087. The estimates

include BLM-source emissions for oil and gas development and production, coal

mining, vegetation management, fire management, forestry and woodland

products, livestock grazing, trails and travel management, general purpose BLM

fleet travel, and road maintenance. *Id*.

Specifically, BLM estimated that coal mining and oil and gas production

would produce annual emissions equivalent to 164,210 tons of carbon dioxide, the

least generated by the five plans considered, under Alterative B. MC:7-3084.

BLM estimated that resource production under Alternative D would produce

annual emissions equivalent to 205,952 tons of carbon dioxide, the highest of the

five plans. MC:7-3086. These estimates amount to a range of 3,284,200 to

4,119,040 tons of $CO_2e$ emitted by BLM resource development activities over the

20-year span of the RMP.

Plaintiffs assert that BLM must "disclose and analyze" downstream

emissions. (Doc. 72-1 at 26.) Plaintiffs reason that BLM's previous analysis of

downstream effects in environmental analyses for lease-level coal projects

demonstrates the reasonableness of this type of quantification. (Doc. 72-2 at 21.)

Plaintiffs further argue that *High Country Conservation Advocates v. U.S. Forest

Service*, 52 F.Supp.3d. 1174 (D. Colo. 2014), and *Mid States Coalition for

Progress v. Surface Transportation Board*, 345 F.3d 520 (8th Cir. 2003), support

the contention that NEPA requires that the RMP-level EIS contain a downstream

emissions analysis.

The district court in *High Country* considered NEPA obligations where lease-level agency action would authorize additional coal mining. *High Country*, 52 F. Supp.3d. at 1189-90. BLM violated NEPA when it ignored a tool available to assess the impacts caused by emissions associated with new coal leases. The social cost of carbon protocol reasonably could have assisted the agencies in their analysis. *Id*. at 1190. BLM acted arbitrarily and capriciously when it decided to quantify the expected *benefits* of the modifications to the coal leases and yet claim that a similar effort to analyze the *costs* of the lease modifications would be impossible. *Id.*

Similarly, the question presented in *Mid States* concerned final approval of a rail line proposal that would increase coal consumption. *Mid States*, 345 F.3d at 549-50. The Surface Transportation Board (STB) declined to consider the effects on air quality that an increase in the supply of low-sulfur coal would produce. The STB defended this omission on the basis that many utilities would shift to the use of low-sulfur coal regardless of whether it approved the new rail line.

The Eighth Circuit deemed it "illogical" to suggest that an increase in the availability of low-sulfur coal at lower prices would not affect the demand. The Court also rejected the argument that the analysis of the effects of increased coal generation would be "too speculative." The increased emissions would be

"reasonably foreseeable" in that context. An agency simply may not ignore an issue when the nature of the effect would be "reasonably foreseeable," but its "extent" may not. STB acted "irresponsibl[ly]" when it approved the proposed rail project "without first examining the effects" of a reasonably foreseeable increase in coal consumption. *Id*. at 550.

These cases admittedly analyzed projects narrower in scope and of a more discrete nature than the RMPs at issue here. The Ninth Circuit in *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002), likewise has instructed, however, that an agency may not "avoid" analysis of foreseeable environmental consequences in an RMP-level EIS "by saying that the consequences are unclear or will be analyzed later when an EA is prepared for a site-specific program proposed pursuant to the RMP." Deferral of such analysis "based on a promise to perform a comparable analysis in connection with later site-specific projects" risks defeating entirely the purpose of completing an EIS at the RMP stage. *Id*.

As the Ninth Circuit observed, "no environmental consequences would ever need to be addressed in an EIS at the RMP level if comparable consequences might arise, but on a smaller scale, from a later site-specific action proposed pursuant to the RMP." *Id*. The EIS analysis at the RMP stage "may be more general" than the subsequent lease-level EA. *Id*. Analysis of environmental consequences at the

RMP-level EIS can "guide" subsequent analyses, however, and prevent "wasteful duplication" among multiple lease-level EAs. *Id*.

NEPA requires that the agency conduct analysis of environmental consequences "as soon as it can reasonably be done." *Id*. (citations omitted). The Ninth Circuit in *Kern* determined that it was reasonable for the agency to analyze the risk of spreading a contagious root fungus during the preparation of an EIS and RMP in an area of federal land with harvestable timber resources. *Id*. at 1073. The "environmental problem" seemed "readily apparent at the time the EIS was prepared." *Id*. The RMP "contained enough specifics" to permit "productive analysis" and consider alternative proposals to mitigate the impact of the fungus. *Id*.

The Miles City RMP and the Buffalo RMP "contained enough specifics" to permit a "productive analysis" of the downstream burning of the coal, oil and gas open to potential development under the RMPs. *Kern*, 284 F.3d at 1073. The RMPs projected the quantity of recoverable fossil fuels to be extracted during the 20-year period of the RMPs. BUF:6-2232; MC:7-3799-3800. The RMPs also acknowledged that the coal recovered from the planning areas will be burned to generate electricity. BUF:6-2252; MC:7-3798. The impact on the climate borne by the burning of greenhouse gases proved "readily apparent" at the time that BLM scoped and completed the Buffalo EIS and Miles City EIS. *Kern*, 284 F.3d at 1073.

Both the Buffalo PRMP and FEIS and Miles City PRMP and FEIS acknowledged climate change concerns. MC:7-2537; BUF:6-1419.

In light of the degree of foreseeability and specificity of information available to the agency while completing the EIS, NEPA requires BLM to consider in the EIS the environmental consequences of the downstream combustion of the coal, oil and gas resources potentially open to development under these RMPs. Without such analysis, the EIS fails to "foster *informed* decisionmaking" as required by NEPA. *Block*, 690 F.2d at 761 (emphasis added). BLM may not defer wholesale such analysis to the leasing stage. To defer consideration would obviate the need for assessment of any environmental impact that also might arise in a site-specific EA. *Kern*, 284 F.3d at 1072.

### ii.    Claim 4: Cumulative Climate Impacts of Federal Fossil Fuel Management

Plaintiffs next contend that BLM violated NEPA by failing to address in the EIS the foreseeable cumulative climate impacts of fossil fuel development on BLM land both regionally and nationwide. (Doc. 72-1 at 30.) Plaintiffs argue that NEPA required BLM, at least, to conduct a cumulative impacts analysis of the potential greenhouse gas emissions under all eight revised RMPs approved by the single ROD on September 21, 2015. This ROD spanned nearly 10 million acres. *Id.* at 32. Plaintiffs further urge the Court to determine that NEPA required a cumulative

35

impacts analysis that spans all 700 million acres of mineral estate managed by the BLM. *Id*.

Claims 3 and 4 differ beyond mere scale. Claim 3 sought the quantification and consideration of foreseeable downstream emissions from estimated development made possible by the RMPs. Claim 4 asks that the Court determine that NEPA required BLM to estimate the impacts of climate change through the greenhouse gas emissions of 10 to 700 million acres of fossil fuels. Analysis of the cumulative impacts of climate change would require not only quantification, but a standard by which to measure the impacts.

Plaintiffs offer that the BLM might have used a "global carbon budget" or "social cost of carbon protocol," as the standard by which to measure cumulative climate impacts. (Doc. 72-1 at 34-35.) A carbon budget caps the amount of greenhouse gases that may be emitted worldwide to stay below a certain warming threshold. In support of the use of a global carbon budget, Plaintiffs cite the Paris Agreement's mandate to limit global warming "well below 2℃ above pre-industrial levels." *Id*. at 34 n.12. Plaintiffs identify no case, and the Court has discovered none, that supports the assertion that NEPA requires the agency to use a global carbon budget analysis.

A social cost of carbon protocol "quantif[ies] a project's contribution to costs associated with global climate change." *High Country*, 52 F.Supp.3d at 1190.

The district court in *High Country* analyzed the sufficiency of BLM's justification to omit the social cost of carbon protocol analysis in a FEIS for a lease modification that added new lands to an existing coal lease. *Id.* at 1190-91. BLM had included the analysis in a preliminary EA for the same project. *Id*. at 1190. The FEIS, by contrast, "offered a categorical explanation that such analysis is impossible." *Id*. The FEIS omitted the costs portion of the analysis while retaining the quantification of benefits associated with the development. *Id*. at 1191. The district court found "factually inaccurate" and arbitrary BLM's justification for the omission of the costs analysis. *Id*.

The district court presented a compelling discussion of the development and value of the social cost of carbon protocol. The district court ultimately determined, however, that "NEPA does not require a cost-benefit analysis." *Id*. at 1190. The district court did not find the FEIS deficient for its failure to include generally the social cost of carbon protocol. *Id*. The FEIS fell short due to its omission of the costs portion of the analysis without adequate justification. The FEIS included, of course, an effort to analyze the alleged benefits of the proposed modifications to coal leases. This decision to ignore an analysis of the proposed costs of the lease modification as too speculative while including a similarly speculative analysis of the proposed benefits represented the arbitrary and capricious action. *Id.*

NEPA requires disclosure of "ecological[,] . . . economic, [and] social" impacts of proposed agency action. 40 CFR. § 1508.8(b). The Buffalo EIS contained GHG emissions inventories at the statewide level. BUF:6-2092–93. The Miles City EIS included comparable statewide information, as well as GHG emissions inventories for the United States and the world. MC:7-3078; 3083–87. The agency used GHG emissions as a proxy for the consideration of global climate change effects. At least one district court has found that the BLM did not act arbitrarily and capriciously by relying on this proxy. *Wildearth Guardians v. Jewell*, No. 1:16-cv-00605-RJ-SCY, 2017 WL 3442922 (D.N.M. Feb. 16, 2017).

The Court's review of NEPA compliance through the APA does not allow the Court to "substitute its judgment for that of the agency." *Volpe*, 401 U.S. at 416. The Court must afford the agency's scientific judgments "the highest level of deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012). The Court agrees with the District of Colorado that, despite the benefits of the social cost of carbon protocol, NEPA does not require a cost-benefit analysis under these circumstances. *High Country*, 52 F.Supp.3d at 1190. BLM's failure to measure the cumulative impacts of its fossil fuel management by either of Plaintiffs' suggested metrics does not present a "clear error of judgment." *League of Wilderness Defs.*, 549 F.3d at 1215.

### iii. Claim 5: Global Warming Potential

Plaintiffs' fifth claim argues that BLM violated NEPA by failing to quantify properly the magnitude of methane pollution by arbitrarily using outdated science. (Doc. 72-1 at 36.) Plaintiffs claim further that NEPA required BLM to analyze emissions over the short-term 20-year planning period of the RMP rather than the 100-year time horizon used by BLM. *Id.* at 37.

The Buffalo FEIS estimated emissions for carbon dioxide, methane, and nitrous oxide from activities within the planning area. BUF:6-2091. BLM multiplied these methane emissions by a factor of twenty-one, and the nitrous oxide emissions by a factor of 310. *Id.* These multipliers convert each gas to its $CO_2e$, and represent the "global warming potential" (GWP) of the emissions. *Id.* The GWP "takes into account the intensity of the substance's heat trapping effect and its longevity in the atmosphere" as compared to carbon dioxide. *Id.*

The Miles City FEIS contained comparable data and GWP calculations. MC:7-2712. BLM noted additionally in the Miles City FEIS that EPA had proposed to change the GWP factors to 25 for methane, and 298 for nitrous oxide. *Id.* BLM further included estimates of methane's GWP from various sources over a 20-year period "rang[ing] from 72 to 105." *Id.* BLM explained that it had selected the GWPs of 21 and 310 to allow "consistent comparison" with existing "state and national GHG emission inventories." *Id.* BLM invited the public to use the

alternate data provided to calculate alternate $CO_2e$ amounts for methane and nitrous oxide. *Id.*

An EIS must provide a "full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. The environmental information made available to the public "must be of high quality." 40 C.F.R. § 1500.1(b). "Accurate scientific analysis" proves "essential to implementing NEPA." *Id.* NEPA requires an agency to ensure "scientific integrity" in the analyses contained in an EIS. 40 C.F.R. § 1502.24. NEPA finds relevant "both short- and long-term effects." 40 C.F.R. § 1508.27(a).

BLM based its GWP on existing EPA data. MC:7-2712; BUF:6-2091. The EPA based its GWP on a 100-year time horizon based on an agreement made by the parties to the United Nations Framework Convention on Climate Change ("UNFCC"). MC:2140-68693; BUF:2165-137116. EPA itself noted that "other time horizon values are available." MC:2140-68693; BUF:2165-137116. A public comment to the Miles City Draft RMP and EIS originally raised the existence and appropriateness of other time horizons. MC:7-3877. A protest submitted on the Buffalo PRMP and FEIS again highlighted the issue. BUF:1996-130451. Only the Miles City PRMP and FEIS noted GWP estimates based on 20-year time horizon. MC:7-2712.

EPA based its use of the 100-year time horizon on a political agreement

between nations rather than on science. The Miles City PRMP and FEIS included estimates based on the 20-year time horizon. Neither the Buffalo PRMP and FEIS, nor the Miles City PRMP and FEIS, explain or justify, however, use of a GWP calculated over a 100-year time horizon. BLM failed in both the PRMP and FEIS to respond further to criticisms of this methodology raised through the comments or protest process. BLM's unexplained decision to use the 100-year time horizon, when other more appropriate time horizons remained available, qualifies as arbitrary and capricious under these circumstances. BLM's unexplained decision to use the 100-year time horizon further fails to satisfy NEPA's purpose of "foster[ing] informed decision-making." *Block*, 690 F.2d at 761.

BLM's decision to note alternate GWP figures in the Miles City FEIS further evidences its awareness that the evolving nature of the science regarding carbon emissions. BLM's failure to acknowledge this changing science in the Buffalo FEIS, however, constituted an additional arbitrary decision that undermined the accuracy and integrity of the GWP analysis. 40 C.F.R. § 1500.1(b); 40 C.F.R. § 1502.24. The Buffalo FEIS failed to provide a "full and fair discussion" as required by NEPA. 40 C.F.R. § 1502.1. The inclusion of this information in the Buffalo FEIS would have allowed members of the public and interested parties to evaluate this information and submit written comments where appropriate, and spur further analysis as needed. Without all the relevant

information, the FEIS could not "foster informed decision-making." *Block*, 690 F.2d at 761.

## C.     Claim 6: Cumulative Impacts on Air Quality

Plaintiffs' final claim alleges that BLM violated NEPA by failing to consider impacts at levels at, or below, the National Ambient Air Quality Standards under the Clean Air Act (NAAQS). (Doc. 72-1 at 41.) Plaintiffs argue that BLM further violated NEPA by failing to consider cumulative impacts on air quality for all federal mineral development and for regional (non-BLM) sources of air pollution. *Id*.

The Buffalo FEIS considered "a summary of current air quality conditions within the planning area and surrounding regions." BUF:6-1692. The Buffalo FEIS based this summary on data from "monitors located within the planning area and in nearby areas." *Id*. The FEIS proceeded to evaluate "potential impacts on air quality" from activities "authorized or performed by the BLM" within the planning area. BUF:6-2059.

BLM's analysis sought to discern whether BLM activity within the planning area would render impacts significant enough to violate the NAAQS or Wyoming Ambient Air Quality Standards (WAAQS). BUF:6-2060. BLM conducted a comparative analysis of cumulative BLM and non-BLM activity emissions and Wyoming statewide emissions.  BUF:6-2089-90. BLM concluded that BLM

activities within the planning area constitute "3 percent or less of statewide totals." BUF:6-2089. The FEIS finally noted that the ozone concentration potentially could violate NAAQS should the EPA act to lower the ozone standard. BUF:6-2090.

The Miles City FEIS established a similar baseline by assessing current air quality within the study area. This assessment included "nearby areas in which air quality could potentially be affected by activities within the planning area." MC:7-2719. BLM further conducted an "air resources impact analysis" that included emissions for "BLM sources and non-BLM sources within the planning area." MC:7-3065. BLM concluded that "emissions from BLM sources would be less than non-BLM sources in the planning area." MC:7-3088. BLM further noted that cumulative impacts from current and projected future BLM and non-BLM sources "would not be expected to exceed the NAAQS or MAAQS [Montana Ambient Air Quality Standards] for any pollutant." MC:7-3088.

The parties have cited no authority, and the Court has found none, that supports Plaintiffs' contention that BLM's reliance on the NAAQS violated NEPA. At least two district courts within the Ninth Circuit have determined that agencies "do not act arbitrarily and capriciously" through reliance on the NAAQS. *Sierra Club v. U.S. Dep't of Transp.*, 310 F.Supp.2d 1168, 1202 (D. Nev. 2004) (citing *Border Power Plant Working Group v. Dept. of Energy*, 260 F.Supp.2d 997, 1021 (S.D. Cal. 2003)). BLM's decision to rely on the NAAQS likewise does not qualify

as arbitrary and capricious.

Plaintiffs' argument regarding non-BLM sources proves similarly unavailing. Both the Buffalo EIS and the Miles City EIS considered regional or statewide air quality from BLM and non-BLM sources. BLM compared the projected emissions of its activity with statewide emissions totals to measure the impact of the plans on the NAAQS. This analysis fostered "informed decision-making" by providing an appropriate context to evaluate BLM's emissions. *Block*, 690 F.2d at 761. This appropriate context included a comparison of those emissions to regional or statewide emissions. BLM reasonably used the NAAQS as a standard in these analyses.

## VI.    JUDICIAL NOTICE

Plaintiffs' Motion for Summary Judgment contained four exhibits. (Docs. 72-8; 72-9; 72-10; 72-11.) Plaintiffs argue in a footnote that these exhibits represent "factual documents" of which the Court may take judicial notice pursuant to Federal Rule of Evidence 201(b)(2) and 201(c). (Doc. 72-1 at 25 n.8, 29 n.11, 34 n.12, 40 n.13.) Federal Defendants contend that Plaintiffs improperly seek to supplement the administrative record. (Doc. 79 at 42.)

Courts generally limit APA review to the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005). A complete administrative record consists of materials considered by the agency "directly or indirectly" in

making a decision. *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). Such materials usually must exist at the time of the decision. *Lands Council*, 395 F.3d at 1029 (quoting *S.W. Ctr. For Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

The Ninth Circuit has recognized four "narrow exceptions" that allow for the admission of evidence outside the administrative record. *Lands Council*, 395 F.3d at 1025. A court may admit such evidence where: (1) the material is necessary to determine "whether the agency has considered all relevant factors and has explained its decision;" (2) the agency has relied on materials not in the record; (3) such material is necessary "to explain technical terms or complex subject matter;" or (4) plaintiffs have demonstrated agency bad faith. *Id.* at 1030 (internal citations omitted). The Court must "narrowly construe[] and appl[y]" these four exceptions. *Id.*

The deadline to file motions to supplement the record fell on June 23, 2017. (Doc. 36 at 2.) Plaintiffs filed their motion for summary judgment on July 14, 2017. (Doc. 72.) The Court further notes that Plaintiffs have not attempted to make any showing that the four narrow exceptions described by the Ninth Circuit in *Lands Council* should apply here.

The Court has not considered or relied on Plaintiffs' exhibits in the above order. The Court declines to take judicial notice of these documents.

45

# VII.   CONCLUSION

An RMP should accomplish the programmatic goal to "guide and control future management actions." 43 C.F.R. §§ 1601.0-2. The Ninth Circuit has recognized that an agency may not defer wholesale analysis and discussion of environmental consequences "based on a promise to perform a comparable analysis in connection with later site-specific projects." *Kern*, 284 F.3d at 1072. Such deferral would absolve the agency of addressing any environmental consequences in an EIS at the RMP level "if comparable consequences might arise, but on a smaller scale, from a later site-specific action proposed pursuant to the RMP." *Id*.

Claim 1: Consideration of alternatives falls at the "heart" of the EIS process. 40 CFR. § 1502.14. BLM cannot acknowledge that climate change concerns defined, in part, the scope of the RMP revision while simultaneously foreclosing consideration of alternatives that would reduce the amount of available coal based upon deference to earlier coal screenings that had failed to consider climate change. NEPA requires BLM to conduct new coal screening and consider climate change impacts to make a reasoned decision on the amount of recoverable coal made available in the RMPs.

Claim 2: NEPA does not require BLM, however, to "address every conceivable alternative." *Evans*, 168 F. Supp. 2d at 1160. BLM reasonably

considered methane mitigation measures within its authority. *Richardson*, 565 F.3d at 709. BLM has not violated NEPA by failing to consider an alternative at the RMP level that would mandate the type of methane mitigation measures proposed by Plaintiffs. This analysis would not assist BLM in making "a reasoned choice" at this point in the resource development process. *Block*, 760 F.2d at 767.

Claim 3: NEPA mandates that agencies integrate the NEPA process in their planning activities "at the earliest possible time." 40 C.F.R. § 1501.2. BLM must supplement the Miles City FEIS and Buffalo FEIS with an analysis of the environmental consequences of downstream combustion of coal, oil, and gas open to development under each RMP. The specific projections in the RMPs of the amounts of resources to be extracted, and their foreseeable uses, makes such analysis reasonably possible.

Claim 4: NEPA does not require BLM, however, to conduct a cost-benefit analysis of potential climate change impacts outside of the geographic reach of the RMPs. *High Country*, 52 F.Supp.3d at 1190. BLM has analyzed climate change impacts based on GHG emissions from the areas covered by the RMPs in the context of statewide, nationwide, or global data. This comparative analysis necessarily will enlarge as BLM considers downstream impacts. BLM's selection of GHG emissions as a proxy by which to analyze climate change impacts represents a scientific judgment deserving of deference.

Claim 5: An EIS must provide "a full and fair discussion of significant environmental impacts." 50 C.F.R. § 1502.1. This discussion must be based on "high quality" information and "accurate scientific analysis." 40 C.F.R. § 1500.1(b). BLM violated NEPA where it failed to justify its use of GWPs based on a 100-year time horizon rather than the 20-year time horizon of the RMPs. BLM also violated NEPA where it failed to acknowledge evolving science in this area in the Buffalo PRMP and FEIS.

Claim 6: NEPA requires agencies to "take a hard look" at the "environmental consequences" of their decisionmaking. *Robertson*, 490 U.S. at 350. Agencies "do not act arbitrarily and capriciously" or violate NEPA's hard look mandate through reliance on NAAQS. *Sierra Club*, 310 F.Supp. 2d at 1202; *Border Power Plant*, 260 F.Supp.2d at 1021. BLM's reliance on the NAAQS in its air quality analyses did not violate NEPA.

## VIII. REMEDIES

Plaintiffs have asked the Court to vacate and set aside the actions of the Federal Defendants. This vacatur presumably would invalidate the ROD issued by Federal Defendants on September 21, 2015. 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . set aside agency action . . . found to be . . . not in accordance with law . . ..").  The ROD addresses eight RMPs spanning millions of acres of federally owned lands across the western United States. This action addresses only the

48

Buffalo RMP and the Miles City RMP. To vacate the ROD would vacate the RMPs for all of the other management areas covered by the ROD.

BLM approved the previous Buffalo RMP in 1985 and the previous Miles City RMP in 1996. A decision to set aside the Buffalo RMP and the Miles City RMP would cause BLM's management plan to revert to the 1985 Buffalo RMP and the 1996 Miles City RMP. *Organized Village of Kake v. U.S. Dept. of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (*en banc*); *Paulson v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005).

Plaintiffs also seek to enjoin the leasing or development of coal, oil, or gas resources in the planning areas pursuant to the Miles City RMP and the Buffalo RMP until Federal Defendants demonstrate NEPA and APA compliance. A court considering injunctive relief must balance the hardships between the plaintiff and defendant and consider the public's interest. This test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). The Court recognizes that the deficiencies identified in the Buffalo RMP and Miles City RMP must be remedied through the preparation of a supplemental EIS for each RMP.

The Court deems it appropriate under the circumstances to seek guidance from the parties as to the nature and scope of the appropriate remedies to address the NEPA violations identified in this order. Accordingly, the Court directs

counsel for all parties to confer in good faith to attempt to reach agreement as to remedies. If the parties cannot reach agreement, the Court directs the parties to submit additional briefing concerning remedies no later than 60 days from today's date.

This briefing shall consist of one brief for the Plaintiffs collectively, one brief for the Federal Defendants collectively, and one brief for Intervenor-Defendants collectively. Each of these briefs shall not exceed 5,000 words, including everything from the caption to the certificate of service. The agreed remedies, or the submitted briefs if the parties remain unable to agree on remedies, should include an expedited schedule for the Federal Defendants to attempt to remedy the NEPA deficiencies identified in this Order for the Buffalo FEIS and the Miles City FEIS through the preparation of a supplemental EIS for the Buffalo RMP and a supplemental EIS for the Miles City RMP that comply with NEPA and the APA.

The Court declines, at this juncture, to make a final ruling on Plaintiffs' request to enjoin leasing and development of coal, oil, and gas. Federal Defendants asserted in defending this challenge that they would defer certain environmental analyses to the leasing stage. Though the law does not allow for such blanket deferral, this assertion indicates that Federal Defendants possess the capacity to comply with this Order at the leasing stage. BLM will comply with the rulings in

this Order at the lease-level and permit-level for any pending or future coal, oil, or gas developments in the Buffalo RMP and the Miles City RMP until BLM produces the supplemental environmental analyses for the Buffalo RMP and the Miles City RMP that comply with NEPA and the APA.

## IX.    ORDER

Accordingly, **IT IS ORDERED**:

1. Plaintiffs' Motion for Summary Judgment (Doc. 72) is **GRANTED IN PART** with regard to Claim 1, Claim 3, and Claim 5, and **DENIED IN PART** with regard to Claim 2, Claim 4, and Claim 6, in accordance with the above Order.

2. Federal Defendants' Cross-Motion for Summary Judgment (Doc. 72), Intervenor-Defendants BTU Western Resources and Peabody Caballo Mining's Cross-Motion for Summary Judgment (Doc. 84), and Intervenor-Defendant Cloud Peak Energy's Cross-Motion for Summary Judgment (Doc. 87), are **GRANTED IN PART** with regard to Claim 2, Claim 4, and Claim 6, and **DENIED IN PART** with regard to Claim 1, Claim 3, and Claim 5, in accordance with the above Order.

3. Any new or pending leases of coal, oil, or gas resources in the planning areas subject to the Buffalo RMP and the Miles City RMP must undergo comprehensive environmental analyses in compliance with the above

Order and all existing procedural requirements under NEPA and the APA.

4. The parties shall meet and confer in good faith to attempt to reach an agreement as to remedies. If the parties cannot agree, the parties shall submit additional briefing on remedies no later than 60 days from today's date, in accordance with the above Order.

5. Entry of judgment will follow the imposition of a remedy in accordance with the above order. The Clerk of Court is directed to withdraw the judgment previously entered (Doc. 110).

DATED this 26th day of March, 2018.

Brian Morris
United States District Court Judge