JEFFREY H. WOOD,
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

SHAUN M. PETTIGREW, Trial Attorney
JOHN S. MOST, Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3895 (Pettigrew)
      (202) 616-3353 (Most)

*Counsel for Federal Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of the Interior, *et al.*, <br><br> Federal Defendants, <br><br> and <br><br> CLOUD PEAK ENERGY, INC., *et. al.*, <br><br> Intervenor Defendants. | Case No. 4:16-cv-00021-BMM <br><br> **FEDERAL DEFENDANTS' REMEDY BRIEF** |

# **TABLE OF CONTENTS**

I.      Vacatur of the ROD, the 2015 RMPs, or any action taken under the
        2015 RMPs is not warranted. ..........................................................................2

II.     Injunctive relief beyond what the Court has already ordered is not
        warranted. ........................................................................................................7

        A.      Plaintiffs cannot show irreparable injury to their particular
                interests...............................................................................................8

        B.      Plaintiffs cannot show that they lack adequate remedies at law.........12

        C.      Plaintiffs cannot show that the balance of hardships favors them
                or that the public interest will not be disserved by an injunction. ......13

III.    Expedited schedule on remand. ....................................................................17

i

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Alaska Ctr. for Env't v. Browner*,
  20 F.3d 981 (9th Cir. 1994) ..................................................................8

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
  950 F.2d 1401 (9th Cir. 1991) .............................................................10

*Backcountry Against Dumps v. Perry*,
  No. 3:12-CV-03062-L-JLB, 2017 WL 3712487 (S.D. Cal. Aug. 29, 2017) ...3, 17

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ............................................................3, 4

*Coast Rivers All. v. U.S. Dep't of Interior*,
  No. 1:16-cv-00307-LJO-MJS, 2016 WL 8673038 (E.D. Cal. Dec. 16, 2016) ......5

*Ctr. for Food Safety v. Vilsack*,
  636 F.3d 1166 (9th Cir. 2011) .........................................................9, 13

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ...........................................................13

*Ecological Rights Found. v. Pac. Lumber*,
  230 F.3d 1141 (9th Cir. 2000) ...........................................................11

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ..............................................................3

*In re Navy Chaplaincy*,
  534 F.3d 756 (D.C. Cir. 2008) ...........................................................10

*L.A. Mem. Coliseum Comm'n v. NFL*,
  634 F.2d 1197 (9th Cir. 1980) ...........................................................10

*Lamb–Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) ..............................................................7

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) .............................................................12

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................................11

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ................................................................. 7, 8, 9, 12

*Mont. Wildlife Fed'n v. Zinke,*
   No. CV 18-69 (D. Mont. filed Apr. 30, 2018) ...................................... 12

*Pac. Rivers Council v. U.S. Forest Serv.,*
   942 F. Supp. 2d 1014 (E.D. Cal. 2013) ........................ 2, 4, 5, 6, 12, 17

*Pollinator Stewardship Council v. EPA,*
   806 F.3d 520 (9th Cir. 2015) .................................................................. 5

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ..................................................................... 10, 11

*United States v. Am. Friends Serv. Comm.,*
   419 U.S. 7 (1974) ................................................................................. 12

*W. Watersheds Project v. Salazar,*
   No. 4:08-CV-516-BLW, 2012 WL 5880658 (D. Idaho Nov. 20, 2012) .... 8, 9, 10

*W. Watersheds Project v. Zinke,*
   No. 18-cv-187 (D. Idaho filed Apr. 30, 2018) ..................................... 13

*Wash. Envtl. Council v. Bellon,*
   732 F.3d 1131 (9th Cir. 2013) ............................................................ 11

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) .............................................................................. 8

*WildEarth Guardians v. Zinke,*
   No. CV 18-73 (D. Mont. filed May 15, 2018) ..................................... 12

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................................. 9

## **Statutes**

5 U.S.C. § 702 ...................................................................................... 2, 9

5 U.S.C. § 705 ......................................................................................... 9

5 U.S.C. § 706(2)(A) ............................................................................... 2

## **Regulations**

82 Fed. Reg. 16,093 (March 28, 2017) ................................................. 17

On March 26, 2018, the Court issued an Opinion and Amended Order (Order) holding that the separate final environmental impact statements (FEISs) supporting revisions to resource management plans adopted in 2015 for the Buffalo field office in Wyoming and the Miles City field office in Montana (2015 RMPs) violated the National Environmental Policy Act (NEPA) by (1) not considering an "alternative that would decrease the amount of extractable coal available for leasing," (2) not considering "the environmental consequences of the downstream combustion of the coal, oil, and gas resources potentially open to development under the[] RMPs," and (3) using a global warming potential factor based on a 100-year time horizon. ECF No. 111 at 24, 35, 41. The Order required the United States Bureau of Land Management (BLM) to supplement the FEISs. *Id.* at 46-47.

Pending completion of supplemental FEISs, the Order also directed BLM to "comply with the rulings in this Order at the lease-level and permit-level for any pending or future coal, oil, or gas developments in the Buffalo RMP and the Miles City RMP." *Id.* at 50-51; *see also id.* at 51 (requiring that any "new or pending leases of coal, oil, or gas resources [subject to the challenged RMPs] undergo comprehensive environmental analyses in compliance with [the Order]"). The Order also directed the parties to meet and confer in a good faith attempt to agree as to whether vacatur of the record of decision (ROD) approving the RMPs or additional injunctive relief on coal, oil, and gas development under the RMPs were

1

appropriate remedies.  *Id.* at 49-50.  The parties met and conferred and were unable to reach an agreement.  As a result, as directed by the Order, Federal Defendants submit this brief concerning remedies.  *Id.* at 50.

For the reasons stated below, this Court should remand the ROD and the 2015 RMPs without vacatur for corrective NEPA analysis consistent with the Order.  Beyond the affirmative injunction already entered by the Order (requiring BLM to conduct certain NEPA analyses at the lease-level and permit-level), no further injunction of coal, oil, or gas leasing or development under the 2015 RMPs is warranted.  Plaintiffs fail to demonstrate imminent risk of likely harm, or any harm at all, that is not outweighed by the public interest.

## I.   Vacatur of the ROD, the 2015 RMPs, or any action taken under the 2015 RMPs is not warranted.

The Administrative Procedure Act (APA) provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  But "courts are not mechanically obligated to vacate agency decisions that they find invalid."  *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013) (gathering cases); *see also*  5 U.S.C. § 702 ("[n]othing herein . . . affects . . . the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground").

Rather, "'when equity demands, the [agency action] can be left in place while the agency follows the necessary procedures' to correct its action." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)); *see also Backcountry Against Dumps v. Perry*, No. 3:12-CV-03062-L-JLB, 2017 WL 3712487, at *2 (S.D. Cal. Aug. 29, 2017) ("[A]n order of vacatur does not mechanically follow from an APA violation."). "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics*, 688 F.3d at 993 (citation and quotation omitted). Vacatur is not warranted here because vacatur would be highly disruptive and the agency's errors are relatively minor.

The Order noted "vacatur presumably would invalidate the ROD," which approved twelve RMP revisions or amendments governing millions of acres of federal lands in five states as part of the Rocky Mountain Region Greater Sage Grouse Conservation Strategy. Order 48; *see* RMR_007953; RMR_007964-67. Plaintiffs challenged the FEISs for only two of these RMPs, and the extraordinarily disruptive consequences of invalidating all of the RMPs governing this vast area of land is self-evident. As such, vacatur of the ROD is not warranted.

3

The Order also noted that vacatur of the Buffalo and Miles City RMPs "would cause BLM's management to revert to the 1985 Buffalo RMP and the 1996 Miles City RMP."[1]  Order 49.  This, too, would be highly disruptive.  The challenged RMPs have been in effect in the Buffalo and Miles City planning areas for nearly three years.  Vacatur and reinstatement of the earlier RMPs now would cause a reversion to the old management regimens and would require restarting the extensive approval processes in two separate BLM State offices, only to potentially have the 2015 RMPs (or some variation of those RMPs) reinstated after completion of the corrective NEPA analysis required by the Order.  *See, e.g.*, *Cal. Cmtys. Against Toxics*, 688 F.3d at 993-94 (cautioning courts to consider "disruptive consequences of an interim change that may itself be changed.").  The practical effect of setting aside the RMPs would be to halt important land management activities within the planning areas.  *See Pac. Rivers Council*, 942 F. Supp. 2d at 1022 ("[D]elaying planned projects is a disruptive consequence . . . ." (citing *Cal. Cmtys. Against Toxics*, 688 F.3d at 993-94)).  Vacatur would also be improper because implementation of the earlier RMPs would eliminate beneficial environmental protections contained in the 2015 RMPs.[2]  *See id.*; Decl. of Ruth

---

[1] Management of the Miles City planning area would actually revert to the 1996 Big Dry RMP and the 1985 Powder River RMP.  *See* Yeager Decl. ¶ 4.

[2] To the extent Plaintiffs argue for partial vacatur of the 2015 RMPs' coal, oil, or gas provisions, the practical effect of any such partial vacatur would be to revert to

Miller ¶ 6, ECF No. 79-2 (noting 2015 Miles City RMP significantly increased acres subject to environmentally protective leasing constraints); Decl. of Thomas Bills ¶ 6, ECF No. 79-1 (same for 2015 Buffalo RMP).

The violations identified by the Order are also relatively minor, thus satisfying the second factor courts are to consider when deciding whether to order vacatur. *Pac. Rivers Council*, 942 F. Supp. 2d at 1019 (noting courts look to "how serious the agency's errors are" (citations omitted)).  The Order found procedural violations under NEPA that require (i) consideration of an additional alternative, (ii) analysis of estimated downstream combustion effects of fossil fuel development, and (iii) disclosure and application of different global warming potential factors.  But these procedural violations do not reflect "fundamental flaws" that would prevent BLM from adopting the same or substantially similar RMPs on remand.  *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015); *see also N. Coast Rivers All. v. U.S. Dep't of Interior*, No. 1:16-cv-00307-LJO-MJS, 2016 WL 8673038, at *8 (E.D. Cal. Dec. 16, 2016) (finding it not unlikely agency will adopt same action on remand following supplemental NEPA analysis).  In addition, the violations identified by the Order are relatively minor because "additional analysis can be completed at the site-specific level

---

the coal, oil, or gas provisions of the earlier RMPs.  And any such partial vacatur would have the same disruptive and negative environmental consequences of vacating the RMPs in their entirety.

before any ground-disturbing actions take place . . . ." *Pac. Rivers Council*, 942 F. Supp. 2d at 1019, 1021.  Indeed, the Order requires such analyses at the lease- and permit-level of development under the 2015 RMPs.

Finally, although not contemplated by the Order, vacatur of any implementation-level activities already authorized under the 2015 RMPs would be inappropriate because Plaintiffs have not challenged those activities.  They challenged the RMPs only and "vacatur is only available for the specific agency decision challenged by a Plaintiff."  *Id.* at 1023.  Moreover, just because actions were authorized under the 2015 RMPs does not render them subject to vacatur.  It is well established that "wholesale vacatur of agency actions not before the Court" is inappropriate because it "precludes the Court from applying the equitable test for determining whether vacatur is warranted . . . ."  *Id.* at 1023-24.

Because vacatur of the ROD or the 2015 RMPs would have highly disruptive consequences and because the violations found by the Order are relatively minor, the Court should order remand to the agency for corrective NEPA analysis without vacating the ROD, the 2015 RMPs, or any other actions taken under the 2015 RMPs.  *See Pac. Rivers Council*, 942 F. Supp. 2d at 1018.  The Order already requires additional NEPA analysis at the implementation stage; vacatur would add nothing to the protections such analysis would afford Plaintiffs.

## II.   Injunctive relief beyond what the Court has already ordered is not warranted.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 165 (2010).  To obtain a permanent injunction, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 156-57 (citation and quotation omitted).  This test "applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation," and a court is not to place its "thumb on the scales" by presuming "that an injunction is the proper remedy." *Id.* at 157.  Moreover, injunctive relief "must be tailored to remedy the specific harm alleged.  An overbroad injunction is an abuse of discretion." *Lamb–Weston, Inc. v. McCain Foods, Ltd.,* 941 F.2d 970, 974 (9th Cir. 1991) (citations omitted).

The Order already affirmatively enjoins BLM to conduct certain NEPA analysis before approving any lease-level and permit-level actions that Plaintiffs have not specifically challenged while BLM conducts corrective NEPA analysis consistent with the Order.  Order at 50-51.  No additional relief enjoining implementation activities under the 2015 RMPs is warranted.  Indeed, as one court

7

noted, "[t]he Supreme Court has held that it is improper to enjoin proposed agency action that will be subject to a NEPA review that could be challenged in court at that time." *W. Watersheds Project v. Salazar*, No. 4:08-CV-516-BLW, 2012 WL 5880658, at \*6 (D. Idaho Nov. 20, 2012) (citing *Monsanto*, 561 U.S. at 162); *see also id.* at \*4 (inappropriate to enjoin RMP implementation activities "without ever having evaluated" them).  In addition, because Plaintiffs challenged the 2015 RMPs only, any injunction of actions not actually implemented by the 2015 RMPs would be clearly overbroad.  *See Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994) ("The district court has broad latitude in fashioning equitable relief *when necessary to remedy an established wrong*" (emphasis added) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)).

### A.  Plaintiffs cannot show irreparable injury to their particular interests.

In *Monsanto*, the Supreme Court reversed a decision of the Ninth Circuit, which had affirmed injunctive relief in a NEPA case, ordered by the Northern District of California.  The order affirmatively enjoined the Department of Agriculture to prepare an EIS and additionally enjoined planting of genetically-altered alfalfa.  Such planting had been made possible by the agency's decision to partially deregulate genetically-altered alfalfa and thus allow certain planting.  The decision was made without an EIS and the injunction was to remain in effect until the agency completed one.  In reversing the Ninth Circuit decision, the Supreme

Court rejected the court's reliance on Ninth Circuit case law predating *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7 (2008).  In *Winter*, the Supreme Court clarified the test applicable to permanent injunctions.  *Id*. at 30-32. In *Monsanto*, the court reaffirmed that test.

In holding that the injunction was not supported by any of the four factors governing permanent injunctive relief, the *Monsanto* court emphasized, "[m]ost importantly," that respondents "cannot show that they will suffer irreparable injury if [the agency] is allowed to proceed with any partial deregulation, for at least two independent reasons."  561 U.S. at 162.  One of these two reasons, directly material here, was described by the court as follows:

> [I]f and when [the agency] pursues a partial deregulation that arguably runs afoul of NEPA, respondents may file a new suit challenging such action and seeking appropriate preliminary relief.  *See* 5 U.S.C. §§ 702, 705.  Accordingly, a permanent injunction is not now needed to guard against any present or imminent risk of likely irreparable harm.

*Id*.  The same is true here.  If and when BLM approves any Mineral Leasing Act leases or permits that Plaintiffs believe violate NEPA, they "may file a new suit challenging such action and seeking appropriate preliminary relief."  *Id*.; *accord Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (no injunction because "nothing prevented Plaintiffs from filing a new legal challenge if and when those [later] decisions were made"); *W. Watersheds Project*, 2012 WL

5880658, at *6 (no irreparable injury because future NEPA review subject to challenge).

As in *Monsanto*, alternative recourse is available here and thus a permanent injunction is not needed to "guard against any present or imminent risk of likely irreparable harm." *Id*.  That risk is forestalled by the Order's requirement that any "new or pending leases of coal, oil, or gas resources [subject to the challenged RMPs] undergo comprehensive environmental analyses in compliance with [the Order]".  Order at 51.  It also bears mention that a plaintiff seeking injunctive relief "must do more than merely allege imminent harm sufficient to establish standing . . . ." *Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991) (citing *L.A. Mem. Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1201 (9th Cir. 1980)).  In particular, the plaintiff "must demonstrate immediate threatened injury as a prerequisite to . . . injunctive relief." *Id*.; *see also In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) (irreparable-harm standard requires more significant showing than injury-in-fact standard).

Plaintiffs have not met this higher standard for injunctive relief.  In fact, they have not identified any implementation-level project that threatens to "impede a specific and concrete plan" to return to and enjoy these lands. *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009).  This not only defeats their claim of irreparable injury, but also defeats their claim of standing, as Federal Defendants

10

argued in challenging Plaintiffs' standing in this case.  *See* ECF No. 79 at 10-14.

Despite these arguments, the Court was satisfied, under the "flexible approach" for

injury-in-fact articulated in *Ecological Rights Foundation v. Pacific Lumber*, 230

F.3d 1141, 1147 (9th Cir. 2000), that Plaintiffs had met their burden of

demonstrating a case or controversy.  However, *Ecological Rights* was decided

nine years prior to *Summers*, which the Court declined to address in its Order.

      In *Summers*, the Supreme Court reaffirmed the principle, stated seventeen

years earlier in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–560 (1992), that

a plaintiff must demonstrate a "firm intention" to visit affected areas, not "vague

desire[s] to return," *Summers,* 555 U.S. at 498, or the "'some day' intentions"

found insufficient in *Defenders of Wildlife*, 504 U.S. at 564.  Thus, even if the

Court is unwilling to reconsider its decision on standing, something it may do at

any time because it relates to the Court's jurisdiction, *see Wash. Envtl. Council v.

Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013), it should recognize at this stage that

Plaintiffs currently face no "imminent risk of likely irreparable harm," a

prerequisite to permanent injunctive relief.

      This is true for two reasons: first, because the Court has already

affirmatively enjoined the agency to undertake certain NEPA analysis before

proceeding with lease-level or permit-level implementation decisions (*i.e.*, lack of

imminence); and second because Plaintiffs can challenge those decisions (*i.e.*, lack

of irreparability).  Just as vacatur would not enhance existing protections, *see*

discussion *supra* at 2-6, so too an injunction would not, *id*., and for this reason

alone the Court should deny permanent injunctive relief.

> **B.     Plaintiffs cannot show that they lack adequate remedies at law.**

Environmental plaintiffs typically do not have an adequate remedy at law

because "environmental injury, by its nature, can seldom be adequately remedied

by money damages and is often permanent or at least of long duration, i.e.,

irreparable."  *League of Wilderness Defs./Blue Mountains Biodiversity Project v.*

*Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (citation and quotation omitted).

But this case is not typical because, as discussed above, Plaintiffs challenge

programmatic decisions that require further implementation before any on-the-

ground effects (*i.e.*, any potential for injury) could occur.  As a result, Plaintiffs

have an adequate remedy at law because legal recourse exists.  *Monsanto*, 561 U.S.

at 162; *accord Pac. Rivers Council*, 942 F. Supp. 2d at 1029 (plaintiffs can

challenge implementing projects they believe will harm them) (citing *United States*

*v. Am. Friends Serv. Comm.*, 419 U.S. 7, 11 (1974)).

Indeed, three lawsuits were recently filed challenging oil and gas leases sold

under the 2015 Miles City RMP.  *See Mont. Wildlife Fed'n v. Zinke*, No. CV 18-69

(D. Mont. filed Apr. 30, 2018); *WildEarth Guardians v. Zinke*, No. CV 18-73 (D.

Mont. filed May 15, 2018); *W. Watersheds Project v. Zinke*, No. 18-cv-187 (D.

Idaho filed Apr. 30, 2018).  Therefore, this factor weighs against enjoining mineral leasing or development activities under the 2015 RMPs.  *Cf. Ctr. for Food Safety*, 636 F.3d at 1174 (no injunction in part because "nothing prevented Plaintiffs from filing a new legal challenge if and when those [later] decisions were made.").

### C.    Plaintiffs cannot show that the balance of hardships favors them or that the public interest will not be disserved by an injunction.

When considering whether to issue an injunction when the government is a party, the final two factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted).  Here, an injunction would harm the public interest and that harm outweighs the complete absence of harm to Plaintiffs.

Mineral development under the 2015 RMPs serves the public interest directly by providing significant revenue to federal, state, and local governments. The Miles City FEIS anticipated that the federal government would collect more than $99.4 million annually from "rents and royalties associated with leasing and production of federal minerals" in the planning area as well as $3.8 million annually in one-time bonus bids for new mineral leases.  MC_0003444; Yeager Decl. ¶ 7.  Of this revenue, BLM estimated that $36.3 million would go to Montana and that local governments in the 17-county planning area would receive $13.6 million.  MC_0003444; Yeager Decl. ¶ 7.  And more specifically, BLM anticipates that the 1,200 currently producing oil and gas wells in the planning area

will generate approximately $18.6 million in revenue over the next eighteen months, of which 49 percent will go to the State of Montana.  Yeager Decl. ¶ 10.

Moreover, there are currently two pending coal lease modifications and two new lease applications for existing mines under the 2015 Miles City RMP.  *Id.* ¶ 13.  Enjoining those actions would result in substantial lost revenues to the federal and state government.  In particular, if BLM cannot complete the lease modification for the Rosebud Mine (one of the two pending lease modifications noted above), the agency anticipates that these coal reserves will be bypassed under circumstances where it would not be economical for the mine operator to return to the bypassed federal coal.  This would result in an estimated loss of $13.5 million to the federal government as well as a loss of $15.3 million to the State of Montana.  *Id.*  Moreover, if federal coal production throughout the planning area were enjoined, BLM estimates an annual loss of approximately $28 million in federal royalty payments.  *Id.*

Likewise, "[i]n fiscal year 2017, federal oil, gas, and coal minerals administered by the Buffalo field office generated $474 million in mineral royalties."  Spencer Decl. ¶ 7.  Annual royalties from these minerals are expected to increase by 2020 to between $633 million and $692 million, 49 percent of which would go to the State of Wyoming.  *Id.* ¶ 8.  Additionally, the State of Wyoming is projected to collect between $449 million and $483 million annually during that

14

same time period in severance taxes from mineral extraction in the Powder River Basin. *Id.* And annual county ad valorem revenues between 2016 and 2020 are projected to be $398 million to $424 million. *Id.* In addition, BLM estimates that oil and gas lease sales over the next eighteen months for the Buffalo field office will generate $128 million and that producing wells authorized under the 2015 RMP will generate over $8 million over that same time period. *Id.* ¶ 10. Forty-nine percent of the revenue from lease sales and production will go to the State of Wyoming. *Id.* Absent such revenues, "state and local governments would face serious budget shortfalls, making it difficult to provide necessary infrastructure and public services." *Id.* ¶ 8.

The Buffalo field office also expects to offer a tract of federal coal for sale in late 2018 or early 2019 under the 2015 RMPs. *Id.* ¶ 14. This sale is intended to maintain existing mine operations without bypassing the federal coal and would generate revenues potentially "in the range of hundreds of millions of dollars with the State of Wyoming receiving 49% of this revenue." *Id.*

In addition to direct revenue to federal, state, and local governments, mineral development on BLM-managed lands also creates and sustains local jobs. For example, the Miles City FEIS "estimated that the exploration, development, and production of bentonite, coal, oil, and natural gas administered by the [Miles City field office] would support a total of 589 local jobs and an estimated $33.2 million

in local labor income on annual average."  MC_0003444; Yeager Decl. ¶ 7.  If

federal coal production were enjoined, BLM anticipates that substantial questions

would arise as to whether three of the mine operators in the Miles City planning

area can remain economically viable.  Yeager Decl. ¶ 15.

Similarly, "[m]ining and mineral activity constitutes most of the economic

activity in the [Buffalo] planning area," and as a result "mining is a key contributor

to the economic wellbeing" of that area.  BUF_0002022-23.  "In 2016, the mining

sector in the Wyoming portion of the Powder River Basin supported 14% of all

statewide employment and 24% of total statewide labor earnings."  Spencer Decl.

¶ 6.  And the Buffalo FEIS estimated that management under the RMP would

contribute to 3,448 jobs per year "due to activities on BLM surface and federal

mineral estate."  BUF_0003052; BUF_0003053 (Table 4.66 – Alternative D).  Any

injunction of such activities and "loss of the mining jobs and labor earnings

associated with minerals administered by the Buffalo Field Office would have

widespread negative economic impacts across the Powder River Basin and the

State of Wyoming."  Spencer Decl. ¶ 6.

Finally, from a broad standpoint, mineral development on federal lands in

both planning areas serves the public interest by contributing to the goal of energy

independence.  As stated in Executive Order 13783, "[i]t is in the national interest

to promote clean and safe development of our Nation's vast energy resources," the

development of which "is essential to ensuring the Nation's geopolitical security."
*See* 82 Fed. Reg. 16,093 (March 28, 2017).

Any injunction of coal, oil, or gas development activities would harm these various compelling public interests.  And compared to Plaintiffs' inability to show any imminent or irreparable injury due to the programmatic nature of the RMPs and the requirement that implementation activities comply with the Order, the balance of harms weighs strongly against enjoining mineral leasing and development activities under the 2015 RMPs.  *See Pac. Rivers Council*, 942 F. Supp. 2d at 1030 (noting socio-economic harm from delayed land management weighed against injunction); *see also id.* at 1033 (job creation and infrastructure benefits); *Backcountry Against Dumps*, 2017 WL 3712487, at *5 (projected government revenue and negative effect to local economy support public interest).

## III.    Expedited schedule on remand.

The Order also instructed Federal Defendants to provide "an expedited schedule . . . to attempt to remedy the NEPA deficiencies identified in th[e] Order for the Buffalo FEIS and the Miles City FEIS through the preparation of a supplemental EIS for the Buffalo RMP and a supplemental EIS for the Miles City RMP that comply with NEPA and the APA."  Order at 50.  Detailed schedules outlining two alternative timelines for completion of corrective NEPA analysis are attached to the Yeager declaration for the Miles City field office and the Spencer

17

declaration for the Buffalo field office.  The first timeline provides a twelve-month schedule limited to performing corrective NEPA analysis.  The second timeline provides a sixteen-month schedule that includes an initial four-month period if coal screening under the Mineral Leasing Act and the Federal Land Policy and Management Act is required.[3]  *See* Yeager Decl. ¶ 18; Spencer Decl. ¶ 15.

Respectfully submitted this 25th day of May, 2018.


JEFFREY H.  WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
JOHN S. MOST
Trial Attorneys
Natural Resources Section
P.O.  Box 7611
Washington, D.C.  20044–7611
Phone:  (202) 305-3895(Pettigrew)
         (202) 616-3353 (Most)
shaun.pettigrew@usdoj.gov
john.most@usdoj.gov

*Counsel for Federal Defendants*

---

[3] Federal Defendants moved for leave to file a motion for reconsideration of the Order's holding that "NEPA requires BLM to conduct new coal screening," ECF No. 111 at 46, because coal screening is not governed by NEPA but is instead governed by two statutes under which Plaintiffs did not bring claims, the Mineral Leasing Act and the Federal Land Policy and Management Act.  *See* ECF No. 112 at 1-2.

18

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the Order by comprising 4,997 words, including everything from the caption to the certificate of service.

*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court via the CM/ECF system, which will provide service to counsel for the parties.

/s/ Shaun M. Pettigrew

SHAUN M. PETTIGREW