Laura H. King (MT Bar No. 13574)
Shiloh S. Hernandez (MT Bar No. 9970)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4852
Ph: (406) 204-4861
king@westernlaw.org
hernandez@westernlaw.org

*Counsel and Local Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS *et al.*, | Case No. CV-16-21-GF-BMM |
| Plaintiffs, | **PLAINTIFFS' REMEDIES BRIEF** |
| vs. | |
| U.S. BUREAU OF LAND MANAGEMENT *et al.*, | |
| Defendants. | |

## INTRODUCTION

Development and combustion of coal, oil, and gas are causing significant environmental and human health impacts. Climate change, driven by greenhouse gas (GHG) emissions from fossil fuel combustion, presents severe and irreparable harm to people and ecosystems. The widespread fossil fuel development enabled and predicted by the Buffalo and Miles City resource management plans

1

(hereinafter, "plans") will exacerbate climate disruption, and the non-GHG pollution from the predicted fossil fuel development will further degrade human health.

Fossil fuel development under the plans will cause widespread harm to the public by exacerbating damage to their health, livelihoods, recreational interests, and the surrounding environment. Over the next decade, the foreseeable development and combustion of fossil fuels in the planning areas will cause between $221 billion and $2,715 trillion in externalized damages.

The evidence weighs heavily in favor of an interim injunction on issuance of new fossil fuel leases, and on development of existing leases issued under the plans, pending BLM's full compliance with the National Environmental Policy Act (NEPA) and the Court's Order dated March 26, 2018 (Order). Specifically, the Conservation Groups seek following relief:

- An interim order enjoining future leasing of federal coal, oil, and gas resources pending BLM's preparation of supplemental environmental impact statements (EISs) for the plans;

- An interim order enjoining any ground-disturbing activities on existing coal, oil, and gas leases issued under the unlawful plans pending BLM's full compliance with NEPA (existing leases would not need to be unwound at this time);

- An order vacating the portions of the unlawful plans that make lands available to coal, oil and gas leasing, and instructing BLM to prepare supplemental EISs that take the hard look at climate impacts that NEPA requires; and

- Retain continuing jurisdiction of this matter until BLM fully remedies its violations of federal law.

## FACTS

On September 18, 2015, Defendant U.S. Bureau of Land Management (BLM) issued a record of decision approving revisions of eight resource management plans, including plans for the Miles City and Buffalo Field Offices in Montana and Wyoming, respectively. RMR:1134-7953. The Miles City Plan included Management Direction MIN 1, which made approximately 71 billion tons of coal available for leasing and development. MC:9-4167. The Buffalo Plan included provision Coal-2001, BUF:8-4282, which made approximately 41 billion tons of coal available for leasing and development. BUF:233-22990, -23143. BLM predicted that 926 million tons of coal would be strip-mined in the Miles City planning area, and 10.2 billion tons of coal would be strip-mined in the Buffalo planning area. MC:7-3799 to -3800; BUF:6-2232.

Regarding oil and gas, the Miles City Plan included Management Direct MIN 11 and MIN 12, which allowed oil and gas leasing with surface occupancy

and use on 3,645,000 acres and 987,000 acres, respectively. MC:9-4168. The Buffalo Plan, in turn, included provisions O&G-2002 to "[o]pen all oil and gas mineral estate to leasing" unless specifically exempted, and O&G-2007 to open specified acreages to oil and gas leasing. BUF:8-4284 to -4285. Under these plans, BLM foresaw the drilling of 1,253 oil and gas wells in the Miles City planning area, and 4,767 wells in the Buffalo planning area. (Doc. 72-2, ¶¶ 18-19.) BLM conducted oil and gas lease sales in in the Miles City planning area in 2016, 2017, and 2018, and in the Buffalo planning area in 2017 and 2018. Generally, BLM conducts quarterly oil and gas lease sales. BLM deferred its June 2018 lease sale in the Miles City planning area.

No federal coal leases have been issued under the plans, but multiple coal leases are pending in the planning areas. Pending in Miles City are: two leases at Spring Creek mine (MTM105485, MTM094378), two leases at Decker mine (MTM 101099, MTM108494), and one lease at Rosebud mine (MTM080697). Pending in Buffalo are the West Antelope III (WYW-184599) and the North Hilight lease by applications (WYW-172388).

## STANDARDS

### I.    Injunctive Relief

Before a permanent injunction may issue, a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of

4

hardships between the plaintiff and defendant, a remedy in equity is
warranted; and (4) that the public interest would not be disserved by a
permanent injunction.

*Montana Envtl. Info. Ctr. v. United States Office of Surface Mining* (*MEIC*), No.
CV 15-106-M-DWM, 2017 WL 5047901, at \*2 (D. Mont. Nov. 3, 2017) (quoting
*Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010)) (internal bracket
and quotation marks omitted).

"A district court has broad latitude in fashioning equitable relief when
necessary to remedy an established wrong." *High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630, 641 (9th Cir. 2004) (quoting *Nat. Res. Def. Council v. Sw. Marine,
Inc.*, 236 F.3d 985, 999 (9th Cir. 2000)). Injunctive relief may properly "extend
beyond that necessary to provide complete relief to the particular plaintiff …
where the balance of equities and the nature of the claims require broader relief."
*City of Chicago v. Sessions*, 888 F.3d 272, 289 (7th Cir. 2018) (citing *Trump v.
Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017)). A district court's
issuance of injunctive relief is reviewed for abuse of discretion and factual findings
for clear error. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803,
823 (9th Cir. 2018).

The Ninth Circuit and other courts have repeatedly approved injunctions
prohibiting agencies from issuing leases or permits pending completion of lawful
programmatic NEPA evaluation. *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836,

842-44 (9th Cir. 2007) (affirming injunction of coal bed methane development in 93% of planning area pending programmatic NEPA review); *Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705, 709-10 (9th Cir. 1993) (affirming injunction of logging operations pending programmatic NEPA analysis of timber management plans); *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 469 (9th Cir. 1986) (district court enjoined mining permitting in three national parks pending programmatic NEPA review); *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1224 (D. Colo. 2011) (staying leases pending programmatic NEPA analysis); *see also Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1039-40 (D. Mont. 2006) (staying surface disturbing activity on leases pending compliance with NEPA).

## II.     Vacatur

The Administrative Procedure Act (APA) provides that "[t]he reviewing court shall ... hold unlawful and set aside" unlawful agency actions. 5 U.S.C. § 706(2)(A) (2018). "Vacatur is the standard remedy for unlawful agency decisions." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1239 (N.D. Cal. 2015). Only in rare circumstances will courts remand without vacatur. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). "When determining whether to leave an agency action in place on remand, we weigh the seriousness of the agency's errors against

the disruptive consequences of an interim change that may itself be changed." *Id.*

(quoting *Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir.

2012) (internal quotation marks omitted)).

## ARGUMENT

**I.     The Court Should Enjoin Issuance of New Fossil Fuel Leases Pending Remand, and Enjoin Any Surface-Disturbing Activity on Existing Fossil Fuel Leases Issued Under the Plans.**

### A.     Uninformed and Unlawful Fossil Fuel Leasing Will Cause Irreparable Injury.

"Irreparable harm should be determined by reference to the purposes of the

statute being enforced." *Nat'l Wildlife Fed'n*, 886 F.3d at 818. The purpose of

NEPA is "to ensure that federal agencies are informed of environmental

consequences before making decisions and that the information is available to the

public." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970-71

(9th Cir. 2003) (quoting *Okanagan Highlands Alliance v. Williams*, 236 F.3d 468,

473 (9th Cir. 2000)) (internal citations and brackets omitted).[1] "[A]llowing a

potentially environmentally damaging program to proceed without an adequate

record of decision runs contrary to the mandate of NEPA." *Sierra Club v.*

---

[1] *Accord Massachusetts v. Watt*, 716 F.2d 946, 953 (1st Cir.1983) (explaining purpose of NEPA to "require consideration of environmental factors before project momentum is irresistible, before options are closed, and before agency commitments are set in concrete.").

*Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007). Thus, "[t]he likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high." *S. Fork Band v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009). "Irreparable harm may be caused by activities broader than those the plaintiffs seek to enjoin." *Nat'l Wildlife Fed'n*, 886 F.3d at 819.

NEPA specifically prohibits interim action that will prejudice a programmatic decision, as here:

> While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action ... will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine the subsequent development or limit alternatives.

40 C.F.R. § 1506.1(c) (2018).

Here, (1) any further fossil fuel leasing; and (2) any development of fossil fuel leases previously issued under the unlawful plans would limit BLM's consideration of reduced-leasing and no-leasing alternatives on remand. *See N.M. ex rel Richardson v. BLM*, 565 F.3d 683, 709-10 (10th Cir. 2009). BLM's issuance of new leases constitutes an irreversible and irretrievable commitment of resources. *Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988). Pursuant to 40 C.F.R. § 1506.1(c), allowing BLM to issue leases during remand, prior to completion of lawful NEPA analysis, "subverts NEPA's goal of insuring that federal agencies

infuse in project planning a thorough consideration of environmental values." *Id*. In light of the look-before-you-leap purpose of NEPA, *Citizens for Better Forestry*, 341 F.3d at 970-71, continued fossil fuel leasing constitutes irreparable harm. *See Nat'l Wildlife Fed'n*, 886 F.3d at 818.[2]

Moreover, unabated fossil fuel leasing under the plans will cause long-term irreparable harm to ecosystems, climate, and the public, including Conservation Groups' members.[3] BLM's unlawful plans made approximately 112 billion tons of coal available for development, and predicted that approximately 11 billion tons of coal would be mined and ultimately combusted within the planning period. Doc. 72-2, ¶¶17, 23, 27. BLM further predicted that thousands of oil and gas wells would be drilled in the planning areas. *Id.* ¶¶18-19. Once coal is strip-mined, and oil and gas resources are drilled and extracted, they cannot be put back—"the injury will therefore be irreparable." *MEIC*, 2017 WL 5047901, at *3; *see also*

---

[2] Analysis of downstream emissions at the individual leasing stage is insufficient, and would not provide the programmatic climate and alternatives analyses required at the planning stage. Doc. 111 at 33-35; *see High Sierra Hikers*, 390 F.3d at 641-46 (affirming injunction pending completion of programmatic cumulative effects analysis, noting that NEPA analyses for individual permits did not address cumulative impacts); *see also N. Cheyenne Tribe*, 503 F.3d at 842-44 (affirming programmatic injunction).

[3] "Courts may also consider extra-record evidence in determining whether a party will suffer irreparable harm in the absence of injunctive relief." *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1300 (D. Or. 2011).

*League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (stating that "logging of mature trees, if indeed incorrect in law," constitutes irreparable harm).

For example, development of additional coal leases will cause air and water pollution, reduce critical water resources, harm wildlife, and damage lands upon which the Plaintiffs' members graze cattle and recreate, and exacerbate harmful climate change impacts. Decl. of Mark Fix, ¶¶12-31 (Exhibit 1); Decl. of Steve Gilbert, ¶¶13-25 (Exhibit 2); Decl. of Shannon Anderson, ¶¶6-13, 19 (Exhibit 3); Decl. of Leland Turner, ¶¶4-10 (Exhibit 4). Members will also be irreparably injured by similar harms from expanded oil and gas operations, including air and water pollution, climate change, industrialization of rural landscapes, and increased truck traffic. Decl. of Terry Punt, ¶¶4-9 (Exhibit 5); Gilbert Decl., ¶¶10-12, 22; Anderson Decl., ¶¶6-8, 15-17; Turner Decl., ¶¶8, 10-12.

These harms would not be possible *but for* BLM's unlawful decision to make these resources available for development through the plans. Injunctive relief pending remand until BLM prepares supplemental environmental reviews will temporarily forestall these harms. Once BLM prepares thorough environmental analyses, it could ultimately select an alternative that reduces the amount of fossil fuel resources made available in the planning areas, reducing the quantities of fossil fuels developed, and thus mitigating and permanently preventing some of

these harms. But the environmentally-preferable options available to BLM on remand would clearly be constrained if the agency issues new leases during the interim period.

The 112 billion tons of coal made available by the plans is *twice* the total amount of coal produced in the United States *since 1949.* Expert Decl. of James Hansen, Ph.D., at 5-6 (Exhibit 6). Combustion of this coal would result in approximately 182.5 billion metric tons of carbon dioxide ($CO_2$) emissions, or more than 35 times the total $CO_2$ emissions from all U.S. energy sources in 2017. *Id.* at 6 ("Accordingly, if the coal at issue in the challenged resource plans is exploited—indeed, if even a significant fraction of it is developed—then, by that action, we may press the climate system past already looming tipping points.").

Even combustion of the smaller, but still enormous, 11 billion tons of coal and the vast amounts of oil and gas that BLM predicts under the plans will significantly exacerbate climate disruption and may not be reversible: "Absent a global carbon drawdown program sufficient to offset emissions, such as those from the proposed project, all new significant emissions intensive projects, including the present challenged proposal, must be deemed environmentally calamitous." *Id.* at 9. Ultimately, the worsening impacts of climate change from continued large-scale fossil fuel combustion—including from issuance of new leases during remand that lock-in years of emissions—constitutes irreparable harm. *Id.* at 10.

Conservatively calculated, the life-cycle pollution from predicted fossil fuel development in the planning area over just the 2018-2028 timeframe[4] will cause monetized damages of at least $802 billion, plus significant but unquantifiable additional damages. Expert Decl. of Peter Howard, Ph.D., at 2, ¶3 (Exhibit 8). Combustion of the approximately 500 million tons of coal strip-mined annually in the planning areas during this period will result in climate change damages of approximately $447 billion. *Id.* at 16, tbl. 5. This conservative figure omits numerous health, environmental, and welfare impacts, such as catastrophic impacts, ocean acidification, and species extinction. *Id.* at 34-37. Non-climate related pollution from combustion of this coal, such as particulate matter, nitrogen oxides, sulfur dioxide, and other hazardous pollutants, will cause at least $306 billion in damage to the public over the next decade. *Id.* at 27, tbl. 7.[5] Climate-related harm from GHG pollution from combustion of the oil and gas authorized by the unlawful plans will result in an additional $4 billion in climate change damages from 2018-2028. *Id.* at 16, tbl. 5. This does not include the climate impacts from the production, transportation, and processing of the oil and gas, and therefore the total damages will be greater. *Id.* at 34. The harm from this fossil fuel

[4] Notably, this includes only *half* of the coal that is predicted to be developed during the 20-year planning period.

[5] This conservative figure omits numerous harms. *Id.* at 35.

development far exceeds any benefits (*cf.* Doc. 114 at 13-15), creating "*net damages of over $73 billion per year*, not including the significant unquantified damages omitted." *Id.* at 37-41 (emphasis added).

Finally, allowing BLM to continue to lease fossil fuels pending completion of a lawful programmatic NEPA review would, in effect, reward the agency for its unlawful conduct. *See Portland Audubon Soc'y*, 998 F.2d at 709-10 ("Thus, if we were to allow the BLM to continue to log in owl habitat pursuant to the old plans, pending finalization of the new Resource Management Plans, we would sanction the BLM's deliberate, protracted refusal to comply with applicable environmental laws, and countenance irreparable harm to plaintiffs.").

### B.     Money Damages Are Not an Adequate Remedy.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *accord MEIC*, 2017 WL 5047901, at *3 ("Once the federal coal is removed beneath the Bull Mountains, it cannot be put back. The same goes for coal combustion pollution and greenhouse gas, which once released into the atmosphere, cannot be removed by any judicial action."); *see also Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833, 835 (9th

Cir. 2002), *abrogated in part on other grounds by Monsanto*, 561 U.S. at157 (affirming interim injunction limiting impacts of grazing pending programmatic NEPA analysis, noting that "[t]here is no remedy at law that would protect the environment during the period the interim protective measures have been ordered").

Here, the Conservation Groups do not seek money damages. Damages are not available under NEPA, and no amount of money could reimburse Plaintiffs' members for the harm to their land, recreational and occupational interests, and resources such as water, air, and climate, caused by continual, large-scale, industrial fossil fuel extraction from the Buffalo and Miles City planning areas. Gilbert Decl., ¶¶25, 33; Anderson Decl., ¶13; *see* Fix Decl., ¶31. There is no adequate remedy at law.

### C. The Public Interest Would Not Be Disserved by Issuance of a Permanent Injunction.

In determining whether to issue an injunction, "courts of equity should pay particular regard for the public consequences." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "[T]he public interest is best served when the law is followed." *Fry*, 408 F. Supp. 2d at 1038. Indeed, "having government officials act in accordance with law" is a "public interest of the highest order." *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991). "[P]reserving nature and avoiding irreparable environmental injury" and "careful consideration of

environmental impacts before major projects go forward" are in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (internal citations omitted).

Here, the public interest weighs heavily in favor of enjoining (1) further leasing and (2) development of leases approved in reliance on the unlawful plans, pending BLM's compliance with NEPA. Fossil fuel production causes significant harm to the public. Combustion of the 112 billion tons of coal that the plans made available would emit approximately 182 billion tons of carbon dioxide ($CO_2$), "substantially accelerat[ing] our present drive toward climate tipping points from which there are no foreseeable means of return." Hansen Decl. at 5-6. Even the combustion of the approximately 11 billion tons of coal BLM predicts will be mined would cause great public harm because "[t]he allowable budget for fossil fuel emissions into the atmosphere is already fully subscribed, if young people are to have any hope of avoiding climate catastrophes." *Id.* at 8. Additional $CO_2$ will "exacerbate the effects of warming to date, including, *inter alia*, heatwaves, fire, drought, floods, extreme weather, increased spread of disease, and compromised prospects of avoiding irreversible impacts." *Id.* at 5.

Climate change has been identified as the "biggest global health threat of the 21st century." Expert Decl. of Brian Moench, M.D., ¶32 (Exhibit 7); *see id.* ¶¶31, 33-46, 50, 52-54. Moreover, the non-GHG pollution impacts of combusting

approximately 510 million tons of coal annually, *see* Howard Decl. at 5, include thousands of premature deaths each year from air pollution and significant non-fatal health problems, such as respiratory illness and impaired brain development of children from toxic pollutants, like mercury and lead. Moench Decl., ¶59; *see id.* ¶¶ 4, 6, 13-15, 18-23, 25-29, 30. The widespread "loss of intellectual capacity" in children from toxics released primarily from burning coal—lead and mercury—could be considered a "national and international societal crisis." *Id.* ¶29.

Indeed, concern for climate impacts and the economic externalities of coal strip-mining led the Department of the Interior to place a nation-wide moratorium on federal coal leasing in 2016, pending completion of a programmatic assessment of the true public costs of the program. Expert Decl. of Mark Squillace, ¶9 (Exhibit 9); Sec. Or. 3338 (Jan. 15, 2016).[6] Furthermore, there is abundant evidence that the anti-competitive coal leasing practices in the planning area are not in the public interest because they undervalue public coal and allow coal companies to engage in speculation by obtaining control of large amounts of public coal at "bargain basement prices." Squillace Decl. ¶¶5-7.

Enjoining (1) issuance of future oil and gas leasing, and (2) any development of leases already issued under the unlawful plans, is in the public interest. As with

_____

[6] Secretary of the Interior Zinke rescinded the coal leasing moratorium in 2017. *See* S.O. 3348 (Mar. 29, 2017).

coal, exploitation and consumption of oil and gas is a primary driver of climate change. Hansen Decl. at 5 n.4. Further, unconventional oil and gas development—which is now the most common form of oil and gas development in the planning area—threaten public health due to the extensive use of toxic and carcinogenic chemicals. *See* Expert Decl. of Carol Kwiatkowski, Ph.D., ¶¶5-9 (Exhibit 10). Multiple peer-reviewed studies have correlated oil and gas operations with adverse health effects, including birth defects, low-birth rates, infant mortality, increased risk of cancer, neurological effects, and respiratory effects. *Id.* ¶¶12-15.

In economic terms, the anticipated pollution and related externalities from the fossil-fuel leasing allowed by the plans will cause hundreds of billions to trillions of dollars in harm to the public, dramatically exceeding any economic benefits. Howard Decl. at 37-41. *MEIC*, 2017 WL 5047901, at *5-6 (finding that public interest supported injunctive relief because the externalized costs of coal mining "far exceeds" public revenue from coal mine).

The coal strip-mining, oil and gas drilling, and combustion made possible by the unlawful plans are broadly harmful to the public. Enjoining such unlawful activities pending full compliance with the law is consistent with the fundamental public interests of public and environmental health, economic efficiency, and the rule of law. This heavily favors interim injunctive relief.

**D.** **Considering the Balance of Hardships, an Interim Injunction on Issuance of New Leases Pending NEPA Compliance Is Warranted.**

If irreparable environmental harm "is sufficiently likely, … the balance of harms will usually favor the issuance of an injunction to protect the environment." *Village of Gambell*, 480 U.S. at 544. "Irreparable environmental injuries outweigh the temporary delay" of operations pending compliance with NEPA. *Connaughton*, 752 F.3d at 766. "A third party's potential financial damages from an injunction generally do not outweigh potential harm to the environment." *Fry*, 408 F. Supp. 2d at 1034.

Here, temporary delay would not result in substantial harm to the intervenor coal companies, Squillace Decl., ¶11, aside from curtailing uncompetitive practices and speculation. *See id.* ¶7. BLM's historical anti-competitive leasing practices have already allowed the coal companies to amass sufficient coal reserves to assure continued, uninterrupted strip-mining for decades. *See id.* ¶5-10; Anderson Decl., ¶20 (identifying leased coal at all mines in planning areas). The Department of the Interior recognized this in 2016 when it imposed a moratorium on further coal leasing pending a programmatic review. Squillace Decl., ¶10."The recoverable reserves of Federal coal currently under lease are estimated to be sufficient to continue production from federal leases at current levels for 20 years…." Anderson Decl., ¶21 (quoting Sec. Or. 3338). Thus, a temporary halt in coal leasing—for

approximately one year—would not cause substantial harm to the coal companies. Squillace Decl., ¶¶10-11.[7]

On the other hand, allowing continued, unlawful coal leasing and development pursuant to unlawful plans would allow the coal companies to obtain vested rights to federal coal in the absence of a lawful, programmatic analysis, including the full impacts of strip-mining and combustion of the coal from the planning areas. *See Conner*, 848 F.2d at 1451 (leases constitute irreversible commitment of resources). Further, the harm from strip-mining and combusting coal in the planning areas dramatically outweighs any benefits from such activities. Howard Decl. at 37-41.

Similarly, oil and gas leases confer "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold." 40 C.F.R. § 3101.1-2. Once sold, the lease purchaser has the exclusive right to use as much of the leased lands as is necessary to explore and drill oil and gas within the lease boundaries. Oil and gas leases are issued for a primary term of 10 years, and may be extended beyond the primary term. 30 U.S.C. § 226(e). Presently, there are far more federal leases issued and

---

[7] The market for coal leases is depressed. No federal coal has been leased since the unlawful plans were approved; however, there are multiple leases pending in the planning areas. Fix Decl., ¶10; Anderson Decl., ¶11.

acres committed to oil and gas than there is production. Anderson, Decl., ¶23. For example, in 2017, Wyoming had 13,095 leases in effect covering 8,349,353 acres, but less than half of the area was in production. Similarly, in Montana there were 2,561 leases covering 1,983,369 acres, but only 1,431 leases and 710,497 acres were in production. *Id.* Like the coal industry, the oil and gas industry holds a vast surplus of federal leases and acres across Wyoming and Montana. Any delay in continued leasing during the pendency of supplemental environmental review would not result in significant harm to the industry, as evidenced by BLM's recent deferrals.

Given the massive amounts of fossil fuels that have already been leased in the planning areas (but not yet mined or drilled), issuance of an interim injunction pending remand to prevent (1) further leasing; and (2) development of leases issued under the unlawful plans would not result in significant harm to the fossil fuel industry. By contrast, the harms from continued fossil fuel leasing and development under the plans weighs heavily in favor of an interim injunction.

## II.    The Court Should Vacate Those Portions of the Plans Related to Fossil Fuel Management.

Vacatur is the presumptive remedy for APA violations. *See* 5 U.S.C. § 706(2); *see also Klamath-Siskiyou*, 109 F. Supp. 3d at 1239 ("Vacatur is the standard remedy for unlawful agency decisions."). Here, it would be improper to vacate the Record of Decision in its entirety. *See* Doc. 111 at 48-49. Instead,

Conservation Groups request that the Court vacate only those portions of the contested plans that that relate to the management of fossil fuels resources in the planning areas—Management Direction MIN 1, MIN 11, and MIN 12 in the Miles City Plan; and Coal-2001; and O&G-2002 and O&G-2007 in the Buffalo Plan. Preparation of supplemental EISs further ensures that BLM complies with the robust public participation provisions of NEPA, including scoping processes and public comment opportunities. 40 C.F.R. §§ 1501.7, 1503.1, 1506.10. This relief is well within the Court's broad discretion to craft an appropriate remedy. *High Sierra*, 390 F.3d at 641 (affirming broad remedial order requiring agency to undertake programmatic NEPA review of cumulative impacts of permits). Vacatur of these portions of the plans and Record of Decision is necessary to assure that the NEPA review process on remand is not a pro-forma exercise in support of a "predetermined outcome." *Fry*, 408 F. Supp. 2d at 1038; *accord Diné CARE v. OSM*, No. 12-cv-1275-JLK, 2015 WL 1593995, at *3 (D. Colo. Apr. 6, 2015) (vacating approval of mining operations in mine expansion area to assure "compliance with NEPA" would not become "a mere bureaucratic formality"); *MEIC*, 2017 WL 5047901, at *6 (vacatur appropriate because "error lies at the heart of NEPA's requirement that agencies make informed decisions"); *see also* 40 C.F.R. § 1506.1(c).

Finally, Conservation Groups do not object to the 16-month timeline proposed by BLM for conducting new coal screens, revising the unlawful plans, and issuing a new Record of Decision, so long as the public participation opportunities outlined by BLM are met. (Docs. 114, 114-1, 114-2.)

## CONCLUSION

BLM violated NEPA by ignoring the harms caused by the development and combustion of fossil fuels in the planning areas, which constitute the Nation's largest fossil fuel producing basin by production. The undisputed evidence demonstrates that this overlooked harm is overwhelming, justifying broad injunctive relief to maintain the status quo pending supplemental environmental review, and partial vacatur of the plans to ensure the remand is more than a paper exercise. Conservation Groups respectfully request the relief detailed above. *See supra* Introduction and Part II.

Respectfully submitted this 25th day of May, 2018.

/s/ Shiloh Hernandez
Shiloh S. Hernandez (MT Bar No. 9970)
Laura H. King (MT Bar No. 13574)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4861
Ph: (406) 204-4852
hernandez@westernlaw.org
king@westernlaw.org

*Counsel and Local Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**[8]

I, the undersigned counsel of record, hereby certify that this brief is double-spaced, has a typeface of 14 points, and contains 4,964 words. I relied on Microsoft Word to obtain the word count.

/s/ Shiloh Hernandez
Shiloh S. Hernandez

---

[8] *See* Fed. R. Civ. P. 5(d)(1)(B) (eliminating certificate of service for electronic filing).